UNITED STATES DISTRICT COURT

WESTERN DISTRICT OF MICHIGAN, SOUTHERN DIVISION


UNITED STATES OF AMERICA                    Case No. 1:08-cr-274

vs.                                         Grand Rapids, Michigan
                                            March 18, 2010
EMOND DUREA LOGAN,                          10:03 a.m.

            Defendant.                      HON. PAUL L. MALONEY
_____/


ARRAIGNMENT AND DETENTION HEARING
BEFORE THE HONORABLE JOSEPH G. SCOVILLE
UNITED STATES MAGISTRATE JUDGE


APPEARANCES:

For the Government:        Mr. Brian P. Lennon
                           United States Attorney's Office
                           The Law Building - Fifth Floor
                           330 Ionia Ave., NW
                           Grand Rapids, MI  49503
                           (616) 456-2404


For the Defendant:         Mr. Leo James Terrell
                           Attorney at Law
                           8383 Wilshire Blvd., Ste. 920
                           Beverly Hills, CA  90211
                           (323) 655-6909

<u>I N D E X</u>

<u>WITNESSES - GOVERNMENT</u>:                                    <u>PAGE</u>

Daniel Zolnai

        Direct examination by Mr. Lennon        18
        Cross-examination by Mr. Terrell        51
        Redirect examination by Mr. Lennon      73
        Recross-examination by Mr. Terrell      80


<u>WITNESSES - DEFENDANT</u>:

None

| <u>EXHIBITS</u> | <u>MARKED</u> | <u>RECEIVED</u> |
|---|---|---|
| DX#1 - Affidavit | 20 | |
| DX#2 - 2006 income tax return | 33 | |
| DX#4 - Photographs | 50 | 51 |
| DX#5 - 2007 income tax return | 46 | |
| DX#6 - 2002 income tax return | 78 | |
| DX#7 - 2003 income tax return | 79 | |

1          Grand Rapids, Michigan

2          Thursday, March 18, 2010 - 10:03 a.m.

3          THE COURT:  Case number 1:08-cr-274, United States

4    versus Emond Durea Logan.  Defendant appears in court with

5    counsel, Leo Terrell.  Mr. Lennon on behalf of the government.

6          This is the time set for arraignment on the Second

7    Superseding Indictment and for hearing on the question of

8    detention.

9          Mr. Terrell, if you and your client would step up to

10   the lectern for arraignment, please.

11         MR. TERRELL:  Your Honor, may I -- I'm sorry, I want

12   to make sure I follow proper protocol.

13         For arraignment, the defendant was hoping to continue

14   the arraignment date.

15         THE COURT:  He doesn't want to enter a plea today?

16         MR. TERRELL:  No, your Honor, that wasn't his

17   intentions to enter a plea today.  He was hoping to enter a plea

18   at a later date.  He's not in a position to enter it.

19         THE COURT:  Well, not even a not guilty plea or to

20   stand mute?

21         MR. TERRELL:  Your Honor, we're willing to enter a

22   not guilty plea but he wanted to continue the arraignment date

23   but --

24         THE COURT:  What would be the -- what would be the

25   grounds for not having the defendant arraigned today?

1          MR. TERRELL:  Your Honor, there are other members of

2    his family that are going to be arraigned on April 5th, I

3    understand, an arraignment date --

4          THE COURT:  Okay.

5          MR. TERRELL:  -- April 5th before this judge, before

6    this Court at, I believe, 1:30.  He was hoping to continue the

7    arraignment date to that date.

8          THE COURT:  Is he hoping or are you hoping?

9          MR. TERRELL:  He would like to continue the

10   arraignment date to the 5th of April.

11         THE COURT:  Why?  Just because other members of the

12   family are -- what we do in arraigning people in cases in our

13   court is to inform them of the charge and enter a not guilty

14   plea.

15         MR. TERRELL:  Yes, your Honor.  Your Honor, then

16   we'll -- my client will enter a not guilty plea.

17         THE COURT:  All right.  Good.  That's all that ever

18   happens anyway.

19         MR. TERRELL:  Okay.

20         THE COURT:  All right.  But since he has really not

21   appeared formally on this matter except without counsel.

22         Mr. Logan, I'm sure you understand that you have now

23   been named in the Second Superseding Indictment in this case,

24   1:08-cr-74.  Have you seen the Second Superseding Indictment?

25         THE DEFENDANT:  Yes.

1          THE COURT:  The other case, the 09 case, has been

2     dismissed, and we'll get into that perhaps a little more as this

3     proceeding goes on.

4          But you have now been named in a two-count Second

5     Superseding Indictment that charges you, first of all, with being

6     part of the conspiracy to distribute and to possess with intent

7     to distribute powder cocaine.

8          Have you read this Indictment?

9          THE DEFENDANT:  Yes, I have.

10          THE COURT:  Count 1 alleges that beginning on some

11     unknown date in the mid-1990s and continuing until some unknown

12     date in 2009 that you and one or more of the other people named

13     in here combined, conspired, and agreed together, and with Alvin

14     Keith Jackson, Donny Charles, Lindell Brown, Felicia Blake and

15     perhaps others, to intentionally distribute or possess with

16     intent to distribute five kilograms or more of a mixture or

17     substance containing powder cocaine, a Schedule II controlled

18     substance.

19          Do you understand the nature of that charge?

20          THE DEFENDANT:  Yes.

21          THE COURT:  If convicted of this offense either after

22     a plea of guilty or a trial, you face a mandatory minimum ten

23     years in prison, a maximum of life imprisonment, a period of at

24     least five years thereafter of supervised release which is like

25     parole -- five years is the minimum, the maximum is life on

supervision -- a maximum fine of $4 million, and the Court must impose a $100 special assessment.

Do you understand those penalties?

THE DEFENDANT: Yes.

THE COURT: Then Count 2 alleges that you were part of a money laundering conspiracy.

It alleges that beginning sometime again in the mid-1990s and continuing through about December 2nd, 2009, that you and one or more of the other people named here, knowing that certain property involved the proceeds of some form of unlawful activity, namely, the distribution of cocaine and conspiracy to distribute cocaine, knowingly, intentionally, and unlawfully combine and conspired together and with Lyndell Brown, Donny Charles, Felicia Blake, Tamara Hughes, and/or Kevin Emerson and other persons to conduct and cause to be conducted financial transactions which involved the proceeds of that unlawful activity or the alleged drug dealing with the intent to promote the carrying on of that unlawful activity or to conceal and disguise the nature, location, source, ownership and control of the proceeds, and to avoid transaction reporting requirements under federal law.

Then Count 2 goes on to allege the methods by which the government claims this conspiracy was carried out and identifies the property that was allegedly involved in the money laundering conspiracy.

1          Do you understand the nature of that charge?

2          THE DEFENDANT:  Yes.

3          THE COURT:  If convicted of this offense you face up

4    to 20 years in prison, a fine of up to $500,000 or twice the

5    value of the property involved, whichever is greater -- and in

6    this particular case twice the value of the property involved may

7    well be greater than $500,000 -- up to three years of supervised

8    release, and a mandatory $100 special assessment.  Do you

9    understand those penalties?

10          THE DEFENDANT:  Yes.

11          THE COURT:  Then, in addition, there are extensive

12   forfeiture allegations that start on page 17.

13          In this proceeding the government seeks to forfeit

14   any right, title, or interest that you might have to any of the

15   property that is listed here including named bank accounts, real

16   property, personal property or any property that is traceable to

17   those things on the theory that these things are the proceeds --

18   represent the proceeds of unlawful activity, the proceeds of drug

19   dealing or were used to facilitate drug dealing.

20          In addition to all that the government seeks a

21   judgment in the amount of $136 million which the government

22   claims is the aggregate monies received in exchange for the

23   distribution of controlled substances.

24          Do you understand what that's all about?

25          THE DEFENDANT:  Yeah.

1        MR. TERRELL:  Your Honor, excuse me, did you say

2   Count 2 or Count 3 he was charged with?  One and three I believe.

3        THE COURT:  Well, you're absolutely right.

4        MR. TERRELL:  Yes, your Honor.

5        THE COURT:  Thank you.

6        MR. TERRELL:  No problem, your Honor.

7        THE COURT:  It's Count 3 that you're --

8        MR. TERRELL:  Yeah, it's not Count 2, your Honor.

9        THE COURT:  There are two money laundering

10  conspiracies here, two and three, and your counsel is absolutely

11  correct, it's three that you are alleged to be part of, and that

12  has to do allegedly with you, Caroline Epps Logan, Martell D.

13  Logan, and Sharon Logan.  The nature of the conspiracy is the

14  same but the property involved and the methods and means involved

15  are different, so I apologize for that mistake.

16        And this allegedly started sometime in 2004 and went

17  through September 2009.  Do you understand the nature of that

18  charge?

19        THE DEFENDANT:  Yes.

20        THE COURT:  All right.  Before calling upon you to

21  enter your plea I'll review with you certain of your

22  constitutional rights.

23        First, you have the right to the assistance of

24  counsel at every stage of the case against you.  As I informed

25  you before if you could not afford to hire counsel the Court

1  would appoint counsel for you, but you've indicated that you wish

2  Mr. Terrell to represent you in this matter; is that correct?

3           THE DEFENDANT:  Yes.

4           THE COURT:  You've hired him to do that.  You are

5  presumed by the law to be innocent of all charges until proven

6  guilty.  The government has the burden of proving you guilty

7  beyond a reasonable doubt.  Do you understand that?

8           THE DEFENDANT:  Yes.

9           THE COURT:  You have the right to plead not guilty.

10 If you do then you'll have a trial by jury and the jury will

11 decide whether or not you're guilty.  At your trial you'll have

12 certain rights including the right to counsel at every stage of

13 the case, the right to confront and cross-examine the witnesses

14 against you with counsel's help.

15          You'll have the right to present a defense and to

16 compel witnesses to testify.  You'll have the right to testify if

17 you wish or to remain silent as you desire.

18          If, however, you plead guilty then you give up most

19 of these rights.  If you plead guilty you will not have a trial

20 of any kind and the only further proceeding in the case will be

21 sentencing.

22          If you understand these rights I'll ask you to read

23 and sign the Rights Form.

24          THE DEFENDANT:  Yes, I do.

25          THE COURT:  And, Mr. Terrell, you indicated that your

1  client wishes to enter a plea of not guilty?

2          MR. TERRELL:  Yes, as to Count 1 and Count 3, your

3  Honor.

4          THE COURT:  A plea of not guilty is entered.  Both

5  have a seat.

6          MR. TERRELL:  Thank you, your Honor.

7          THE COURT:  We have this matter of detention but, Mr.

8  Terrell, we also have this question, and I'm not sure where this

9  is going to land, that was raised I believe the first time your

10 client was in court, and that is that you've entered appearances

11 for more than one defendant in the case raising the question of

12 possible conflict of interest.

13         And I wondered, first of all, whether you plan to

14 represent all of these people or whether there's some process

15 that you have in mind for getting them other counsel, and if you

16 do wish to represent more than one then what you had in mind with

17 regard to this conflict of interest question.

18         MR. TERRELL:  Thank you, your Honor.  May I respond,

19 please?

20         THE COURT:  Yes.

21         MR. TERRELL:  Thank you, your Honor.

22         I know the other day I received a call from the U.S.

23 Attorney regarding his intention to raise this issue.  I didn't

24 know if he was going to -- it was going to be brought up today at

25 this hearing, however --

1          THE COURT:  Well, excuse me, I didn't want to

2     interrupt you, but I'm not going to resolve it today.

3          MR. TERRELL:  Okay, fine.

4          THE COURT:  I just want to know where it's going.

5          MR. TERRELL:  Yes, your Honor.  It's my intention,

6     your Honor, to represent Mr. Emond Logan.

7          There is a process in place where I might represent

8     an additional member of the family but there is a process in

9     place currently where they may be seeking other representation.

10    I did appear briefly for the purposes of the -- so that's

11    basically what I would like to limit my comments to.

12         THE COURT:  Okay.  We sometimes have the situation

13    where one counsel is in the case at the very beginning until --

14         MR. TERRELL:  Yes, your Honor.

15         THE COURT:  -- other counsel can be sorted out and

16    that's generally fine, but if it does come to pass that you will

17    be representing more than one then we are going to have to look

18    into it very carefully and see whether that's going to be

19    allowed.

20         MR. TERRELL:  Yeah, and the Court's comments about my

21    initial representation at this early stage is basically exactly

22    what I'm performing in this current stage, and definitely at the

23    critical stage of there is at a later point that may need to be

24    reevaluated, but there are plans in the works to make sure that

25    there is separate representation for other members of the Logan

1  family, your Honor.

2          THE COURT:  All right.  Good.  Thank you.

3          MR. TERRELL:  Thank you, your Honor.

4          THE COURT:  Mr. Lennon, can you shed any light on

5  this?

6          MR. LENNON:  I can, your Honor.  Yes, we flagged this

7  issue actually quite some time even when this case, the potential

8  issue of conflict, even when the case was still before Judge

9  Jonker.

10         We are about 90 percent done with a brief which is a

11  notice of conflict of interest request for a hearing on the

12  status of counsel, and the reason that it's not completed is two-

13  fold.  One is we were waiting for the jail tapes of Mr. Logan's

14  from the weekend from the time he signed a plea agreement to the

15  time he withdrew that plea agreement.

16         The government's contention is is that we believe

17  even though Mr. Terrell was not representing Mr. Emond Logan --

18  he had been denied that by Judge Jonker -- he was representing

19  now co-defendant Martell Logan.

20         And the government is -- we're proceeding cautiously.

21  We're going to provide a copy of the tapes to Mr. Emond Logan's

22  prior counsel, Mr. Zambon, to have him review that.  But we

23  believe there is a clear conflict and it has already come to

24  fruition because, with all due respect to Mr. Terrell, we believe

25  he had a duty of loyalty to his client, Martell Logan, and the

1   filing that said he was representing him in the criminal

2   forfeiture matter and said so in open court.

3           And the plea agreement that Mr. Emond Logan withdrew

4   had a no prosecution agreement for Martell Logan.  So the

5   government contends that Mr. Terrell has already acted against

6   the interest of one of his clients, Martell Logan, we believe by

7   counseling Mr. Emond Logan to withdraw the plea.

8           Now, I say that, your Honor, only because of the e-

9   mail traffic between Mr. Logan and I which will be attached to

10  our brief but we, hopefully, will confirm that with the jail

11  tapes we believe.  We just received them this morning.  We're

12  going to have Mr. Zambon look at them.

13          So I know the Court is not going to resolve this

14  issue --

15          THE COURT:  Right.

16          MR. LENNON:  -- and the Court really -- it's really

17  not an issue.  I mean, we don't know until the other defendants

18  appear what the situation is going to be, but I did need to

19  highlight the Court and Mr. Terrell because I called his office

20  and did not receive a response.  Pursuant to the local rule I

21  wanted to see if he would agree with my motion.  I'm assuming he

22  doesn't.

23          But the government contends that there is already a

24  pure conflict, and we're relying on the case of United States vs

25  Hall where defense counsel tried to represent two brothers who

1  had very different interests.  One was looking at life; one was

2  looking at a very lower sentence.  Both went to trial, and it was

3  reversed in part because when two defendants have so completely

4  different and juxtaposed interests jury representation is

5  difficult.

6          In this case Mr. Terrell has filed actually a

7  dispositive brief with respect to all four Logans.

8          Now, in an abundance of caution I have alerted the

9  Federal Public Defender's Office that there may be an affidavit

10  coming from the other Logans seeking court-appointed counsel

11  because with them flying in from California on the 5th, again to

12  accommodate their schedules giving them some time to get their

13  affairs in order, we're hoping to keep their visit here to an

14  arraignment.

15          So I don't know what the status is of that.  I've not

16  seen any appointments made by the defender's office.  The only

17  thing we have right now is essentially Mr. Terrell filing a Rule

18  12 motion on behalf of all four Logans, and in this case filing

19  this motion for bond with respect to Emond Logan.

20          THE COURT:  What does Mr. Zambon have to do with

21  this?

22          MR. LENNON:  Well, your Honor, I was concerned that

23  Mr. Terrell had made some representations that he had already

24  been retained by the family.  So I was reluctant myself, and my

25  investigators listened to the phone call between the defendant --

we believe, we just got the tapes today -- and Mr. Terrell.  So the thought was instead of having a tape team in my office that we would just allow -- provide Mr. Zambon with a copy of the tapes and maybe over-thinking things.

THE COURT:  Well, he's not counsel in this case. He's not counsel -- you dismissed the other case?

MR. LENNON:  Correct.

THE COURT:  He's not getting paid.  He's -- the Court hasn't appointed him to do anything.  So, I mean, I'm not telling you what to do but I don't know what good that's going to do you to have a former lawyer in a former case look at anything.

MR. LENNON:  I talked this issue with our ethics -- and so we're still working it out but that was the preliminary advice from our ethics advisor in the office that we should contact Mr. Zambon.

I mean, the argument is that Mr. Terrell over that weekend was not his counsel.  I mean, he had been denied substitution of counsel so, but just I wanted to proceed cautiously.  I didn't want there ever to be a claim that there was some kind of Sixth Amendment violation here.

So we may go the a tape team instead, have some lawyers instead review those phone calls in our office who are not involved in this case.

But our concern is is there is actually a conflict at this point because, at least under the Michigan Rules of

1  Professional Responsibility, that Mr. Terrell's acknowledged

2  representation of a co-defendant, Martell Logan, and this was

3  both in open court and in pleading that I have, may have already

4  been violated because Mr. Emond Logan may have been advised to

5  turn down a plea agreement that had a no prosecution clause for

6  Mr. Martell Logan.

7           THE COURT:  Okay.

8           MR. LENNON:  So we're going to file something in

9  writing.  I'm just letting the Court know, and I know the Court's

10 not going to decide it but wanted to make all parties aware of

11 that.

12          THE COURT:  Okay.  And that's probably more than I

13 need to know, and I knew that that long speech was going to

14 provoke a response.

15          MR. TERRELL:  Thirty seconds.

16          THE COURT:  It's sort of hard for you not to respond.

17 So, of course, I'll let you speak.

18          MR. TERRELL:  Thirty seconds.  Your Honor, I think

19 it's also important, as I heard my colleague speak, that there

20 was a motion before Judge Jonker, and the issue of this

21 representation that I may have had with Mr. Logan was limited to

22 this criminal forfeiture hearing, and Judge Jonker made comments

23 on that which I think are quite relevant.

24          But at the point of this plea offer that was made the

25 government had no indictment against Mr. Martell Logan, and this

1  representation allegedly that I had limited to a criminal

2  forfeiture hearing for Mr. Logan I don't think -- well, I don't

3  think is relevant to my representation of him of a matter that he

4  was not charged with at that point.

5          But again, your Honor, I just wanted to make that

6  response.

7          THE COURT:  Okay.  All right.  Well, as I said, I'm

8  not going to decide this today and I'm not sure that I'll be the

9  person to ultimately decide it anyway but I just wanted to make

10 sure that this was on a track for resolution.

11         MR. TERRELL:  Yes, your Honor.

12         THE COURT:  Because we can't have alleged conflicts

13 of interest spinning around out there in a criminal case and not

14 being addressed.  All right.

15         Mr. Lennon, the defendant has never had a detention

16 hearing in this case, and as far as I'm concerned the old case is

17 dead --

18         MR. LENNON:  Yes.

19         THE COURT:  -- and I'm a little puzzled as to why the

20 defendant has been in custody for almost a month now without a

21 hearing.

22         But, be that as it may, the point is that I think we

23 start over again now so I'll hear from you on the question of

24 detention first.

25         MR. LENNON:  And, your Honor, the government would

1  agree that we do start over but this Indictment came down the end

2  of February, and I believe there was -- Mr. Logan asked for court

3  -- asked for retained counsel and when we came back he still

4  didn't have it, and I'm assuming we're here today to accommodate

5  Mr. Terrell's schedule as well.

6             So the government is intending to proceed as if we

7  have the burden to establish by a preponderance of the evidence

8  that Mr. Logan is serious risk of flight and by clear and

9  convincing evidence he's a danger to the community and we intend

10 to carry those burdens today.

11            We have one witness to call, Dan Zolnai, Lansing

12 police department.

13            DANIEL ZOLNAI, GOVERNMENT'S WITNESS, SWORN

14                        DIRECT EXAMINATION

15 BY MR. LENNON:

16 Q     Good morning.

17 A     Good morning.

18 Q     How are you employed?

19 A     I'm employed by the City of Lansing, Lansing Police

20 Department.

21 Q     How long have you been with the Lansing Police Department?

22 A     With the Lansing Police Department over 15 years.

23 Q     And before then law enforcement experience?

24 A     Yes.

25 Q     With who?

1  A     With Michigan State for 11, and Newaygo County for less

2  than a year.

3  Q     Now, and you're a sergeant with the Lansing Police

4  Department?

5  A     I am a sergeant with the Lansing Police Department.

6  Q     Is your current assignment now in the jail of the Lansing

7  police?

8  A     It is.

9  Q     When did you start that current assignment?

10 A     September.  September of 2009.

11 Q     All right.  And before then where were you assigned?

12 A     I was on patrol, and then just prior to that I was sergeant

13 that was in charge of the Special Operations Section.

14 Q     And is that the Special Operations Section, is that the one

15 involved in mostly drug interdiction in the Lansing area?

16 A     Yeah, that's correct.

17 Q     And what kind of responsibilities did you have with the

18 Special Operations Section?

19 A     We had a myriad of tasks that we had to deal with,

20 primarily things that affected the City of Lansing involving

21 narcotics trafficking, vice, things of that nature.

22 Q     So it wasn't limited just to drugs?

23 A     No.

24 Q     And at some point did you run that section?

25 A     I did.

1  Q     Do you recognize the defendant, Mr. Emond Logan?

2  A     I do.

3  Q     Did you participate in the execution of search and seizure

4  warrants at his home in September 2009?

5  A     I did.

6  Q     Have you been involved in the investigation prior to the

7  execution of those search warrants?

8  A     Yes.

9  Q     And who is Steven Toth?

10 A     Steven Toth is a special agent with the Alcohol, Tobacco,

11 Firearms, and Explosives.

12         MR. LENNON:  May I approach, your Honor?

13         (Government Exhibit No. 1 marked.)

14 BY MR. LENNON:

15 Q     I'm showing you what's marked as Government Exhibit 1 for

16 identification.  A copy has been given to Mr. Terrell.  I've got

17 a copy for the Court as well.  Do you recognize that?

18 A     I do.

19 Q     And what is Government Exhibit 1?

20 A     It's an affidavit of ATF Special Agent Steven Toth with

21 regards to I think it's seizures.

22 Q     Now Special Agent Toth mentions in here that before

23 swearing this out he's had conversations and discussed the

24 content of this with you?

25 A     Yes, he has.

1  Q      Have you had a chance to read this?

2  A      I've had a chance to go over it, yes.

3  Q      Would you adopt that as your preliminary testimony today?

4  A      Yes, I do.

5          MR. TERRELL:  Objection, your Honor, it's lack of

6  speculation, calls for foundation -- lack of foundation, calls

7  for speculation on the part of this witness.  Hasn't established

8  he even read the document, and the relevance of it I don't

9  understand.

10         THE COURT:  Well, first of all, you said you looked

11 at it and you didn't read it.

12         THE WITNESS:  If I can clarify, your Honor.

13         THE COURT:  Yeah.

14         THE WITNESS:  I did read it.

15         THE COURT:  Okay.  Well --

16 BY MR. LENNON:

17 Q      Let's talk about when you read it.

18         MR. LENNON:  I'm sorry, your Honor.

19         THE COURT:  Go ahead.

20 BY MR. LENNON:

21 Q      Well, let's back up.  You understand that this was issued

22 to the Court essentially in September, the fall of 2009?

23 A      That is correct.

24 Q      And before Special Agent Toth took it to the Court, did you

25 read it at that point?

1  A     I did.

2  Q     Now, did you read it from then till now have you read it?

3  A     Yes, I have.

4  Q     Okay.  And when was the last time you read that document?

5  A     Prior to coming into this courtroom, sir.

6           THE COURT:  All right.  The objection is overruled.

7  The Court may take into consideration affidavits and other

8  hearsay in the context of a detention hearing.

9           Go ahead.

10  BY MR. LENNON:

11  Q     And does that fairly -- Government Exhibit 1 fairly

12  summarize the background of how the Lansing Police Department got

13  to California in September of '09 to the arrest of the defendant,

14  Mr. Logan?

15           MR. TERRELL:  Your Honor, that's vague and calls for

16  a conclusion.  Again, lack of foundation with this witness.  I

17  mean, he's asking --

18           THE COURT:  Overruled.

19           Go ahead.

20           THE WITNESS:  It does, your Honor.

21  BY MR. LENNON:

22  Q     And so were you personally involved -- it mentions the Ahh-

23  Dee-Ahh drug organization that operated in Lansing -- were you

24  personally involved in the investigation and prosecution and

25  dismantlement of Ahh-Dee-Ahh?

1  A     I was.

2  Q     And that Government Exhibit 1 also talks about what went on

3  after the dismantlement of Ahh-Dee-Ahh; is that correct?

4  A     That is correct.

5  Q     In the course of that investigation did you identify some

6  drug traffickers in the Detroit area who were supplying the

7  cocaine?

8  A     Yes.

9  Q     And does it describe how that investigation led to the

10 arrest and prosecution of Alvin Jackson?

11 A     Yes, it does.

12 Q     In the course of your investigation do you know what

13 relation, if any, Alvin Keith Jackson has to this defendant?

14 A     Alvin Keith Jackson's wife, Lisa, I believe, Buchanan,

15 Jackson-Buchanan, his wife and Emond Logan's wife, Caroline, are

16 sisters.

17 Q     So would you say that Alvin Keith Jackson is Mr. Logan's

18 wife's brother-in-law --

19 A     Correct.

20 Q     -- is that accurate?  The affidavit describes a number of

21 individuals who've been cooperating with law enforcement; is that

22 correct?

23 A     That is correct.

24 Q     Was Alvin Keith Jackson one of those individuals?

25 A     Yes, he was.

1  Q    Who, if anyone, debriefed Alvin Keith Jackson?

2  A    I debriefed Alvin Keith Jackson.

3  Q    And was that just on one debriefing or several?

4  A    Several.

5  Q    Can you describe during that debriefing did Alvin Keith

6  Jackson describe his relationship with respect to drug

7  trafficking with the defendant?

8  A    He did.

9  Q    Can you summarize that for the Court, please?

10 A    Alvin Keith Jackson advised me that he was approached by

11 Emond Logan to transport cocaine to Michigan, and that Emond

12 Logan would pretty much terminate his current employment and

13 obtain a tractor trailer semi-truck and would transport the kilos

14 of cocaine for Alvin Jackson.

15           He said that that did occur.

16           THE COURT:  I understand what you just said.  You

17 used too many "he's" and I don't know who's doing what.  Please

18 start over.

19           THE WITNESS:  Okay.

20 BY MR. LENNON:

21 Q    What role did Alvin Keith Jackson admit that he did with

22 respect to this drug trafficking operation?

23           MR. TERRELL:  Relevance to Alvin Jackson.

24           THE COURT:  Overruled.

25           Go ahead.

1          THE WITNESS:  Alvin Jackson was a drug supplier.  He

2    obtained the cocaine from a Mexican connection.  He needed a

3    means to transport it to Michigan.  Emond Logan offered his

4    services to transport the kilos of cocaine to Michigan for Alvin

5    Jackson.

6          Alvin Jackson said that that took place from 2004

7    pretty much through 2007.

8    BY MR. LENNON:

9    Q    Now, through 2007 or when was the ending date according to

10   Alvin Keith Jackson?

11   A    It would have been, the ending date would have been

12   January.

13   Q    So it was just into 2007; is that correct?

14   A    Correct, it was right at the beginning.

15   Q    And why did Alvin Keith Jackson say this -- well, let me

16   back up.  Did Alvin Keith Jackson describe how Mr. Logan

17   transported the cocaine?

18   A    He did.  He would transport it in his semi-tractor, and his

19   responsibility was --

20   Q    Whose semi-tractor?

21   A    Emond Logan's semi-tractor is a tractor that he had

22   obtained.  He transported the kilos of cocaine from California to

23   Michigan and then he subsequently transported the proceeds back

24   from Michigan to California.

25   Q    Did Alvin Keith Jackson personally deal with Mr. Logan in

1 Michigan as well?

2 A    He would be the only person that actually met with him on a

3 regular basis.  He would actually -- Alvin, excuse me, Alvin

4 Keith Jackson would obtain the cocaine, would meet with Emond

5 Logan, give him the kilos of cocaine.

6 Q    And where did that take place according to Mr. Jackson?

7 A    This was near Fontana in the Fontana area.  He had a --

8 Q    Is that California or Michigan?

9 A    It's in California.

10 Q    Okay.

11 A    He would give him the kilos of cocaine.  Emond Logan would

12 place them in his tractor trailer, transport them down, and --

13 Q    Down to where?

14 A    Down to Michigan.  Alvin Keith Jackson would fly to Chicago

15 at Midway Airport, rent a vehicle, and drive to the stash

16 location which was located in Southfield, Michigan.

17        A day or two after his arrival in Southfield,

18 Michigan, he'd receive a call from Emond Logan saying that he was

19 nearby and then they would meet.

20        They typically met at the same location which is near

21 Ann Arbor area -- it's a Wolverine truck, freight truck liner

22 place -- and the exchange would take place where --

23 Q    Now, when you say "exchange," what was given by whom to

24 whom?

25 A    Alvin would meet Emond Logan by himself.  He would take his

rental vehicle, go to this location, this pre-arranged location,
meet with Emond Logan. Emond Logan sometimes would have the
kilos of cocaine in duffle bags, sometimes he wouldn't, but
primarily he would.

Alvin Keith Jackson would take the bags of cocaine,
place them in his rental vehicle, and return to the stash
location in Southfield, Michigan, where they eventually were
distributed.

Once they obtained the money --

Q    Who's "they?"

A    The people that Alvin dealt with, Lindell Brown, Felicia
Poindexter or Blake, Tamara Hughes.

Q    Were these folks the ones who were distributing the
cocaine?

A    They were distributing in the Detroit area. They had
connections to people in Detroit that would purchase these large
quantities of cocaine.

Q    And was one of their suppliers the leaders of Ahh-Dee-Ahh
who took the cocaine then to Lansing?

A    That is correct. The organization was essentially the
leader of that Ahh-Dee-Ahh investigation. They transported the
kilos of cocaine to Lansing where it was distributed in the City
of Lansing.

Q    Now, how long based -- and you've talked to Ms. Blake,
Hughes, a number of individuals in this case; is that correct?

1  A    I've talked to them all.

2  Q    Generally how long would it take them to distribute this

3  quantity of cocaine?

4  A    They had some great connections so it'd typically only take

5  a couple days for them to go ahead and get rid of it, a week at

6  the most.

7  Q    And what kind of quantities according to Alvin Jackson and

8  the others was Mr. Logan bringing to Michigan?

9  A    Approximately 120 kilos a month, sometimes more.

10 Q    So what size loads were those and how many loads a month?

11 A    He would transport 60 kilos, approximately 60 kilos, per

12 load, and according to Mr. Alvin Keith Jackson the

13 transportations or the deliveries took place twice a month,

14 sometimes three times a month.

15 Q    What did Mr. Jackson tell you, Alvin Keith Jackson, as to

16 his compensation arrangement for Mr. Logan?  What was Mr. Logan

17 to receive during this time frame?

18 A    Mr. Logan knew exactly how many kilos were being

19 transported from California to Detroit, and the agreement was he

20 was to receive $800 per kilo.

21        Mr. Logan would typically take his cut prior to -- on

22 his way back he would take his cut out and give the rest to Alvin

23 Keith Jackson.

24 Q    Now, so if it's $800 a kilo and it's 60 kilos a time and

25 two times, let's use the most conservative, is that $48,000 a

1  load?

2  A      Yes.

3  Q      And you said this went on until January 2007 according to

4  Alvin Keith Jackson?

5  A      That is correct.

6  Q      What did Mr. Jackson say that happened of significance with

7  respect to this operation with Mr. Logan in or about Memorial

8  Day, 2006?

9  A      As I mentioned earlier, your Honor, Emond Logan's

10  responsibility was to transport the kilos to Michigan from

11  California and the proceeds back, and that Alvin Keith Jackson

12  would fly there from California to Chicago and rent a car and

13  then eventually fly back to California where he would receive the

14  money from Emond Logan.

15          He said on that particular date he had flown back and

16  then taken his family -- Alvin Keith Jackson had flown back and

17  taken his family to, I believe, it's Florida, maybe Miami, for a

18  vacation.

19          When he got back, returned back to California, Emond

20  Logan told him that they were stopped, "they" as in his vehicle

21  was stopped and it was driven by his cousin, Anthony.

22  Q      Whose cousin?

23  A      Emond Logan's cousin who was later identified as Anthony

24  Strange --

25  Q      Okay.

1  A    -- was stopped in New Mexico by the New Mexico police --
2  highway patrol, it wasn't clear -- but law enforcement.
3          And there was something wrong with Anthony Strange's
4  commercial driver's license.  They searched the vehicle and
5  discovered and seized $800,000 from the semi-truck.
6  Q    Now, again, is this the story that Alvin Keith Jackson told
7  you with respect to the information he heard from Mr. Logan?
8  A    That is correct.
9  Q    Okay.  So essentially he's saying according to Mr. Jackson
10 around Memorial Day 2006 Mr. Logan claimed that the police -- the
11 "dirty cops," essentially -- had seized the drug money; is that
12 correct?
13 A    That is correct.
14 Q    What did Mr. Jackson tell you with respect to whether he
15 believed the story?
16 A    He said he didn't believe it.  He actually was -- Emond had
17 shown him a citation which he felt was not an authentic citation
18 from a police department to support his claim that they were
19 stopped.  He didn't believe him, and he said that he would
20 monitor his spending habits.
21 Q    He would monitor --
22 A    Alvin Jackson would monitor Emond Logan's spending habits
23 but would continue to use him.
24 Q    What did Mr. Jackson say about this money?  Wasn't this,
25 the bulk of this money supposed to be paid back to the cartel?

1  A     The bulk of the money had to be paid back to the cartel.

2  Q     So just to be clear, according to Alvin Keith Jackson were

3  these cocaine kilos that were transported to Michigan, were they

4  fronted to him?

5  A     Yes, they were.

6  Q     Okay.  So he owed -- Alvin Keith Jackson said he owed the

7  Mexicans some money; is that correct?

8  A     That is correct.

9  Q     What, if anything, did he do to pay them back?

10 A     He continued the deliveries.  He reduced Emond Logan's

11 payment from $800 a kilo down to 400, and eventually were able to

12 pay off the Mexicans.

13 Q     Now, during the course of this investigation, and according

14 to Alvin Keith Jackson, how much money does he believe Mr. Logan

15 stole from him around Memorial Day 2006?

16 A     He said it was approximately over $800,000.

17 Q     In the course of the investigation have we obtained the

18 services of a financial investigator named Frank Scartozzi?

19 A     Yes.

20 Q     And was Frank Scartozzi tasked with doing some background

21 subpoenaing documents of bank and other information regarding Mr.

22 Logan?

23 A     Yes.

24 Q     What, if anything, did Mr. Scartozzi learn about Emond

25 Logan's banking habits from essentially the end of May 2006 to

1  mid-November 2006?

2  A    In a short time period he made 62 individual deposits

3  sometimes on the same day.  The amounts were at $9,000 on each

4  transaction.

5  Q    Now, I understand -- can you look at the attachment to the

6  affidavit?  Do you recognize that?

7  A    I do.

8  Q    Is that a compilation put together by Financial

9  Investigator Scartozzi?

10 A    It is.

11 Q    Now, it says "deposits."  Were these cash deposits or were

12 these check deposits?

13 A    These were all cash deposits.

14 Q    Okay.  And I assume these were into the various bank

15 accounts.  I think there's at least three listed here, is that

16 correct, a WestCom and a couple Wells Fargo accounts?

17 A    Correct.

18 Q    And these are then the dates and the amounts of those

19 deposits?

20 A    It is.

21 Q    Now, what was the total of these cash deposits between --

22 and these are accounts that were controlled by the defendant,

23 Emond Logan?

24 A    Yes.

25 Q    What was the total for the cash deposits from May 30th,

1  2006, to November 15th, 2006?

2  A      $527,200.

3  Q      I understand that also during the course of your

4  investigation you obtained some tax records from the IRS; is that

5  correct?

6  A      That is correct.

7  Q      And those would have been from the years essentially 2002

8  to 2007?

9  A      Correct.

10 Q      Have you had a chance to review Mr. Logan's income tax

11 return from 2006?

12 A      Yes.

13             (Government Exhibit No. 2 marked.)

14             MR. LENNON:  Your Honor, may I approach on Exhibit 2.

15 BY MR. LENNON:

16 Q      I understand that -- do you recognize that --

17 A      I do.

18 Q      -- Government Exhibit 2?  What is Government Exhibit 2?

19 A      That is a photocopy of a 1040 US Individual Tax Return for

20 2006 for Emond Logan as a joint with Caroline Logan.

21 Q      And what was the amount of income that was reported for

22 them that year?

23 A      It was $14,480.

24 Q      And so from that income tax is there any indication as to

25 where this $527,000 or so came from?  Is there any indication

1  from that income tax report?

2  A    No, there isn't.

3  Q    Does that include the business loss, if you will, for Mr.

4  Logan's Executive Transporting?  Is that included in that?

5  A    It is.

6  Q    Does it show that level of even gross receipts?

7  A    Yes.

8  Q    I'm looking at Profit and Loss of a Business, Schedule C,

9  line one.

10  A    It shows $124,164.

11  Q    Now, was there -- now, did Alvin Keith Jackson explain how

12  long it took him to be able to obtain all the funds to kind of

13  come even with his Mexican suppliers?  Do you recall how long it

14  took him?

15  A    I don't recall that.

16  Q    Okay.  Well, let's just move forward then.  So let's go to

17  the events of January 2007.  What, if anything, did Alvin Keith

18  Jackson tell you that happened in January of 2007 with respect to

19  Mr. Logan?

20  A    Alvin Keith Jackson said that he was meeting with Emond

21  Logan at that pre-arranged location, which is Wolverine Freight

22  Liner parking lot, with the intent on giving him the drug

23  proceeds to transport back to California.

24  Q    Do you recall -- and this was kind of -- was part of their

25  modus operandi?

1  A     That is correct.

2  Q     Did Mr. Jackson tell you how much he had at that time in

3  January, January '07?

4  A     He had over $1 million.

5  Q     What did Mr. Jackson say happened that was kind of out of

6  turn as to what was their normal procedure?

7  A     Mr. Jackson said that he had pulled into the lot and pulled

8  up near or next to Emond Logan's tractor rig.

9  Q     So Mr. Logan's tractor rig was already there at the lot

10 when Mr. Jackson arrived?

11 A     That is correct.

12 Q     What happened?

13 A     Mr. Emond Logan was out of the vehicle and was facing Alvin

14 Jackson who was still seated in his vehicle.  Alvin Jackson

15 noticed another vehicle pulled in to a tractor trailer that was

16 adjacent to them and that two individuals had gotten out of that

17 vehicle and were approaching his vehicle from behind.

18 Q     So according to Mr. Jackson, as this individual was

19 approaching his vehicle from behind where was Mr. Emond Logan

20 standing?

21 A     Mr. Logan was standing directly in front of Alvin Keith

22 Jackson facing to the back of Alvin's vehicle so he would have

23 view of anything that would be approaching from the rear.

24 Q     So according to Mr. Jackson Mr. Logan is standing right in

25 front of his car essentially blocking his path; is that correct?

1  A     That is correct.

2  Q     And looking to the rear where this man or men are

3  approaching?

4  A     That is correct.

5  Q     What happened next?

6  A     The individuals were wearing a hood and were armed with

7  guns.  And he looked at Emond --

8  Q     Who's "he?"

9  A     -- Alvin Jackson looked at Emond Logan and noticed that he

10 wasn't giving any indication that what was approaching from

11 behind and simply turned away and walked away.

12 Q     And what then did Mr. Jackson do?

13 A     Mr. Jackson eventually, when he was approached by these

14 individuals, took off, and when he took off several rounds were

15 fired and one struck him through the chest.

16 Q     Struck who in the chest?

17 A     Alvin Jackson in the chest.

18 Q     What did Mr. Jackson do after he was struck in the chest

19 with a bullet?

20 A     He drove out of the parking lot, eventually got in a

21 traffic accident nearby, and called his wife who he was unable to

22 get a hold of and then called Felicia Blake.  At this time --

23 Q     She's one of the co-defendants, at least unindicted co-

24 defendants, who's already pled guilty and cooperating?

25 A     That is correct.

1  Q    Okay.

2  A    She gave him directions to a particular location, a ramp to

3  pull over, and she had him follow her to Oakwood Hospital.

4  Q    Was Mr. Jackson treated and released for a gunshot wound to

5  his chest?

6  A    He was.

7  Q    And were police reports issued?

8  A    They were.

9  Q    And investigations done?

10 A    That is correct.

11 Q    I understand that Mr. Jackson, according to Ms. Blake, made

12 an excited utterance as he was trying to reach her with a bullet

13 in his chest?

14 A    That is correct.

15 Q    And do you recall what Ms. Blake has told you that Mr.

16 Jackson told her?

17 A    He told Ms. Blake that his brother-in-law had set him up

18 and he was shot.

19 Q    Now, had Ms. Blake heard about this brother-in-law, if you

20 will --

21 A    She had.

22 Q    -- prior to this?

23 A    Yes.

24 Q    And what, according to Ms. Blake, what was her

25 understanding of the role of his brother-in-law in their cocaine

1  conspiracy?

2  A    The only knowledge that she had with regards to the

3  brother-in-law at that point was that he was the person that

4  transported the kilos of cocaine from California to Michigan.

5  Q    Now, I understand that Mr. Jackson, it was not a life-

6  threatening wound, is that correct, to his chest?

7  A    Yes.

8  Q    He was eventually released from the hospital after a

9  relatively short stay?

10  A    Yes.

11  Q    What happened to the money that he was, according to Mr.

12  Jackson or others, that he was attempting to deliver to Mr.

13  Logan?

14  A    It was still inside of his rental vehicle.  He had told

15  Felicia to make arrangements to take care of the money.

16  Q    That's Felicia Blake?

17  A    Felicia Blake.  Felicia Blake contacted her husband, whose

18  name is King Twitty, and King Twitty came by, picked up the bag

19  of money and took it to their house.

20  Q    When you say "their house," that's Blake and Twitty's?

21  A    That is correct.

22  Q    Did Ms. Blake and/or Mr. Jackson, did anybody tell you what

23  Ms. Blake got for safeguarding the money?

24  A    Ms. Blake owed money to Alvin Jackson and Alvin essentially

25  dismissed a $70,000 loan or debt that she had with Alvin Jackson.

1  Q    And is that a drug debt, if you will?

2  A    It is a drug debt.

3  Q    Okay.  And, according to Mr. Jackson, was that the last

4  time that he was involved in drug trafficking with the defendant,

5  Mr. Logan?

6  A    That is correct.

7  Q    And that was January 2007?

8  A    That is correct.

9  Q    What happened in April of 2007 at Mr. Logan's home in

10 Riverside, California?

11 A    A search warrant was executed at his home.

12 Q    By whom?

13 A    It was a multi-jurisdictional investigation that included

14 Alcohol, Tobacco, Firearms and Explosives, and it was a gang

15 investigation and they went to -- they executed a search warrant

16 at the Springbrook address in Riverside belonging to Emond Logan.

17 Q    Have you had an opportunity prior to today to review an ATF

18 report from essentially that search warrant on April 12th, 2007?

19 A    I have.

20 Q    What, if anything, was located in Mr. Logan's house on that

21 date?

22 A    Numerous firearms, long guns, and handguns.

23 Q    What, if anything, did Ms. Logan acknowledge at the time

24 belonged to him, which firearms?

25 A    Well, Ms. Logan said that the long -- several of the long

guns or a couple of long guns belonged to her but she had no connection to the handguns.

Emond Logan said that the rest of them, they didn't belong to him but he was holding them for a friend, and he provided a name. They asked for this person's address. He said he didn't know. They asked for this person's phone number to contact him. He said he didn't know.

Q    And I understand that this resulted in a felon in possession conviction for Mr. Emond Logan?

A    That is correct. I believe he was still on -- he was a convicted felon at that time, excuse me, yes.

Q    And was he, okay, at the time he was a convicted felon when these guns were seized, April 12th, 2007?

A    That is correct.

Q    Do you know what his underlying felony was?

A    I believe it was strong armed robbery. I believe it may have started out off with armed robbery but it went down as strong armed robbery.

Q    And is that also from an admission made in that report by Mr. Logan?

A    Yes.

Q    Now, let's fast forward to September of 2009. I understand that again you said there was a financial investigator involved in this case?

A    That is correct.

1  Q    And on September 11, 2009, you were present in Mr. Logan's

2  house, that same house in Riverside, California --

3  A    I was.

4  Q    -- for the execution of a state search warrant and federal

5  seizure warrants?

6  A    Yes.

7  Q    Can you describe, well, first of all, let's back up.

8        This house on Riverside, prior to the search in

9  September of '09 what, if anything, did you learn about the

10 mortgage, if you will, on that house?

11 A    The mortgage had been paid off.

12 Q    And was this paid off -- do you remember how much the

13 payoff amount was?

14 A    I don't -- it was in the hundreds of thousands of dollars.

15 Q    And was this payoff done at about the same time all this

16 cash was being put in deposits into Mr. Logan's bank accounts?

17 A    That is correct.

18 Q    Now, so when you hit the house can you describe briefly

19 what this house looked like?

20 A    It was a beautiful home in Riverside, probably an upscale

21 home in the Riverside area.

22 Q    A pool in the back?

23 A    There was a pool, in-ground pool in the back.  It had a

24 place for an outdoor bar, things of that nature.

25 Q    Now, how was it furnished, and I'd like you to describe --

1 well, how was it furnished?

2 A    It had high end furniture, high end furnishings throughout

3 the house, I mean.

4 Q    I understand a number of pieces of personal property

5 belonging to both Mr. Logan and his wife were seized; is that

6 correct?

7 A    That is correct.

8 Q    And from the Indictment there's numerous handbags; is that

9 correct?

10 A    That is correct.

11 Q    Can you describe some of these handbags that were seized by

12 law enforcement?

13 A    We seized, I believe, over 42 handbags, purses.  These were

14 all designer purses.

15         Your Honor, the highest purse, the most expensive one

16 that we located still had the receipt there and it was purchased

17 for $14,000 for one handbag.

18 Q    Was there another one that -- at least one other that was

19 over $10,000?

20 A    That is correct.

21 Q    And did several of these have tags on them for $3,000-plus?

22 A    By and large the lowest end was in the $1,000 range.

23 Q    How many fur coats were seized;  do you recall?

24 A    I believe there was probably three, three or four fur

25 coats, and a stole.

1  Q     How many Rolex watches; if you recall?

2  A     Three to five Rolex watches were taken.

3  Q     I understand that there were a number of items of personal

4  property; is that correct?  What kind of automobiles did Mr.

5  Logan have at the time?

6  A     He had a Maserati, I believe it was a 2007 Maserati.  2010

7  Ford Mustang.  He had I believe a 2008 Mercedes hard top

8  convertible.

9  Q     What was the license plate on the back of that one?

10 A     That was "Mrs. CEO."

11 Q     And there were other vehicles seized in this investigation

12 as well that belonged to Mr. Logan, one being driven by his

13 daughter; is that correct?

14 A     Correct.  That was a Lexus SUV, and then there was a

15 Chrysler 300 that was driven by Emond Logan's wife's --

16 essentially his mother-in-law.

17 Q     And so all those were seized pursuant to federal seizure

18 warrants?

19 A     That is correct.

20 Q     Now, in the course of the investigation have any of the co-

21 conspirators who have been cooperating describe how the money was

22 actually packaged when it left the stash house and then was taken

23 eventually to California?

24 A     Yes.  The money itself was pretty much in stacks of 5,000,

25 and they were placed in food saver vacuum sealed bags, and this

1  all took place at the stash house off Carlton Street in

2  Southfield, Michigan.

3  Q      Now, I understand that at some point in your investigation

4  that stash house was kind of searched by law enforcement?

5  A      That is correct.

6  Q      Did you find a food saver wrapper in that house?

7  A      We found a food saver machine that sealed the wrappers or

8  the bags, and we found containers containing numerous bags.

9  Q      And you said you debriefed a lot of defendants.  Is one of

10 them Henry Swan?

11 A      Yes.

12 Q      What was Henry Swan's role in this investigation?

13 A      His primary role was to count the money.  That was his main

14 role.  He had some other roles but primarily he had to count the

15 money.

16 Q      Was he from California?

17 A      He was from California.

18 Q      And so he'd fly out to Michigan to count the money?

19 A      That is correct.

20 Q      And package it?

21 A      That is correct.

22 Q      What did Mr. Swan tell you that they tried to put the cash

23 in before it was food saver wrapped?  What kind of denominations

24 or what kind of totals?

25 A      He said they put them in $5,000 stacks.

1  Q     Did you find any evidence of cash in food saver wrappers in

2  Mr. Logan's house in September of 2009?

3  A     I did.

4  Q     Tell the Court about that?

5  A     In the course of searching the Springbrook address, which

6  is Emond Logan's house, I went into his walk-in closet --

7  Caroline Logan had her own walk-in closet -- and this particular

8  closet just had men's clothing in it.

9         I was searching one of the garment bags that

10 contained a suit.  At the bottom of the garment bag I located a

11 stack of currency totaling $5,000.

12        In the next garment bag I searched, at the bottom of

13 that I located some food savers, heat sealed or vacuum sealed

14 bags.  I had located that in that garment bag as well as he has a

15 shelf that runs along the top inside the walk-in closet and there

16 were some additional bags located up there.

17 Q     Based on your -- so these were right in Emond Logan, the

18 defendant's, closet?

19 A     They were in his closet --

20 Q     Okay.

21 A     -- in garment bags.

22 Q     Were those food saver bags, were they -- had they been used

23 or were they unused ones prior to sealing?

24 A     They were used.  They were cut open.

25 Q     Now, in the course of your investigation have you had the

1  chance to talk with Mr. Scartozzi, the financial investigator,

2  about the amount of money that Mr. Logan allegedly made from this

3  investigation?

4  A     Yes.

5  Q     And so is this based in part on obviously the cooperation

6  of Alvin Keith Jackson?

7  A     That is correct.

8  Q     Would it be safe to say a conservative estimate was just a

9  little under $100,000 a month that Mr. Logan made?

10 A     That is correct.

11 Q     And then not counting the $800,000 that he allegedly stole

12 in Memorial Day 2006?

13 A     That is correct.

14 Q     Have you, to your satisfaction and Mr. Scartozzi's, have

15 you accounted for all that money?

16 A     No, not even close.

17 Q     Is it safe to say that there are hundreds of thousands of

18 dollars that are still unaccounted for?

19 A     Both in currency and jewelry.

20 Q     And what do you mean in "jewelry?"

21 A     When we conducted the search warrant at his location --

22 Emond Logan's location on Springbrook address in Riverside, we

23 located a document for insurance purposes of a wedding ring that

24 belonged to his wife and it is valued at over $125,000.  There

25 were also some earrings valued over $28,000.

1          (Government's Exhibit No. 5 marked.)

2    Q    I'm going to show you what's marked for identification as

3    Government Exhibit 5.  I don't have extra copies but I have shown

4    counsel.

5              Do you recognize that?

6    A    I do.

7    Q    What is that in Government's Exhibit 5?

8    A    It's a Form 1040 US Individual Income Tax Return for 2007

9    for Emond Logan and joint with Caroline Logan.

10   Q    Is that the last tax return that we were able to get from

11   the IRS?

12   A    That is correct.

13   Q    And what is the gross -- adjusted gross income at the

14   bottom there for tax year 2007?

15   A    $8,417.

16   Q    Now, is that positive or negative?

17   A    It shows it is positive -- excuse me, negative.

18   Q    And so does that recall to your recollection that there was

19   actually reported a loss in that year?

20   A    Yes.

21   Q    Was any income at all reported for the Logans that year, I

22   mean, as far as wages and salaries?

23   A    No.

24   Q    Now, in the course of your investigation have you and Mr.

25   Scartozzi talked or obtained documents to show that there was

some legitimate income going into the Logan's house during these

years, '06 and '07? I mean, what was his -- Executive

Transporting wasn't just transporting cocaine; is that correct?

A    That is correct.

Q    What else were they transporting according to your

investigation?

A    They were transporting bulk mail.

Q    And did Mr. Jackson say that -- how did he describe how the

cocaine was mixed in with the bulk mail?

A    He had placed it -- Alvin Keith Jackson had placed the

cocaine in boxes and had given them to Emond Logan while they

were in California, and Emond Logan had just intermixed that with

the bulk mail.

Q    I understand that while out in California you or one of the

other investigators went to one of these banks, one or more of

the banks that Mr. Logan used and made these large cash deposits;

is that correct?

A    That is correct.

Q    Was it you or one of the other investigators who spoke with

one of the tellers who recalled very well Mr. Logan?

A    It's one of the other investigators.

Q    What did he report to you as to what this teller said about

her recollection and remembrance of Mr. Logan?

A    Said that Mr. Logan had deposit amounts under $10,000 but

the money had a distinct odor of diesel fuel.

1  Q    And did she report that to any law enforcement?

2  A    She did.

3  Q    Okay.  And was it some relative of hers?

4  A    Yes.

5  Q    Do you know whether a report was ever generated?  Were you

6  able to get any kind of generation of a report of that or was it

7  just from the statement of the teller?

8  A    I believe the statement of the teller.

9  Q    Now, I understand that just very recently you and Sergeant

10 Tran were able to review some documents from Mr. Logan's

11 computers that were seized; is that correct?

12 A    That is correct.

13 Q    And when did you and Sergeant Tran begin that or where are

14 you in the process of reviewing those documents?

15 A    Actually we just made copies.  Sergeant Tran made copies as

16 of yesterday and was just reviewing the last disk to ensure that

17 it had copied correctly.

18 Q    Were these computers sent to the National Drug Intelligence

19 Center after the raids in September '09?

20 A    That is correct.

21 Q    And were just recently retrieved?

22 A    Yes.

23 Q    So you're doing the analysis of what they've retrieved; is

24 that correct?

25 A    That is correct.

1 Q     Did you or Sergeant Tran locate any photographs in there of

2 firearms?

3 A     Yes.

4            (Government Exhibit No. 4 marked.)

5 Q     I'm showing you what's marked as Government Exhibit No. 5

6 (sic).  Do you recognize that series of photographs?

7 A     I do.

8 Q     Do you recognize anybody in that?  Well, how do you

9 recognize that?  Where did you see that?

10 A     I saw this on the disk that was on -- that Sergeant Tran

11 had obtained from NDIC.

12 Q     Now, I understand your analysis is fairly preliminary but

13 did the computer that you reviewed give any indication of when

14 these photographs were taken?

15 A     I believe these were 2007.

16 Q     And is that from the computer itself?

17 A     From the computer itself.

18 Q     Do you have any independent verification of that?

19 A     No.

20 Q     Now, and do you recognize any of the individuals in those

21 photographs?

22 A     I only recognize one individual in there.

23 Q     And who is that?

24 A     The black male that's in the background.

25 Q     And who is that?

1  A      That's Marvin Epps.

2  Q      And what relation is Marvin Epps to this defendant?

3  A      Marvin Epps is essentially Emond Logan's son.

4              MR. LENNON:  Your Honor, we'd move for just the

5  limited purpose of this hearing Government Exhibit 2, which is

6  the tax return from 2006 -- I may have gotten my numbers a little

7  mixed up -- but we'd also ask the Court to consider the tax

8  return from 2007 and the photographs here from the computer.

9              THE COURT:  What are they marked?

10             MR. LENNON:  I didn't mark them, your Honor, that's

11 probably why I got messed up here.  For purposes of

12 identification we'll make them Government Exhibit 4, a copy of

13 which has been provided to counsel.

14             MR. TERRELL:  No objection.

15             THE COURT:  Exhibit 4 is received.

16             (Government Exhibit No. 4 received.)

17             MR. LENNON:  Nothing further, your Honor.

18             THE COURT:  All right.  Cross-examination?

19             MR. TERRELL:  Thank you very much, your Honor.

20                      CROSS-EXAMINATION

21 BY MR. TERRELL:

22 Q      Good morning, sir.

23 A      Good morning.

24 Q      I want to stick to 2004.  You said you talked to Alvin

25 Jackson about his dealings with Emond Logan, okay?

1  A    Okay.

2  Q    Is that correct?

3  A    Okay.

4  Q    Is that correct?

5  A    Correct.

6  Q    Alvin Jackson talked about Emond Logan being involved in

7  drug trafficking commencing in 2004; is that the year?

8  A    Actually, he says he was involved prior to that.

9  Q    Okay.  Well, tell me the year that he got, according to

10 what you talked to Alvin Johnson, when did Emond Logan first

11 start getting involved in drug trafficking?  What year?

12 A    He said it occurred I'm going to say a couple years prior.

13 Q    Give me a year, please?

14 A    There isn't a specific year.  He said a couple years prior.

15 Q    Okay.  But before 2004?

16 A    Correct.

17 Q    Okay.  Now, did Alvin Jackson -- through your interview

18 with Alvin Jackson did Alvin Jackson ask you to verify his

19 statements about Emond Logan's drug dealing with his wife, Lisa

20 Jackson?  Did he ask you to verify?

21 A    No.

22 Q    Did you ever talk to Lisa Jackson, Alvin Jackson's wife?

23 A    Yes.

24 Q    Okay.  Isn't it true, sir, that Lisa Jackson told you that

25 Alvin Jackson asked her to lie about Emond Logan and his drug

1 dealings and Lisa Jackson refused to give a statement?

2 A    Absolutely not.

3 Q    Well, let me ask you this question directly, sir.  Did you

4 interview Lisa Jackson to see if Alvin Jackson's comments about

5 Emond Logan were true?  Did you ever talk to her?

6 A    I've talked to her.

7 Q    Lisa Jackson never validated any of Alvin Jackson's

8 comments about Emond Logan's drug dealing; isn't that true?

9 A    No.

10 Q    Sir, do you have any type of written document, any

11 statement from Lisa Jackson, stating that Emond Logan was

12 involved in drug trafficking with her husband?  That's my

13 question.

14 A    Do you have statement --

15 Q    Yeah --

16 A    Can you please repeat that?

17 Q    Sure.  Officer, from the moment you -- when did you first

18 interview Lisa Jackson?

19 A    When we executed a search warrant at the location.

20 Q    Month and year when you first interview Lisa Jackson?

21 A    I believe that's going to be in November of '08.

22 Q    Okay.  From November '08 up until today's date, do you have

23 a statement from Lisa Jackson corroborating any of the testimony

24 you gave in this courtroom today regarding Emond Logan's conduct

25 with Alvin Jackson?  That's my question.

1  A    I interviewed Lisa Jackson.  Lisa Jackson said that he made

2  -- Alvin told her these things.

3  Q    I didn't ask you that, sir.  I'll ask you again.

4         Do you have any statement from Lisa Jackson

5  corroborating Alvin Jackson's comments regarding Emond Logan's

6  involvement in drugs?  Anything?  The answer is "no," isn't it?

7  A    No.

8  Q    Is that correct?

9  A    That is correct.

10 Q    In fact, isn't it true that you and your officers have

11 instructed Lisa Jackson not to talk at all to anyone from the

12 Logan family?  Isn't that true, sir?

13 A    No.

14 Q    Have you ever instructed Lisa Jackson not to communicate

15 with the Logans?

16 A    No.

17 Q    Are you aware of any of your officers telling Lisa Jackson

18 not to communicate --

19 A    No.

20 Q    -- with the Logans?

21 A    I've never heard that.

22 Q    Never heard that.

23        Sir, let me ask you this.  Have you ever heard the

24 fact that -- have you ever heard Lisa Jackson -- assume the

25 following fact.  Lisa Jackson stated that Alvin Jackson called

1  her and asked her to corroborate the statements that he has made

2  against Emond Logan during a plea deal.  You never heard that

3  statement before?

4  A    No.

5  Q    Okay.  Let me ask you, from 2004 up until today has there

6  been any forensics done on the tractor trailer truck that you

7  testified to that Emond Logan was carrying drugs?

8         Have there been any forensics done on that truck to

9  determine if drugs were ever found in that truck?

10 A    No.

11 Q    Sir, during your course of investigation involving Emond

12 Logan's conduct with Alvin Jackson, have you found any traces of

13 any drugs on the tractor trailer truck that you testified to

14 today?  Anything?

15 A    No.

16 Q    I want to deal with the year 2004.  You testified about the

17 forensics -- about the amount of money that was received in Emond

18 Logan's bank account in 2006, 2007.

19        I want to talk about 2004.  Have you reviewed any tax

20 returns of 2004?

21 A    I reviewed them but I don't recall them.

22 Q    Sir, was there any outstanding -- was there any -- have you

23 looked at 2005?

24 A    The same answer, sir.

25 Q    What is the same answer, sir?

1  A    That I've reviewed them but I don't recall them.

2  Q    Have you looked at any bank accounts in -- in 2004 you

3  would agree that Emond Logan was involved in Alvin Jackson's, in

4  these drug transactions, correct?

5  A    That is correct.

6  Q    And you testified on direct that he was receiving these

7  large quantities of drugs in 2004 and 2005, correct?

8  A    Correct.

9  Q    And he was carrying these drugs in his truck in 2004 and

10 2005, correct?

11 A    And on.

12 Q    And on.  I'm talking about 2004, 2005.

13 A    Okay.

14 Q    And you talked about him getting paid, correct?

15 A    Correct.

16 Q    Did you review bank accounts in the name of Emond Logan for

17 2004?  Bank accounts, that's all I'm asking you.

18 A    Did I review bank accounts?

19 Q    Did you or your officers ever review Emond Logan's bank

20 accounts in 2004?  That is my question.

21 A    Frank Scartozzi is assigned to do the forensics analysis

22 with regards to the financial end of this.

23 Q    Sir, I'm asking you as you testified did you review the --

24 did Frank Scartozzi ever show you any review or any financial

25 records of Mr. Logan's bank accounts in 2004, show any type of

1  increase in funds in his accounts -- that's my question -- for
2  2004?

3  A    Okay.  That wasn't your original question.

4  Q    Sir, it's my question now.  2004 --

5  A    Okay.

6  Q    -- did you see any change in his bank account in 2004?

7  A    I did not review his bank account.

8  Q    Did Frank Scartozzi ever show you any documents?

9  A    He did not show me the documents.

10 Q    Let's deal with 2005.  Any bump or increase in funds in Mr.
11 Logan's bank accounts in 2005?

12 A    My answer would be the same.  I did not review his bank
13 accounts.

14 Q    Sir, I'm not asking whether you personally reviewed them.
15 Did Frank Scartozzi ever show you any documents, tell you any
16 information about any increase in Mr. Logan's bank account in
17 2004?

18 A    You've got to be specific when you're asking me a question,
19 but with regards --

20 Q    Okay, I'll be specific.  Frank Scartozzi, this independent
21 investigator --

22 A    Mm-hmm.

23 Q    -- as of today's date, did he show you any documentation
24 reflecting any deposits in Mr. Logan's bank account for the year
25 2004?

1  A     No.

2  Q     2005?

3  A     No.

4  Q     Did Frank Scartozzi tell you that Emond Logan's first wife

5  passed away in 2001?

6  A     I don't know if he told me or not.

7  Q     Did you become aware of that?

8  A     Emond Logan told me that.

9  Q     Okay.  Did you check out the fact that as a result of her

10 passing that he received an insurance proceeds check?  That's my

11 question, sir.

12 A     Yeah.

13 Q     During your course and scope of investigation do you recall

14 whether or not he received, as a result of the loss of his first

15 wife, an insurance check?

16 A     Mr. Terrell, I was at that search warrant.  We found

17 documents showing that.

18 Q     Sir, what was the amount of that?

19 A     He received $14,000.

20 Q     Sir, did he receive a check for $250,000 for the loss of

21 his wife?

22 A     He did not.

23 Q     He did not receive any proceeds in the amount of $200,000?

24 A     I don't recall any amount of $200,000 that he received for

25 the death of his wife.

1   Q     Okay.  Sir, what was the occupation -- Emond Logan is

2  married, correct?

3  A     Correct.

4  Q     Did Alvin Jackson tell you about any drug trafficking

5  involving Mr. Logan's wife, Caroline Logan?

6  A     No.

7  Q     I beg your pardon?

8  A     No.

9  Q     During the course and scope of -- you're aware that

10  Caroline Logan is charged with Count 1, the same charge as Mr.

11  Emond Logan, correct?  Are you aware of that in the Superseding

12  Indictment?

13  A     Okay.

14  Q     Sir, I'm asking you a question.  As you sit here today

15  under oath are you aware that Emond Logan's wife, Caroline Logan,

16  is charged with the exact same count as Emond Logan?

17  A     Yes.

18  Q     Will you please tell the Court all the information Alvin

19  Jackson told you?  Will you please tell the Court everything

20  Alvin Jackson told you about the drug involvement that Caroline

21  Logan had from 2004 to the present?

22         MR. LENNON:  Objection.  Relevance.  It's not

23  relevant to this proceeding which is looking into the detention

24  issue of -- this is just a blatant attempt just to try to get

25  some discovery and it's not relevant to the issues here at hand.

1          THE COURT:  Well, first of all, you basically tried

2 your case, so if the question is scope of the detention hearing

3 the government's blown way by that an hour ago.

4          First question -- well, I'm overruling the objection.

5 Go ahead.

6          MR. TERRELL:  Thank you.

7 BY MR. TERRELL:

8 Q    Answer the question, please.  Tell this Court everything

9 Alvin Jackson told you about the drug trafficking conduct of

10 Caroline Logan, everything?

11 A    Strictly to the drug trafficking itself and not money

12 laundering aspect of it, he did not mention her name as being

13 involved in the actual drug trafficking part of it.

14 Q    Tell anything that Alvin Keith Jackson told you about the

15 drug trafficking deals that Caroline Logan was involved in with

16 Emond Logan, everything?

17          MR. LENNON:  Asked and answered.

18          MR. TERRELL:  No, that's a different question, your

19 Honor, respectfully.

20          THE COURT:  Overruled.

21 BY MR. TERRELL:

22 Q    Let me say it very clearly.  When you sat down with Alvin

23 Jackson and he told you about Emond Logan's dealing, tell me if

24 he told you anything involving a drug trafficking transaction

25 between Emond Logan and his wife, Caroline Logan, everything?

A     With respect to Alvin Keith Jackson's statement to me, he

made no mention with regards to Caroline Logan being -- having an

actual hand's on involvement in the drug trafficking part of

that.

Q     That's what I'm talking about, with her husband.  He never

mentioned any observations, knowledge, of drug transactions

involving Emond Logan and Caroline Logan, correct?

A     Correct.

Q     I want you to -- the forensic investigator that you

testified who gave you this information about Emond Logan's bank

accounts in '07-08 -- I mean, excuse me, '06-07 -- I want you to

tell me if he provided you with any documentation of any homes

that Mr. Logan and his wife sold between 2003 and 2005, anything?

A     I don't recall that.

Q     Did the Logans sell homes that they owned prior to their --

strike that.  Did Caroline Logan own a home prior to 2004; if you

know?

A     I believe she did.

Q     Did she sell that home?

A     I don't know if she sold that home or not.

Q     So as you sit here today, the current home that you

testified to, you are unaware if the Logans had sold a previous

home prior to their purchase of this home, correct?

A     If you're asking me if Caroline Logan sold a home, I don't

know.  I know that Emond Logan told me that he owned two homes

1  that he sold.

2  Q    Did he sell -- okay, did you check -- what was the value of

3  those homes?  Did you check that out?

4  A    No.

5  Q    Well, did he receive any proceeds from that home?  Did you

6  check that out?

7  A    I can tell you what he told me.

8  Q    Sir, all I'm asking you, I'm not limiting your answer to

9  just what he told you.

10  A    Okay.

11  Q    During the course and scope of your investigation did you

12  learn that Emond Logan received proceeds from the selling of his

13  home during the same time period that you have alleged he's been

14  involved -- that Alvin Keith (sic) has alleged that he was

15  involved in drug trafficking?

16  A    I can only go off of what's on this -- the tax forms in

17  which he claimed or did not claim, and it's not listed on here as

18  any income that he claimed.

19  Q    Okay.  I'll ask you again.  I'm not limiting your question

20  to just the tax return.

21        To the whole universe of investigation that you

22  conducted, did you learn from documentation that Emond Logan

23  received at least $200,000 from the selling of his home during

24  the same time period that he's being alleged to traffic drugs?

25  That's all I'm asking.

1  A      No.

2  Q      Now, I wanted to talk about this shooting that you made

3  reference to that Alvin Jackson told you about, correct?

4  Remember the shooting that you were talking about, that he was

5  alleging shot?  Is that a "yes?"  You recall that, sir?

6  A      I recall it.

7  Q      Okay.  Now, did you look at the police reports?

8  A      I did.

9  Q      Okay.  In the police reports, not what Alvin Jackson told

10 you later, did Alvin Jackson give a statement as to who shot him?

11 A      Did Alvin Jackson say who shot him?  He said --

12 Q      In the police report -- let me back up -- did you review

13 the police reports?

14 A      Sure did.

15 Q      And in the police report Alvin Jackson never accused Emond

16 Logan of shooting him; isn't that correct?

17 A      That's correct.

18 Q      Isn't it also true that in the police report -- by the way,

19 Alvin Jackson copped -- excuse me, accepted a plea deal, correct?

20 Let me strike that.

21        When did you talk to Alvin Jackson about the events

22 that occurred involving Emond Logan?

23 A      I don't know the dates.  I talked to him several times.

24 Q      Okay.  What's the first time you recall talking to him?

25 A      I don't recall.

1  Q     How about was it December '08?

2  A     I think probably more in November.

3  Q     Okay, November '08.  But Alvin Jackson -- the shooting that

4  you talked about and testified to --

5  A     Mm-hmm.

6  Q     -- Alvin Jackson had given a police statement prior to the

7  time he spoke to you, correct?

8  A     Correct, he said he was meeting his brother, his brother-

9  in-law.

10 Q     Sir, my question is -- all I asked you was did he give a

11 statement?

12        My question is in the police reports that you

13 reviewed before he spoke to you, he never accused Emond Logan of

14 being involved in shooting him, isn't that correct, according to

15 the police report?

16 A     According to the police report, you're correct.

17 Q     Okay.  Now, I want to talk about -- you testify about this

18 multi-task raid of Mr. Emond Logan's house in April '07.  You

19 recall that?

20 A     Yes.

21 Q     Mr. Logan was not the target of that multi-task raid; isn't

22 that correct?

23 A     That is correct.

24 Q     Mr. Logan was not arrested for any drug involvement as a

25 result of that raid; isn't that correct?

1  A     That is correct.

2  Q     Mr. Logan was arrested because he was in the vicinity of

3  firearms; isn't that correct?

4  A     He was arrested because he's a felon and he possessed

5  firearms.

6  Q     He was in the -- the firearms were in his house, correct?

7  A     I would say that's in the vicinity.

8  Q     Okay.  And it was a result of a prior act that took place

9  in the 1980s he was arrested for; isn't that correct?

10  A     I'm not sure of the date.  It was a strong arm robbery.

11  Q     Sir, isn't it true that he was -- the act was a felony that

12  took place in the 1980s, 20 years prior?

13  A     I don't know the date.

14  Q     Fair enough.  Also, at the time that he was arrested he had

15  completed the conditions of probation; isn't that correct?

16  A     I don't know that.

17  Q     Well, let me ask you.  Assume the following fact.  He was

18  given an ankle -- did he have an ankle bracelet on at the time

19  you arrested him?

20  A     No.

21  Q     Okay.  Was he -- did you check to see if he had -- you

22  looked at any rap sheet to see if he had completed the terms and

23  conditions of his probation for being in possession of the

24  firearms?

25  A     No.

1  Q    So if I was to ask you if you could tell this Court the

2  legitimate income that Mr. Logan has earned from the sale of his

3  two homes, from the insurance proceeds, you wouldn't be able to

4  tell this Court, would you?

5  A    I couldn't.

6  Q    Okay.  Now, let me ask you, what was the occupation of his

7  wife, Caroline Logan; if you know?

8  A    At what point?

9  Q    Well, between -- at the time Alvin Jackson was telling

10 about these drugs, between 2004 and 2007.  What was her

11 occupation?

12 A    She worked for the company.

13 Q    What company are you referring to, sir?

14 A    Executive Transporting.

15 Q    Did you, in your investigation, did you determine whether

16 or not Caroline Logan was also a real estate agent?

17 A    She told me she stopped -- you asked me a question.  I'm

18 answering it.  She said she stopped becoming a real estate agent

19 in 2004.

20 Q    Okay.  So she was earning, according to your testimony, she

21 was a real estate agent at least up to 2004, correct?

22 A    That's what she told me.

23 Q    And according to your initial testimony Alvin and Mr. Logan

24 was involved in drug transactions prior to 2004, correct?

25 A    That is correct.

1  Q     Okay.  So my question is did you -- the forensic

2  investigator who has testified of -- not testified, excuse me,

3  your Honor -- the forensic investigator who looked and shared

4  these documents and reviewed these documents, did he ever

5  determine how much money Ms. Caroline Logan made, earned, as a

6  real estate broker, let's say, for the year 2003?  Ever show you

7  that information?

8  A     I don't recall seeing any.

9  Q     How about 2004?

10 A     I don't recall seeing any.

11 Q     Did you ever look at any type of property -- search of the

12 property that Caroline Logan owned during the course and scope of

13 the marriage that she had with Mr. Logan; the property she owned,

14 assets that she owned?

15 A     Everything in her name and Emond Logan's name, they were

16 all investigated.

17 Q     I didn't ask you that.  I ask you respectfully, did the

18 forensic investigator make any evaluation of the personal wealth

19 owned by Caroline Logan?  That's my question, sir.

20 A     Personal wealth like what?

21 Q     Cash, stocks, bonds, her own separate property?  That's my

22 question.

23 A     Her property was Emond Logan's property.

24 Q     Did you make a determination whether or not Caroline Logan

25 owned any separate property?

1 A    No.

2 Q    Okay.  Where is this tractor trailer truck -- excuse me,

3 I'm sorry.  Let's go back to this arrest that was made in

4 September '07 when you came to the house and you found all these

5 purses and furniture in there.

6 A    It wasn't in 2007.

7 Q    Excuse me, it was 2009.

8          Did you look at the items that the government seized?

9 Was there any review of the date of purchase of any of these

10 items?  Date of purchase?  Has there been any purchase on the

11 date of purchase of the items that were purchased -- for example,

12 that were found in the house?  For example, let's say, a

13 painting, a painting of Laker basketball players that was seized.

14 Do you recall that?

15 A    I believe there was a lithograph that was there.

16 Q    Okay.  Has there been any determination on the date of

17 purchase as to whether or not that lithograph was purchased in

18 2005 or 1999?  Any date of purchase?

19 A    No.

20 Q    Has there been any research done on the date of purchase of

21 any of the items that the government seized?

22 A    Yes.

23 Q    Okay.  And is -- have you -- do you have some type -- has

24 there been a document that you have looked at?  Can you describe

25 that document so it can be identified?

1  A    The documents seized within his residence included the

2  purchase of the vehicles, the purchase of the jewelry, some of

3  the jewelry.  I think we had some documents relating to the

4  purchase of the house, the tractor trailer, the tractor part

5  itself.

6  Q    You don't recall the dates of the -- for example, that

7  lithograph that we're just talking about, that was seized,

8  correct?

9  A    It was seized.

10  Q    Okay.  Do you have the date of that?

11  A    Do I have the date of what?

12  Q    The purchase of the lithograph, the photograph, the

13  lithograph that we just described?

14  A    Not that I'm aware of.

15  Q    Okay.  You can't testify to the date of purchase of any of

16  these items that you have described that were seized from the

17  Logan's home; isn't that correct?

18  A    That's not correct.  I just answered you.

19  Q    You said you haven't.  Do you know the date of these

20  purchases?

21  A    Some of them.  They're within the 2004 -- well within the

22  2004 to 2007 time frame.

23  Q    Okay.  I'll move on.  I'll move on.

24        You said that the house that Mr. Logan lives in has

25  been paid off.  Do you know what the value of the house was?

1  That's my question, just the value?

2  A     The current value of it?

3  Q     No, at the time it was -- the time that you -- the

4  government seized the properties at Timberline, the value of the

5  house?  Was it $10,000, was it $100,000, was it $80,000, was it a

6  million dollar home?  Do you know, as you sit here today, do you

7  know the value of the home?

8  A     At the time of seizure, as you know, Mr. Terrell, that the

9  real estate market has taken a drop, so if you're asking me my

10 personal opinion that I --

11 Q     No, I'm not asking your personal opinion, sir, I'm asking

12 you whether or not the forensic investigator who's been doing all

13 this research, did he provide you with a value of the house?

14 A     I can estimate over 400,000.

15 Q     Okay, 400,000.

16        Now, did he tell you the amount of money -- you also

17 testified that Mr. Logan paid off the mortgage.  Did he tell you

18 what the amount of the mortgage was that he paid off?  The

19 amount?  That's a "yes" or "no" question.

20 A     I think I answered that, it was over a couple hundred

21 thousand dollars.

22 Q     That's what he paid off?

23 A     I believe so.

24 Q     When did he pay it off?

25 A     I don't have specific dates, Mr. Terrell.

1  Q      How about a general date, sir?

2  A      Mr. Terrell, I don't have the specific dates --

3  Q      Okay, I'll move on.

4  A      -- unless you have some documents you want to show me then

5  I can answer that.

6          THE COURT:  That's enough.  Don't argue.

7          MR. TERRELL:  I'll move on.

8          THE COURT:  We're not going to start arguing here on

9  either side.

10         And you started it, so don't do that.

11         THE WITNESS:  I apologize, your Honor.

12         THE COURT:  Don't do that again.

13         Proceed.

14         MR. TERRELL:  Thank you, your Honor.

15  BY MR. TERRELL:

16  Q      Is it fair to say that between 2004 and 2007 you have not

17  reviewed any bank documents indicating that Mr. Logan deposited

18  any alleged drug proceeds in any bank account from 2004 to 2005,

19  that 24-month period?

20  A      In all of 2004, sir, and all of 2005?

21  Q      Yes, sir.

22  A      There's documents that support the drug activity.

23  Q      No, no, proceeds?

24  A      Yes.

25  Q      Okay.  And those documents indicate that he deposited money

1  into his bank accounts?

2  A    That is correct.

3  Q    Okay.  And how much in that -- let's deal with 2004, how

4  much?  How much drug proceed money that you have knowledge of

5  that was transferred or deposited in Mr. Logan's account in 2004?

6  Just give me a number?

7  A    I cannot provide you with that number.

8  Q    Fair enough.  Let's deal with 2005?

9  A    I cannot provide you with that number.

10 Q    Let me ask you, do you have any evidence of any drug

11 proceeds that Mr. Logan received in 2004 was used to purchase

12 anything in 2004?

13        Drug proceeds in 2004 that he purchased items that

14 year?  Let's deal with that year?

15 A    All those answers would be addressed with the Asset

16 Forfeiture Investigator Scartozzi.  My personal knowledge, if

17 you're asking my personal knowledge with my discussion with Mr.

18 Scartozzi, I don't recall.

19 Q    How about 2005?

20 A    The same answer.

21 Q    Same answer, okay.

22        MR. TERRELL:  Your Honor, thank you very much.  I

23 have no further questions.

24        THE COURT:  All right.  Thank you.

25        Anything further of this witness?

1          MR. LENNON:  Yes, your Honor.

2          I'd alert the Court and Mr. Terrell to page eight of

3  Government Exhibit 1.  It's the first paragraph under subsection

4  (e).

5                    REDIRECT EXAMINATION

6  BY MR. LENNON:

7  Q     You can find that in Government Exhibit 1, page eight.

8  It's kind of confusing because there's two affidavits on top of

9  each other.  Would you read that to yourself?

10  A     You're asking me, page eight?

11  Q     Page eight, paragraph (e).

12  A     Oh, paragraph (e).

13  Q     The first paragraph below.  And does that paragraph refer

14  to cash deposits made by Emond Logan beginning in the late summer

15  of 2004?

16  A     It does.

17  Q     Now, is it correct, I understand from your direct

18  examination, you personally haven't reviewed those bank accounts,

19  correct?

20  A     That is correct.

21  Q     To your knowledge, where did that information come from

22  that was supplied to Special Agent Toth?

23  A     It is from Frank Scartozzi.

24  Q     And is it consistent with what your discussions with Mr.

25  Scartozzi have been?

1  A    Yes.

2  Q    Now, you understand Mr. Scartozzi is out of town today on

3  other ATF business; is that correct?

4  A    That is correct.

5  Q    So he couldn't be here for that reason?

6  A    That is correct.

7  Q    Now, let me go back to Lisa Jackson.  You interviewed her

8  first at the time that Alvin was arrested, correct?

9  A    Correct.

10 Q    Either November or December 2008?

11 A    Correct.

12 Q    Did she admit knowledge of Alvin Keith Jackson's drug

13 trafficking at that time?

14 A    No.  I mean, she was in denial of it.  She said that she

15 was kept out of the loop on everything, and that he would provide

16 her with papers to sign and that would be it.

17 Q    Based on the investigation, the financial investigation of

18 Alvin Keith Jackson, who handled the funds in the Alvin Keith

19 Jackson home, Mrs. Lisa Jackson or Alvin Keith Jackson?

20 A    Alvin Keith Jackson.

21 Q    Now, is that the same for the Logans based on what you know

22 of the investigation?

23 A    Just the opposite.

24 Q    So who handled the finances in the Logan family, co-

25 defendant Caroline Logan or Emond Logan?

1  A     Caroline Logan.

2  Q     Now, let me ask you just generally, when you're going to

3  interview a witness -- because you've talked to Lisa

4  subsequently, Lisa Jackson, subsequently, haven't you?

5  A     I have.

6  Q     She's called you?

7  A     She's called me.

8  Q     And, in fact, she showed up while the search warrant was

9  being executed at Emond Logan's house the second time; is that

10 correct?

11 A     That is correct.

12 Q     And you know what she is a sister of co-defendant, Caroline

13 Logan, correct?

14 A     That is correct.

15 Q     When you interview a suspect just generally, or not a

16 suspect, when you interview another witness, do you tell them

17 what another witness has said to try to, you know, like would you

18 say when you're interviewing Witness B, would you say, well, A

19 says this, is that right?

20 A     No.

21 Q     Why would you not do that?

22 A     Because you want an independent recollection as to what

23 they know about something.

24 Q     Do you recall ever telling Lisa Jackson what Alvin Keith

25 Jackson told you in detail about Emond Logan's involvement?

1  A    No.

2  Q    And why would you not want to do that?

3  A    I want to get an untainted version of what she knows about

4  the events.

5  Q    To date, has Lisa Jackson ever given you a full and in your

6  opinion truthful explanation of her knowledge?

7  A    Yes.

8  Q    She has?

9  A    Personally I think she wasn't completely truthful on some

10  things but she's, by and large she's claiming she doesn't have

11  any direct knowledge about the activity.

12  Q    Okay.  So you're saying that she's saying she doesn't have

13  direct knowledge and that's why you tend to believe her?

14  A    Yes.

15  Q    Now, let's clear something up here.  I realize that you

16  didn't have a chance probably to review all the IRS documents?

17  A    No.

18  Q    You do understand that they were subpoenaed from 2002

19  through 2008 and we got up to '07?

20  A    I've kind of reviewed them and gone through them but I

21  don't recall them.

22        MR. LENNON:  And Mr. Terrell, you've probably seen

23  them, I assume, from Mr. Zambon.

24        May I approach, your Honor?

25        THE COURT:  Yes.

1    BY MR. LENNON:

2    Q    Do you recognize that as being the returns we got on Emond

3    and Caroline Logan from '02 through '05?

4    A    Yes.

5    Q    And I'd ask you to look at the '03 return.  Does it include

6    a capital gain and loss for sale of a home?

7    A    Yes.

8    Q    And does it appear that it was kind of a -- what's the

9    selling -- date of acquired of this home?

10   A    April 3rd, 2003.

11   Q    And what's the sell date?

12   A    April 2nd, 2003.

13   Q    Doesn't make sense, does it?

14   A    No.

15   Q    And but it seems to be a short term sale, correct?

16   A    Correct.

17   Q    That's what it's entitled?

18   A    Correct.

19   Q    What was the profit Mr. Logan made on the short term sale

20   of that house?

21   A    $50,000.

22   Q    In 2003?

23   A    Correct.

24   Q    Now, he mentioned life insurance policies?

25   A    Correct.

Q     We did -- investigators did uncover some information that there was a life insurance policy paid off to Mr. Logan; is that correct?

A     That is correct.

Q     And some of that money went also to his kids?

A     That is correct.

Q     Was it anywhere near hundreds of thousands of dollars?

A     It was $50,000 and it was split up amongst the kids and Emond Logan.

MR. LENNON:  We'd move for the admission, your Honor, tentatively for the purposes here of those tax returns from 2002 through 2005.

MR. TERRELL:  No objection.

THE COURT:  Let's mark them.

MR. LENNON:  Okay.  And we'd mark those -- we'll just mark them together, your Honor, if we can as five -- '02, '03, '04, '05.

THE COURT:  You have a Government Exhibit 5, which is the 2007 tax return.

MR. LENNON:  Apologize, your Honor.  Six for '02.

(Government Exhibit No. 6 marked.)

BY MR. LENNON:

Q     What does it show the profit or the adjusted gross income for the Logans in 2002?

A     It shows $52,947.

1          (Government Exhibit No. 7 marked.)

2   Q    And in '03 -- and we'll call that Government Exhibit 7?

3   A    $99,021.

4   Q    '04?

5   A    Minus $3,619.

6   Q    And in '05?

7   A    Minus $5,701.

8   Q    Now, you mentioned -- Mr. Terrell asked you about a lot of

9   receipts.  Those have been scanned and provided to defense

10  counsel; have they not?

11  A    They have.

12  Q    Did you bring any of the receipts for the purses or fur

13  coats or anything with you today?

14  A    I did not.

15  Q    Okay.  And but is it your testimony that you have reviewed

16  these items at least at some point when they were seized?

17  A    Yes.

18  Q    And a number of these high value items were purchased in

19  the time of 2004 through 2007, is that correct, and thereafter?

20  A    That is correct.

21  Q    Is there any indication that you have at all in your

22  investigation that explains the large cash deposits made by Emond

23  Logan in 2004 through the time of this conspiracy?

24          Anything that you or your investigators have come up

25  with that explains these large cash deposits?

1  A      Other than his involvement with Alvin Keith Jackson in

2  conspiracy to deliver the cocaine and the money proceeds from

3  that, no.

4          MR. LENNON:  Nothing further, your Honor.

5          THE COURT:  Anything more of this witness, Mr.

6  Terrell?

7          MR. TERRELL:  If I ask for 30 seconds would that be

8  okay?

9          THE COURT:  Sure, that's fine.

10                     RECROSS-EXAMINATION

11 BY MR. TERRELL:

12 Q      I just want to ask you, you and your agents have instructed

13 Lisa Jackson.  When you went to see go Lisa -- on the day that

14 you went to Mr. Emond Logan's house, Lisa Jackson arrived at the

15 house; isn't that true?

16 A      She did.

17 Q      And your agents told her to leave; isn't that true?

18 A      No.

19 Q      Sir, are you -- so is it your understanding that none of

20 your agents have instructed Lisa Jackson not to communicate with

21 the Logans?

22 A      No.

23 Q      Okay.  And assume the following fact.  If Lisa Jackson

24 testifies that she was asked by Alvin Jackson to corroborate what

25 he told you and the officers, you would have no knowledge of any

1  of your officers instructing Lisa Jackson not to provide

2  corroborating evidence?  Let me rephrase that.

3        You never had any instructions with Lisa Jackson not

4  to communicate about the testimony of Alvin Jackson?

5  A    That is correct.

6             MR. TERRELL:  No further questions, your Honor.

7             MR. LENNON:  Nothing, your Honor.  Thank you.

8             THE COURT:  You may stand down.  Thank you.

9             THE WITNESS:  Thank you.

10            THE COURT:  Anything further from the government?

11 Proofs?

12            MR. LENNON:  Just proffer from the pretrial services

13 report, your Honor.

14            THE COURT:  All right.  Go ahead.

15            MR. LENNON:  Just, your Honor, with respect in

16 addition to what we have here, and the government would recognize

17 that there is information here that Mr. Logan has a residence in

18 California, albeit, it's one that we've got a lis pendens on, but

19 we would acknowledge that there's probably information in here

20 sufficient to rebut the rebuttal presumption.

21            But in speaking about specific information, your

22 Honor, what we're looking at is essentially acknowledgement, if

23 you will, of the fact that the pretrial services report mentions

24 that there is -- the defendant is apparently still on some type

25 of -- at least, it appears that he's still on probation or

1  parole, I guess I'd be probation, from the felon in possession
2  case.

3           It's not clear from here what exactly we have as far
4  as the status of that, and certainly it's something we'd like to
5  supplement the record if given the opportunity to do so.

6           But the government contends, again, that there is --
7  and maybe this is more argument, but there's certainly a
8  distinction that can be made from this report as to the other
9  Logans who are allowed to self-report and were not initially
10 indicted.

11          The rest is, your Honor, argument.  I'm sure the
12 Court has read this report.  But the government's contention is
13 that his status appears to be that he's still on parole from this
14 felon in possession case through 2011 or into 2011.

15          THE COURT:  While you're addressing it, what
16 distinction would you make?

17          MR. LENNON:  Oh, between the Logans?

18          THE COURT:  Mm-hmm.

19          MR. LENNON:  Yes, your Honor.  Well, I don't think
20 the government has any information whatsoever as far as any
21 criminal history for Caroline Logan, Martell or Sharon.

22          I mean, obviously, that's something we're still doing
23 but when we executed the search warrant and arrest of Mr. Logan
24 in September we issued target letters to the other Logans,
25 Caroline, Martell, and Sharon.

1    So just in the very nature that we arrested Mr. Emond

2  Logan and did not arrest the other Logans was a government

3  acknowledgement that we did not believe that they were either

4  risk of flight or danger to the community.

5    They've subsequently been arrested, and I worked with

6  Mr. Terrell's office so that they could self-report in the

7  Central District of California and then have a report date here.

8    We are not going to be seeking their -- because we

9  believe, one, their involvement is much less than Emond Logan.

10  There's no indication that Caroline, Martell, or Sharon were

11  involved in the shooting of Alvin Jackson, but we believe there's

12  certainly substantially testimony that Emond Logan at least had

13  knowledge of it, and then participated in some way, albeit, not

14  the trigger man.

15    And we also have with respect to Martell and Sharon

16  Logan, we have from our review we don't believe that their assets

17  -- we believe they are accounted for.  I believe we've alleged

18  and shared this with Mr. Terrell that they were involved in

19  laundering a relatively small amount of money, I believe it was

20  under $45,000, in the time period consistent with Mr. Emond

21  Logan's cash deposits of Memorial Day '06 to November '06.

22    So we believe that the other Logans, Caroline,

23  Martell and Sharon, it's apples and oranges, not only with

24  respect to their involvement in the charges but also in their

25  criminal history and in the government's comfort with respect to

1   their release because we believe that they would appear for

2   future proceedings.

3          They have much less, we believe, exposure to a

4   potential prison term than Mr. Emond Logan.

5          THE COURT:  And these other Logans are just indicted

6   in the money laundering case?

7          MR. LENNON:  Except for Caroline, your Honor, and

8   that's on the theory that Caroline is the defendant's wife that,

9   unlike Lisa Jackson, our documents and records show that she was

10  not only intimately involved in the finances of the Logan family

11  and the business but she was essentially the lead person in that.

12         Other than making the cash deposits which was done by

13  Emond she was the one writing the checks; she was the one who had

14  intimate knowledge of the legitimate income coming into the

15  family and what was then, we believe, laundered.

16         So Caroline Logan is mentioned in the ten-to-life

17  count.

18         THE COURT:  Right.  Thank you.

19         Mr. Terrell, first of all, any witnesses or proffer

20  of evidence?

21         MR. TERRELL:  No.  I'd just like to respond.  Sorry,

22  your Honor.

23         THE COURT:  Yeah, I can see that by the look on your

24  face.

25         MR. TERRELL:  Yes, your Honor.

1          THE COURT:  First I want to make sure that you have

2   nothing of a factual nature to present.

3          MR. TERRELL:  No, your Honor.

4          THE COURT:  All right.  Then you can certainly speak.

5          MR. TERRELL:  Thank you, your Honor.  I want to

6   specifically address the first concern that -- or the first issue

7   that the AUSA addressed about this probation that Mr. Emond Logan

8   was on, and I speak to you as an officer of the court because I

9   was his attorney.

10          He was -- that issue was resolved.  He was given a

11  probation period in which he had to comply with a detention which

12  consisted of wearing an ankle bracelet for a time period which he

13  complied with, and to take a class, an anger management class,

14  which resulted from a prior misdemeanor charge.

15          The judge struck the strike and he served probation.

16  At the time that he was arrested, your Honor, he had complied

17  with all the terms and conditions set forth.  I say that to you

18  as an officer of the Court.

19          THE COURT:  Was he officially off probation?

20          MR. TERRELL:  No, he was still on -- the probation

21  period was still on --

22          THE COURT:  All right.

23          MR. TERRELL:  -- but he had complied with all the

24  terms.  It was just the probation period would have needed to be

25  expired another year, year-and-a-half.

1          THE COURT:  So was that unsupervised at that point?

2          MR. TERRELL:  Unsupervised, your Honor.

3   Unsupervised.  And the time period in which he had the bracelet

4   off, he had completed that, but it was unsupervised probation so

5   I want to be clear on that.

6          Your Honor, I also want to, you know, focus back on

7   what our papers set forth.

8          You can't distinguish the difference between the

9   charges set forth that the government has charged Caroline Logan

10  with and Emond Logan.  They are charged identical charges facing

11  the same amount of criminal exposure.  It is undisputed.  Count

12  1, Count 3, Mrs. Logan and Emond Logan.

13         The fact that an individual has a prior criminal

14  history is not the issue here.  The issue is flight risk.  And

15  the issue is ties to the community.  The issue is will he return.

16         Now, the government and I had an arrangement which

17  set forth a PR bond for Caroline Logan, Martell and Sharon Logan,

18  but I want to focus on Caroline Logan because she's the best

19  example.

20         A criminal history is not the issue here.  The Court

21  has to determine whether or not the individual, Mr. Logan, will

22  return and not evade.  The concern here, this presumption that

23  because he was involved in drug trafficking, the government has

24  to provide some burden of persuasion.

25         Our papers set forth the exact same history, the

exact same information, that Caroline Logan has. He lives with
her. They have no financial resources which gives them the
capability of leaving. The Court can set forth any additional
conditions.

But look at his conduct from the time he was arrested
in September '09 up until today. He's been a model person. He
surrendered. He came in and has been a model inmate since his
incarceration.

At the time that the original Indictment was
dismissed he should have had a bail hearing. In fact, I made the
request that could he be offered the same condition as Caroline
Logan. It was denied. I sent an e-mail to my colleague. It was
denied, therefore, we took the initiative to file this motion.

But the Court has to look at whether or not Mr. Logan
will return and whether or not he will appear. Mr. Logan has put
himself in a position where he is in the same exact position as
his wife.

The criminal history, your Honor, and the fact that
he was on this unsupervised probation shows you the type of
person he is. He is not going to leave. He is not going to not
appear. He is going to show up and fight this case, and all
we're asking for is for this man to have the opportunity to
receive bail, either PR or whatever additional conditions.

But to be denied bail for the charge that he's
facing, let's face it, your Honor, basically what we heard today

is that Mr. Logan was what they would call a mule. He was

transporting. He wasn't selling it. He wasn't buying it. He's

allegedly some type of individual -- allegedly -- someone who's

transporting this alleged cocaine which has to be proven.

But he's not the buyer. He's not the guy out there

selling it. He is a person who's apparently what you might call

a small fry, not the guy who's calling the shots. And so I look

at his role in this type of situation and say, your Honor, he's

not -- he's not the Alvin Jackson. He's not the guy who's

setting, you know, who's running the operation.

And so you look at his role in this, and his role is

basically the same as his wife. And that's why I think it's

impossible for the government to make an argument, a credible

argument to this Court, and say, you know what, Caroline Logan,

okay, she's facing the same amount of time. But Emond Logan,

he's bad. He's somebody we just cannot trust.

The one thing we did hear is this so-called

transportation vehicle that he was using, the sole witness

testified that there's no evidence of any -- I don't want to try

the case here because the issue, I want to stay focused -- the

issue here is flight risk. Will he return?

I say, your Honor, all the indicators, even at the

time he was arrested, is that this man faces justice and faces

any charges he has.

I ask this Court please to look at the law in this,

1  look at the facts that we have outlined in our papers, and if the

2  Court believes additional conditions are necessary, fine.  But to

3  be denied bail and to be held just doesn't -- the government has

4  not made that case.  The government has not made that case to

5  hold him without bail.

6          Thank you, your Honor.

7          THE COURT:  Thank you.  All right.

8          Mr. Lennon, let's go through this step by step.  The

9  government's case, if given complete credence, indicates, first

10  of all, that the defendant was transporting large amounts of

11  cocaine one way and money the other way for this Alvin Keith

12  Jackson for a number of years.

13          MR. LENNON:  Correct.

14          THE COURT:  That's over?  That's over?  Jackson --

15          MR. LENNON:  That's correct.

16          THE COURT:  So the head has been lopped off this

17  conspiracy and the conspiracy is done?

18          MR. LENNON:  That's correct.

19          THE COURT:  All right.  Second then this idea of

20  large cash deposits --

21          MR. LENNON:  Mm-hmm.

22          THE COURT:  -- unexplained wealth, tax evasion,

23  compounded by the allegation that the defendant stole $800,000 on

24  Memorial Day 2006, so this is all a part of the idea that he's

25  got a lot of money and not all of it is accounted for?

1          MR. LENNON:  That's correct, your Honor.

2          THE COURT:  And for today's purposes, detention, that

3   means he might have the wherewithal to flee?

4          MR. LENNON:  That would be the government's argument.

5          THE COURT:  Right.  And that's all that a lot of

6   money shows, right, is witness wherewithal to flee?

7          MR. LENNON:  For purposes of today, yes.

8          THE COURT:  Right.

9          MR. LENNON:  The Court mentioned some other things

10  that would be admissible for but we acknowledge that's what it's

11  being offered for.

12         THE COURT:  For detention.  So let's assume that

13  there is money out there that has not been found by the

14  government, seized, accounted for in any way.  What evidence is

15  there that this defendant has either a motive or a history of

16  non-appearance or flight?

17         MR. LENNON:  We would acknowledge, your Honor, that

18  there does not appear to be a -- I've seen no failures to appear

19  and whatnot on his previous histories here, so we would

20  acknowledge that it doesn't seem to be in the record.

21         There was a violation revocation but not -- that has

22  to do with -- that was from 2000 but I'm just quickly looking

23  through.  I don't see -- I didn't see any failure to appear, your

24  Honor.

25         THE COURT:  So when you were previously speaking and

1 you gave the reasons for the government's lack of comfort, it's

2 all this unaccounted for wealth, some criminal history, his

3 alleged involvement in this shooting of Jackson --

4          MR. LENNON:  Correct, your Honor.

5          THE COURT:  -- in January of '07.

6          MR. LENNON:  Other guns in the case, your Honor.

7          THE COURT:  Guns.

8          MR. LENNON:  Which is a factor under 42 --

9          THE COURT:  You said this was the -- this is the

10 defendant's blood son?

11          MR. LENNON:  No, I think the testimony was that the

12 African-American youth in there --

13          THE COURT:  Oh, in the background, okay.

14          MR. LENNON:  -- is in the background.  We don't -- I

15 don't think we know who the other one is -- is the defendant's

16 stepson essentially.  I don't think there's any blood relation

17 but he was at the home and was living in the home.  And these

18 were just from the computer.  We can't tell the Court where those

19 pictures were taken.

20          THE COURT:  Right.  Okay.  Go ahead then.  I wanted

21 to clarify those.

22          MR. LENNON:  Absolutely, your Honor.  And we believe

23 the shooting in 2007 and we acknowledge that it appears that he

24 either had knowledge of or participation in that shooting based

25 on the evidence.

1          We think that can also be looked at for risk of

2     flight as well, but whether that rises to the level of clear and

3     convincing evidence or danger to the community obviously we defer

4     to the Court on that.

5          But that is essentially the government's argument,

6     that he's not a mule only, it's a mule plus.  We've got all these

7     other concerns including the detailed information and the money

8     laundering count.

9          We understand that that strength of the case, if you

10    will, is not necessarily considered by the Court as being a real

11    strong factor here, but we do believe those other things on

12    nature and characteristic of the defendant are important for our

13    bond --

14              THE COURT:  All right.  Thank you.

15              MR. LENNON:  -- for our motion.  Thank you.

16              THE COURT:  All right.  Thank you, Counsel.

17          This is a proceeding under the Bail Reform -- oh,

18    wait a minute.

19          How am I to -- what am I to do or what am I to think

20    about the fact that the defendant has been held in custody for

21    six, seven months now on a case that has disappeared for which if

22    he is convicted he's not going to get any credit probably?

23          At what point does the prolonged incarceration start

24    to weigh in favor of release when there is really no end in

25    sight?

1          MR. LENNON:  Well, your Honor, a couple points.  I'm

2    not so sure that he wouldn't get credit because we really have,

3    even though a different case name, it's essentially the same

4    offenses that were listed in the original Indictment.

5          But I think if the Court were to look at the record

6    in this case they would see that all of the continuance and the

7    delay have come at the request of the defendant.

8          Mr. Terrell met with me and Mr. Zambon in October of

9    2009 and Mr. Terrell represented that he was going to come in the

10   case.  We actually moved the Court for a hearing on the status of

11   counsel.  In fact, one of the exhibits on our motion is going to

12   be an e-mail from Mr. Terrell saying he planned to be in then by

13   November 19th.

14         So the request for additional time has really been

15   for the defendant because he has wanted vehemently for Mr.

16   Terrell to enter the case.

17         Mr. Terrell didn't file a notice of appearance in

18   that underlying case until after the final pretrial conference.

19   So he put myself and Mr. Zambon, I think, in a bad situation.

20         We provided the discovery very early-on in this case

21   and were ready to go but the position we took from the very

22   beginning was -- and counsel was aware of this, I'm talking about

23   Mr. Zambon and I believe Mr. Terrell -- that if we couldn't

24   resolve this matter with Mr. Logan in a manner that included no

25   prosecution agreements for his family that ultimately he was

1  going to be added in to the Alvin Keith Jackson indictment, which

2  is the case before the Court.

3          So we were up front with the Court as far as -- as

4  early as November of 2009 on that, and we're here in part

5  primarily because it took so long for Mr. Terrell to finally

6  enter the case or try to enter the case.

7          THE COURT:  You have to understand that's troubling.

8          MR. LENNON:  Oh, I understand.  I understand the

9  Court's position.

10          THE COURT:  And tell me this finally.  I see from the

11  docket sheet in the other case, the one before Judge Jonker, that

12  he did deny the motion to withdraw that Mr. Zambon brought, but

13  the order doesn't explain precisely why.

14          MR. LENNON:  I'm sure Mr. Terrell will correct me if

15  I'm wrong, but I think Judge Jonker really concentrated not on

16  any of the conflict of interest issues at all, but more on the

17  fact of the delay in Mr. Terrell coming in on the case.

18          THE COURT:  Too late.

19          MR. LENNON:  He referred to his non-document order

20  back in November that kind of gave everybody notice, hey, if

21  you're going to come in this case then you got to do it sooner.

22  If it comes closer to trial and it will result in another delay

23  he was not inclined to do that.  That is my recollection.

24          THE COURT:  The Court of Appeals has everybody scared

25  to death now on speedy trial --

1          MR. LENNON:  I understand, your Honor.

2          THE COURT:  -- and most of the time it weighs against

3 the defendant.  The defendant is often deprived of time that

4 might otherwise be reasonable because everybody is scared to

5 death about the irrationality perceived in the Court of Appeals

6 decisions.

7          You had something to add to that?

8          MR. TERRELL:  Yeah, your Honor.  The thing about it

9 was in the previous case in part there was an effort for me to

10 get in the case but there was a lack of pursuit of action taken--

11 I think this was Mr. Logan's concern with Mr. Zambon -- of any

12 pretrial motions being filed, one including a bail hearing and

13 other dispositive motions that were filed.

14          So, you know what, Judge Jonker's ruling was very

15 brief.  There was representation -- I'm sure my colleague would

16 also agree to this -- that there was this ongoing discussion of a

17 Superseding Indictment that was going to occur if the plea deal

18 but there was a variety of different issues, one including my

19 involvement.

20          Again, your Honor, the focus here, I guess, is Mr.

21 Logan's ability to return.  If he's a flight risk, there's no

22 evidence of that.  If you just look at his -- this Court is too

23 wise to compare the previous cases that the Court has heard on

24 bail hearing and look at the fact pattern here and look at the

25 similarities here between him and his wife.

1          It just seems so odd for his wife to stay anchored in

2     California and for him to attempt to go elsewhere.  I mean,

3     there's just no logic behind that.  And when you look at his

4     previous encounters with the court system he's always appeared

5     and that's the history.  That's what we go by.

6          You know, one other point, your Honor.  Wealth is not

7     a basis for denying.  I mean, even if there's an assumption that

8     Mr. Logan has money, this Court has granted bail, I'm sure, to

9     individuals who have wealth ten times as high as Mr. Logan.

10         So, I mean, this argument that he has some money, it

11    could be elsewhere, and he's, you know, he has this -- your

12    Honor, as I said before, whatever restrictions the Court wants to

13    impose in addition to the ones that are in existence, there's no

14    argument here.  It's just he should be granted the opportunity to

15    be released.

16         THE COURT:  All right.  Thank you.

17         And let me say at the outset, now that I've satisfied

18    myself on this previous proceeding that's going to have nothing

19    to do with what I'm doing here today.

20         MR. TERRELL:  Thank you, your Honor.

21         THE COURT:  I'm going just to assume that this is a

22    brand new case and that the detention matter is before the Court

23    de novo and proceed from there.

24         This is a proceeding under the Bail Reform Act, 18

25    USC Section 3141 and following.  The Court is required to release

defendants on conditions of bond unless the government makes a
showing by clear and convincing evidence that no condition or
combination of conditions will adequately assure the safety of
the community, or by a preponderance of the evidence that no
condition or combination of conditions will adequately assure
appearance at trial.

The government has the burden of showing risk of non-
appearance, as I said, by a preponderance of the evidence and
showing of danger by clear and convincing evidence.

The government does have the benefit of the statutory
presumption created in Section 3142(e) in that the grand jury has
indicted the defendant on Count 1 which is a drug conspiracy
charge punishable by more than ten years in prison.

The statutory presumption does not shift the burden
of proof which remains at all times with the government but
merely imposes on the defendant a light burden of proceeding.

The defendant is required to address one or more of
the factors set forth in Section 3142(g).  If the defendant fails
to do that then the presumption remains unrebutted and may, in
and of itself, be strong enough to justify detention.

If the defendant does meet his light burden of
proceeding then the presumption is to be weighed with all other
statutory factors.

In this case it's conceded that the defendant has met
his presumption, has met his light burden of proceeding to rebut

the presumption in that the defendant is married, had a business called Executive Transport, owns a home although subject to lien by the government, owns a good deal of property, again, subject to seizure by the government, has a stable relationship with his wife, and really has never -- never has had a history of drug or alcohol abuse nor a history of non-appearance.

So all those matters that appear before the Court now in the various pretrial services reports are sufficient to rebut the presumption.

So the Court is to consider the subsection (g) factors to determine whether the government has met its burden. Those factors include the nature and circumstances of the offense and whether in this case it's a drug crime. In this case it is a drug crime so that is a factor in favor of detention.

The weight of the evidence against the person seems to be substantial, although, like any criminal case there are two sides to every story.

And for that reason the courts, not just I but the appellate courts that have looked at this issue, have indicated that the weight of the evidence is not to be the factor upon which the Court orders detention because then we would be trying people without a jury in truncated pretrial proceedings in which the Rules of Evidence do not apply, and that's really not what the constitution envisions.

So in any case it's the subsection (g)(3) factors

that are going to bear the most weight.  The history and
characteristics of the person, character, physical or mental
condition, family ties, past criminal history, record of alcohol
or drug abuse, record concerning appearance in court, et cetera.

So those are the factors that I generally give the
greatest credence to because they are the factors that the
defendant has himself forged over a lifetime in showing whether
he is a trustworthy person or not in this circumstance.

Now, the criminal history here is not serious or
extensive.  There is an old robbery conviction followed by a
felon in possession conviction in 2007 that arose from this
execution of a search warrant on the defendant's home where some
guns were found and apparently entered a plea of guilty to that,
was given probation, is still on probation on that conviction.

But beyond that this is certainly not the worst
criminal history that the Court sees.  In fact, it, in relative
terms is rather modest.

What we have from the government's point of view is
evidence that the defendant was involved in transporting large
amounts of cash and cocaine for a period of years for Alvin
Jackson.  Jackson is now cooperating with the government and is
subject to indictment, may already be convicted.  I presume that
if he's not convicted he's on his way to being convicted.

That the defendant made a lot of money in this
enterprise including $800,000 that he allegedly stole from Alvin

1  Jackson, and that's corroborated to some extent by these deposits

2  in two or three banks made in structuring amounts; that is to

3  say, amounts less than $10,000 to apparently avoid reporting

4  requirements.

5          That the defendant did not account for this money

6  allegedly in his tax returns and, in fact, was involved in

7  laundering it.

8          So for the purposes of today's proceedings, as we've

9  recognized in previous colloquy with counsel, the effect of all

10  this unaccounted for money is that it gives a defendant the means

11  to flee if he wants to flee.

12          But as defense counsel just mentioned wealth; that is

13  to say, the means to flee, doesn't necessarily meet the

14  government's burden because in addition to the means to flee we

15  need either the history or the motivation to flee.

16          Now, it's funny that poverty on one side counts

17  against the defendant.  He has no assets.  He has no home.  He

18  has no income so let's lock him up.  And wealth on the other hand

19  counts against the defendant.  He's got a lot of money, he can

20  flee.

21          So if you listen to the government as I have over 22

22  years whether the person has money or doesn't have money that's a

23  reason to lock him up.

24          Now, this isn't just money, I will acknowledge that.

25  It is ill-gotten gains from the government's point of view.  It's

not just that the defendant has Rolexes and Maseraties, but it's that this is drug proceeds, and I suppose that weighs in the balance somewhat.

But really for detention purposes all I can conclude is that if the defendant wanted to he probably has money squirreled away somewhere in which he could flee, but I don't see any history of non-appearance.

I also see that the defendant's house was ransacked by officers in January of 2007 and he didn't flee. So he has had three years if he wanted to flee, he's had three years of notice that the officers, you know, ATF and everybody else, has been interested in what was going on in this drug conspiracy, and that's the time to secrete oneself and to go to Guatemala or wherever it is that one's going to go, not after everything has been seized and been subject to lis pendens and everything else with regard to government activity, and that's what's happened here.

So looking at all the statutory factors, character, physical and mental condition, family ties, employment, they generally weigh towards bond.

No history of non-appearance. Stable family. The defendant had a business, and it's admitted that there was some legitimacy to the business even if there was some illegitimacy to it.

He seems to have some financial resources. He can

afford counsel.  Hiring counsel to come in and defendant oneself
is usually evidence that the defendant is serious about a defense
and cuts towards a finding that he's not going to flee; he's
going to face up to this.

So I really do not see by a preponderance of the
evidence anything that I can base a finding on that would say
that the defendant poses a serious risk of flight principally
because of the lack of motive or history of that sort of thing.

This leaves me with the January '07 shooting.  Oh, it
was April '07, the raid.  January '07, the shooting.

Mr. Jackson seems to think that the defendant had
something to do with the fact that there was this attempted
hijacking and actual shooting.

The evidence, even if we were here in a conspiracy
case, the evidence would be very circumstantial that the
defendant was in the position to see those two guys come up with
guns and once he did see them he fled.  Very circumstantial
because he could have been saving his own skin.

This was his brother-in-law.  Either he was a coward
or he was complacent, but right now all I have is the secondhand
statement by Jackson through various officers who've talked to
him.  Jackson thinks that the defendant had something to do with
this, and Jackson's feeling about this is circumstantial.

Hard for me to say by clear and convincing evidence
that the defendant conspired to have Jackson murdered in order to

1    take $1 million away from him. Very hard for me to say that by

2    clear and convincing evidence. I don't think anybody could do

3    that.

4            And that's really the only danger to the community

5    evidence that is before the Court. As I said earlier, and as Mr.

6    Lennon who is always four square with the Court admitted, the

7    idea that there would be more drug dealing, more transportation

8    of money, more money laundering, is really a thing of the past

9    now. The conspiracy is done and overwith.

10            Many times that is not the case when we see people

11    who are fresh off the street and that weighs very heavily in

12    favor of detention, but in this case the government has been

13    successful in shutting this thing down and without all the other

14    co-conspirators, all of whom have been taken out of the play, I

15    don't see any reason to think that this defendant could possibly

16    resurrect whatever illegality was taking place for the last three

17    or four years.

18            So I do not find any reason to believe that the

19    defendant, if released, will not appear. I also am not convinced

20    by clear and convincing evidence that he would pose a danger to

21    the community. So the government's motion for pretrial

22    detention, which I said I'm looking at completely de novo as if

23    this were a new case for him as it is, the government's motion is

24    denied.

25            So, Mr. Logan, I'm going to release you on the

general conditions that we place on people who are in serious
drug cases and who are released on bond.

You'll be released on $100,000 unsecured bond.
Unsecured means you don't have to put up any money with the Court
but you must promise to appear for all your court appearances.
If you do not appear the government can seek a judgment for the
$100,000 against you.

You are not to use or possess any controlled
substances for any reason unless you have a doctor's
prescription. You are to report to the pretrial services officer
and submit to urinalysis or other drug treatment, screening, et
cetera, as they direct.

You are not to use or possess any firearms or
destructive devices while on bond. You are to remain in the --
it's the Central District of California, is it not --

MR. TERRELL: Yes, your Honor.

THE COURT: -- Central District of California where
you'll be supervised by the pretrial services officer there
unless you have permission of the pretrial services officer or
the Court to travel or you are coming back and forth to these
proceedings here in court.

You are not to have any direct or indirect contact
with any other defendant in the case unless you are related to
that defendant by blood or marriage.

I don't order people as a condition of bond not to

speak to their wives or their children, but anybody else who is not related to you, you may not have any direct or indirect contact.  That means by phone, by e-mail, by Twitter, by messenger, in person.

If you're not talking to them then no one can accuse you of trying to tamper with their testimony or intimidate them, so this is for your benefit as well as the government's.

MR. LENNON:  Your Honor, may I have a point of clarification.  I understand if there were children involved.  I would like to hear a clarification with respect to co-defendants Martell and Sharon.

Martell is the defendant's brother, and Sharon is Martell's wife, so the defendant's sister-in-law.  Does the Court intend to have the exception cut out for them as well or would it be more just those folks who share the same home, which is just co-defendant Caroline Logan?

THE COURT:  Can you live without speaking to your brother and sister-in-law?

MR. TERRELL:  May I speak on his behalf, your Honor?

THE COURT:  Yes.  Yes.

MR. TERRELL:  I think that that would be very hard if the Court ordered it but I don't see, you know, he's blood line, his brother and sister-in-law.

I would ask the Court to carve that exception where he can communicate with his brother and his sister-in-law unless

1  the Court finds that, you know, we want to comply with the

2  Court's order but that's a --

3           THE COURT:  Where do they live?

4           MR. TERRELL:  They live, to give you some analogy,

5  your Honor, they live about 25-30 miles from Mr. Logan, where Mr.

6  Logan lives, Emond Logan lives, in Riverside.  They live in LA

7  County.

8           THE COURT:  Well, let me say this.  It is in

9  defendant's best interest --

10          MR. TERRELL:  Yes.

11          THE COURT:  -- for me to do this.  I go a couple

12  months without talking to my brother and I think it would be in

13  his best interest.

14          MR. TERRELL:  Yes, your Honor.

15          THE COURT:  As I said, if he's not speaking to them

16  then nobody can accuse him of anything.

17          MR. TERRELL:  Yes, your Honor.

18          THE COURT:  If he is speaking to them then it's his

19  word against somebody else's --

20          MR. TERRELL:  Yes, your Honor.

21          THE COURT:  -- as to what was being said.

22          MR. TERRELL:  Yes, your Honor.

23          THE COURT:  So I'm going to --

24          MR. TERRELL:  Yes, your Honor.

25          THE COURT:  I'm just going to allow people who live

1  in the house.

2          MR. TERRELL:  Yes, your Honor.

3          THE COURT:  And let's just say them by name then.

4  Who is in this case?  Caroline Epps Logan, certainly he can talk

5  to.  Anybody else in this case as a witness or a defendant?

6          MR. LENNON:  No, your Honor, who's listed there.  But

7  I would -- I think in light of what Mr. Terrell had said I'm

8  concerned about Lisa Jackson.  She's not named as a co-defendant

9  and she's not named as an unindicted co-conspirator but there

10  certainly has been already some concern.

11          Obviously Mr. Terrell can speak with her --

12          THE COURT:  Right.

13          MR. LENNON:  -- but I'm talking about for the

14  defendant.  Lisa Jackson would be --

15          MR. TERRELL:  No objection.

16          THE COURT:  Okay.  So here's how it's going to read.

17  No contact with -- direct or indirect -- with anyone who's a

18  defendant in the case or is known to be a witness including Lisa

19  Jackson but excluding Caroline Epps Logan.  So that includes

20  Martell; that includes Sharon.

21          And certainly counsel can speak to these people,

22  investigators can speak to these people.  Counsel can speak to

23  their counsel.

24          MR. TERRELL:  Your Honor, pretrial services, he would

25  report to Central District in California?

1          THE COURT:  Right.

2          MR. TERRELL:  Okay.

3          THE COURT:  That's called courtesy supervision.

4          MR. TERRELL:  Right.

5          THE COURT:  Any other conditions from the government?

6          MR. LENNON:  The standard condition that no firearms,

7   I believe, is part of that.

8          MR. TERRELL:  Yes.

9          THE COURT:  Yeah, I said that.  No firearms.

10          MR. LENNON:  Your Honor, I think that's acceptable to

11   the government.

12          MR. TERRELL:  Is the ordered forthwith?

13          THE COURT:  Yes.

14          So those are the conditions.  You understand those

15   conditions?

16          THE DEFENDANT:  Yes, sir.

17          THE COURT:  If you're faithful to the conditions of

18   bond there won't be any action taken on the bond.

19          If you fail to appear or fail to comply with any

20   condition whatsoever the bond will be revoked.  You will be held

21   in jail without bail, certainly, and you may be charged with a

22   separate felony for failure to appear for which the penalties are

23   in addition to anything else you face.

24          MR. LENNON:  Your Honor, I don't know if the Court

25   addressed, and it's not clear whether, it appears the defendant

1  does have a passport.

2          THE COURT:  Is there a passport?

3          MR. TERRELL:  Do you have a passport?

4          THE DEFENDANT:  I have one but it was in the safe

5  where they took --

6          MR. TERRELL:  They took everything.  They took like,

7  his wife, Caroline Logan, same issue.

8          THE COURT:  Okay.

9          MR. TERRELL:  They took the passport and --

10          THE COURT:  I will say surrender any passport that is

11  in your possession --

12          MR. TERRELL:  Yes, your Honor.  Thank you.

13          THE COURT:  -- and if you don't have one, don't apply

14  for one.

15          MR. TERRELL:  Yes, your Honor.  Thank you.

16          THE COURT:  All right.

17          The clerk will give you an oath on your bond.

18          (Defendant sworn.)

19          THE COURT:  All right.  Now, Mr. Terrell, we're not

20  adjourned yet.  Your client will be taken down to the fifth floor

21  lock-up.

22          MR. TERRELL:  Yes, your Honor.

23          THE COURT:  He'll be released from there, then he

24  needs to see the pretrial services officer and then he'll be free

25  to go until the next court appearance.

1          Do we have clothes for him here?

2          MR. TERRELL:  No.  We have nothing, your Honor, other

3  than what I'm wearing right now, no.

4          THE COURT:  Well, you'll need them.

5          MR. TERRELL:  Yes.

6          THE COURT:  Generally what we do then is give the

7  family a chance -- we can't release him like this.

8          MR. TERRELL:  Right.

9          THE COURT:  He'll be shot on sight.  We give the --

10  we keep him in jail until such time --

11          MR. TERRELL:  Yes.

12          THE COURT:  -- as the family gets him whatever he

13  needs to get back.

14          MR. TERRELL:  That would be perfectly okay because I

15  can make arrangement with the family to get some type of clothes

16  and things for him to -- so that would be fine.  That would be no

17  problem with that.

18          Along as he -- it'll probably take me about 24 hours

19  to get those things in place so when I do have them, money and

20  clothes, do I personally -- will there be an order in which I

21  would have --

22          THE COURT:  What we can do is -- what is this -- do

23  you think you'll have the things here by tomorrow?

24          MR. TERRELL:  Yes, your Honor.

25          THE COURT:  We can have him back at 4:00.  You can

1  send the things right to here to the Marshal's Service.  We'll

2  have the defendant returned tomorrow.  Will that work?

3          UNITED STATES MARSHAL:  Or we can check and see if we

4  have anything that we can provide for him, or his attorney can go

5  to the local store.

6          THE COURT:  Most people would rather stay in jail

7  than wear the clothes that you people have.

8          MR. TERRELL:  Your Honor, you know, I want to make

9  sure -- because I have a plane flight, I can try to get clothes

10  for him.  If the matter is going to be clothes, I can get clothes

11  for him right now, go to a store, buy some clothes for him and

12  take care of that.

13          THE COURT:  Okay.  Let's try to do that.  If not, get

14  him back here tomorrow and if he's not released today.

15          UNITED STATES MARSHAL:  Okay.

16          THE COURT:  Okay.

17          MR. TERRELL:  Okay.

18          THE COURT:  But let's work that plan of getting him--

19          MR. TERRELL:   Yes.

20          THE COURT:  -- released today.

21          MR. TERRELL:  If he has to show up tomorrow do I need

22  to be here, too?

23          THE COURT:  No.

24          MR. TERRELL:  Okay.

25          THE COURT:  No.  Just make sure he's got clothes.

1          MR. TERRELL:  Right.

2          THE COURT:  All right.

3          MR. LENNON:  Thank you, your Honor.

4          MR. TERRELL:  Thank you, your Honor.

5          THE COURT:  Court's adjourned.

6          (At 12:27 p.m., proceedings adjourned)

7                        — — — — —

CERTIFICATE


I, Patricia R. Pritchard, CER 3752, Certified Electronic
Court Reporter for the State of Michigan, do hereby certify that
the foregoing pages, 1 through 113, inclusive, comprise a full,
true and correct transcript, to the best of my ability, of the
proceedings and testimony recorded in the above-entitled cause.


April 23, 2010               Patricia R. Pritchard  /S/   
                          Patricia R. Pritchard, CER 3752