1          IN THE UNITED STATES DISTRICT COURT

2         FOR THE WESTERN DISTRICT OF MICHIGAN

3              SOUTHERN DIVISION

4

5  UNITED STATES OF AMERICA,

6        Plaintiff,

7   v.                        CASE NO:  1:08-CR-274-16

8  EMOND DUREA LOGAN,

9        Defendant.

10 _____/

11

12                * * * *

13            SENTENCING HEARING

14                * * * *

15

16    BEFORE:  THE HONORABLE PAUL L. MALONEY, CHIEF JUDGE
                 United States District Judge
17                Kalamazoo, Michigan
                 March 31, 2008
18

19

20

21

22

23

24

25

1    APPEARANCES:

2
     APPEARING ON BEHALF OF THE PLAINTIFF:
3
         JOHN C. BRUHA
4        BRIAN P. LENNON
         Assistant United States Attorney
5        P.O. Box 208
         Grand Rapids, Michigan  49501-0208
6

7    APPEARING ON BEHALF OF THE DEFENDANT:

8        SCOTT GRAHAM
         Scott Graham, PLLC
9        1911 West Centre Avenue, Suite C
         Portage, Michigan  49024
10
         LEO JAMES TERRELL
11       Law Offices of Leo James Terrell
         8383 Wilshire Boulevard, Suite 920
12       Beverly Hills, California  90211

13

14

15

16

17

18

19

20

21

22

23

24

25

1

I N D E X

2

WITNESSES:                                           Page

3

4   ALVIN JACKSON:  Government Witness

5       Direct Examination by Mr. Bruha                    6
        Cross Examination by Mr. Graham                   38
6       Redirect Examination by Mr. Bruha                 55
        Recross Examination by Mr. Graham                 56

7

8

    JOSEPH GUZMAN:  Government Witness

9

        Direct Examination by Mr. Bruha                   58
10      Cross Examination by Mr. Graham                   67
        Redirect Examination by Mr. Bruha                 73

11

12   EMOND LOGAN:  Defendant

13      Direct Examination by Mr. Graham                  74
        Cross Examination by Mr. Bruha                    79
14      Redirect Examination by Mr. Graham                98
        Recross Examination by Mr. Bruha                  99

15

16

                        E X H I B I T S

17                                                    Rec'd.

18  Government's Exhibit No. 1                          59
        (transcript)
19
    Government's Exhibit No. 2                          59
20      (transcript)

21  Government's Exhibit No. 3                          62
        (letter)

22

23

24

25

KATHLEEN S. THOMAS, U.S. District Court Reporter
410 West Michigan Avenue, Kalamazoo, Michigan  49007
(269)385-3050

1          Kalamazoo, Michigan

2          March 31, 2011

3          at approximately 1:37 p.m.

4                          PROCEEDINGS

5          THE COURT:  This is 08-274; The United States of

6     America vs. Emond Logan.  This matter is before the Court

7     for sentencing.

8          The Court's file reflects that on September 13, of

9     the year 2010, the defendant pled guilty to Count One,

10     conspiracy to distribute and possess with intent to

11     distribute five kilograms or more, of cocaine, contrary to

12     21 U.S. Code 846, 841(a)(1), (b)(1)(A)(ii).  The plea was

13     accepted by the Court at that time.

14          I accept the plea agreement finding the charges pled

15     to adequately reflect the seriousness of the actual

16     offense behavior.

17          The Court has been advised that there are objections

18     to the presentence investigation report and the scoring of

19     the advisory guidelines to be resolved today.  The Court

20     has tentatively scored this case at Offense Level 40,

21     Criminal History Category III, resulting in an advisory

22     guideline range of 362 months to life.

23          The record should reflect that Assistant United

24     States Attorneys John Bruha and Brian Lennon are here on

25     behalf of the government.  Attorney Scott Graham and Leo

1    Terrell are here on behalf of the defendant.  The

2    defendant is present in person.

3        Mr. Graham and Mr. Terrell, have you had ample

4    opportunity of reviewing the presentence report with your

5    client?

6        MR. GRAHAM:  Yes, your Honor.

7        MR. TERRELL:  Yes, your Honor.

8        THE COURT:  And I know that there are several

9    objections to the presentence report as far as the

10    defendant is concerned.  Have I got the universe of the

11    objections?

12        MR. GRAHAM:  Yes, your Honor.

13        MR. TERRELL:  Yes, your Honor.

14        THE COURT:  All right.  Thank you.

15        Mr. Bruha, I don't think the government had any

16    objections to the report; is that right?

17        MR. BRUHA:  We have no disagreements with the report

18    or the calculation, your Honor.

19        THE COURT:  All right.  Thank you.

20        The Court has been advised that one or more parties

21    wish to put on some proofs; is that right?

22        MR. BRUHA:  The government does, your Honor, yes.

23        THE COURT:  Okay.  All right.  Thank you.

24        And Mr. Graham, the universe of objections is the

25    ones that were originally stated.  You don't intend to--

1    You're pursuing those objections, I guess, is my

2    question?

3        MR. GRAHAM:  That is correct, your Honor, nothing

4    new, but we are pursuing those.

5        THE COURT:  All right.  Mr. Bruha, you may proceed,

6    sir.

7        MR. BRUHA:  Government calls Alvin Keith Jackson.

8    ALVIN KEITH JACKSON -  GOVERNMENT WITNESS - SWORN

9        COURT CLERK:  Please be seated.

10        State your full name and spell your last name for the

11    record, please.

12        THE WITNESS:  Alvin Keith Jackson, J-a-c-k-s-o-n.

13                    DIRECT EXAMINATION

14    BY MR. BRUHA:

15   Q.  Good afternoon, Mr. Jackson.

16   A.  Good afternoon.

17   Q.  Would you turn to face me, please?

18   A.  Sure.

19   Q.  How old are you?

20   A.  Forty-four.

21   Q.  And how much education do you have?

22   A.  I have a college degree.

23   Q.  Where did you receive that degree?

24   A.  Tuskegee University.

25   Q.  And what is your degree in?

1  A.  Finance.

2  Q.  And have you ever been in a mental hospital?

3  A.  No.

4  Q.  Have you received any mental health treatment?

5  A.  No.

6  Q.  Have you been in this courtroom before?

7  A.  Yes.

8  Q.  Did you plead guilty in this court to the charge of

9      conspiracy to distribute over five kilograms of cocaine?

10  A.  Yes.

11  Q.  And did you have a plea agreement with the government?

12  A.  Yes.

13  Q.  Did that plea agreement include cooperation with the

14      government?

15  A.  Yes.

16  Q.  And did that cooperation agreement include providing

17      truthful testimony if called upon to do so?

18  A.  Yes.

19  Q.  As part of your plea agreement, did the government agree

20      not to file a Supplemental Information against you that

21      would have increased your minimum mandatory sentence?

22  A.  Yes.

23  Q.  And prior to your sentencing, did the government file a

24      motion for downward departure based upon your substantial

25      assistance at that time?

1  A.  Yes.

2  Q.  And was that motion granted by the Court?

3  A.  Yes.

4  Q.  And what--  Were you sentenced in this court?

5  A.  Yes.

6  Q.  And what sentence did you receive?

7  A.  235 months.

8  Q.  And how much cocaine were you held accountable for at your

9     sentencing?

10  A.  Slightly over 1,000 kilos.

11  Q.  Now, Mr. Jackson, do you know the defendant in this case

12     Emond Logan?

13  A.  Yes.

14  Q.  Is Mr. Logan present in the courtroom today?

15  A.  Yes.

16  Q.  Is he the only other person in the courtroom wearing an

17     orange jumpsuit?

18  A.  Yes.

19  Q.  How long have you known Emond Logan?

20  A.  I believe I met Logan either 2001, 2002.

21  Q.  Do you have any familial relationship with Mr. Logan?

22  A.  He is my wife's brother-in-law.

23  Q.  So if I understand correctly, Mr. Logan is married to your

24     wife's sister?

25  A.  That is correct.

1 Q.  And did there come a time when Mr. Logan became involved

2    in your drug trafficking activity?

3 A.  Yes.

4 Q.  When did that first begin?

5 A.  2003.

6 Q.  What happened then?

7 A.  He came to me to purchase small amounts of cocaine, kilo

8    size cocaine.

9 Q.  Is that what you consider a small amount, a kilogram?

10 A.  Yes.

11 Q.  Did he ever purchase more than a kilogram at that time?

12 A.  At that--  The first time, no.  Eventually he would

13    purchase, I think at the most, either two or three.

14 Q.  At a time?

15 A.  At a time, but he didn't do it often.  I think altogether

16    I had sold him small amounts of cocaine on maybe, on the

17    most, I would say, on three occasions.

18 Q.  Did his relationship change with you at any time?

19 A.  Say that again.

20 Q.  Did Mr. Logan's drug relationship with you change at any

21    time?

22 A.  Yes.

23 Q.  After 2003?

24 A.  Yes.  It went from him being a purchaser of cocaine to

25    being a courier of cocaine.

1  Q.  How did that come about?

2  A.  He approached me in the summer of 2004 with an idea of him

3      quitting his current job, buying a semi tractor, becoming

4      an independent contractor or independent operator, as well

5      as he wanted to become a drug courier.  So he asked me if

6      he quit his job, purchased a truck, could I make some

7      out-of-town contacts with him-- for him that would allow

8      him to transport cocaine for him-- for me, or for us.

9  Q.  And what did you tell him?

10  A.  I told him if he was going to quit his job and purchase a

11      truck on the idea of me being able to hire him as a drug

12      courier, not to do it, because I could make no guarantees

13      at all.

14  Q.  Do you know whether or not Mr. Logan had any experience as

15      a drug courier at that time?

16  A.  No.

17  Q.  No, you don't?

18  A.  I'm not aware of him having any experience as being a drug

19      courier at that time.

20  Q.  Did he become a drug courier for you after that?

21  A.  Yes.

22  Q.  When did that begin?

23  A.  In 2004.

24  Q.  What part of 2004?

25  A.  It would be the summer of 2004, or early fall.

1  Q.  And what did Mr. Logan begin doing for you at that time?

2  A.  Transporting small amounts of cocaine.

3  Q.  Where?

4  A.  To Detroit, Michigan.

5  Q.  Did you have a cocaine customer in Detroit?

6  A.  Yes.

7  Q.  Who was your cocaine customer in Detroit at that time?

8  A.  Lindell Brown.

9  Q.  And what quantities of cocaine were you distributing to

10      Mr. Brown at that time?

11  A.  Initially it was small amounts, anywhere from 10 to 15

12      kilos in the very beginning.

13  Q.  And did it change after that?

14  A.  Yes, it rapidly escalated upwards.

15  Q.  How quickly?

16  A.  Within months.

17  Q.  And what did it escalate up to?

18  A.  An average about 50 kilos per trip.

19  Q.  When did you begin distributing 50 kilogram loads of

20      cocaine to Mr. Brown?

21  A.  I can't give you an exact time, but like I said, it was

22      within months, so I would say if we began in August or

23      September of 2004, I would say probably by the end of

24      2004, beginning of 2005.

25  Q.  How often was Mr. Brown receiving those kind of loads of

1    cocaine?

2  A.   Approximately twice a month.

3  Q.   And that would have been at least from the early part of

4    2005?

5  A.   Yes.  I mean as far as go back in 2004 at least twice a

6    month.

7  Q.   But at least by 2005?

8  A.   It started in 2004, we were going at least twice then, but

9    definitely by 2005, certainly.

10  Q.   And averaging 50 kilograms per load?

11  A.   By 2005, yes.

12  Q.   What were you charging Mr. Brown for kilograms of cocaine?

13  A.   It averaged or it varied from anywhere from $18,000 to

14    $20,000 per kilogram.

15  Q.   And what were you paying Mr. Logan for transporting that

16    cocaine?

17  A.   Initially it was about one-- it was exactly $1,000 per

18    kilogram, and then it scaled down to approximately about

19    $800.

20  Q.   Did Mr.--  Was Mr. Logan doing anything for you besides

21    just transporting cocaine to Detroit?

22  A.   He was also transporting the drug proceeds back to

23    California.

24  Q.   Could you tell us how that worked, please?

25  A.   He would drop off the loads of cocaine in the Detroit,

1    Michigan area, I would pick them up, take them to Brown,

2    he would sell them, I would package the money, take the

3    money to Logan in the Detroit area, he would transport the

4    money back to California, where I would later receive it

5    from him.

6  Q.  And how much-- What were the amount of drug proceeds that

7    he would transport back to California from the Detroit

8    area?

9  A.  It would vary on the quantities of drugs, but easily

10    several hundreds of thousands of dollars to slightly over

11    a million dollars.

12  Q.  How long did you continue transporting loads of cocaine to

13    Lindell Brown?

14  A.  Until his arrest in June, I believe, of 2005.

15  Q.  Where was he arrested?

16  A.  In the Detroit, Michigan, area.

17  Q.  And what happened to your drug distribution business after

18    Mr. Brown was arrested?

19  A.  It ceased.

20  Q.  Permanently?

21  A.  It was terminated.

22  Q.  Permanently?

23  A.  No, not permanently.

24  Q.  How long did it cease?

25  A.  I would say approximately two to three months.

1  Q.  Did it cease completely with Mr. Brown?

2  A.  Yes, it did.

3  Q.  Did it resume with someone else?

4  A.  Yes.

5  Q.  Who was that?

6  A.  Mr. Brown's co-conspirator.

7  Q.  Who was that?

8  A.  Felicia Blake.

9  Q.  And were you familiar with Felicia Blake?

10  A.  I had seen her before, yes.

11  Q.  Was she previously associated with Mr. Brown during your

12      business dealings with Mr. Brown?

13  A.  Yes.

14  Q.  And did she then begin obtaining loads of cocaine from you

15      after Mr. Brown's arrest?

16  A.  Yes.

17  Q.  When did that begin?

18  A.  Again, that would be late, I would say, the late summer of

19      2005 or early-- early fall or late summer, 2005.

20  Q.  And what were you distributing to Ms. Blake at that time?

21  A.  Cocaine.

22  Q.  How much?

23  A.  Again, on average about 50 kilograms per trip.

24  Q.  How often were these trips?

25  A.  Again, on average twice a month.

1  Q.  Who was transporting that cocaine for distribution to Miss

2     Blake?

3  A.  Logan-- Mr. Logan.

4  Q.  And did you continue to use the same procedure as you did

5     before?

6  A.  Yes.

7  Q.  Did you have any problems or setbacks during your dealings

8     with Miss Blake?

9  A.  Did I have any setbacks with Miss Blake?

10  Q.  During the time you were dealing with Miss Blake?

11  A.  Yes.

12  Q.  What was that?

13  A.  It was Memorial Day weekend, 2006, I had given Logan

14     approximately $800,000 in cash to transport back to

15     California.

16  Q.  Where did you give him that cash?

17  A.  In the Ypsilanti area.

18  Q.  And you personally delivered that amount of cash to

19     Mr. Logan?

20  A.  Yes.

21  Q.  And what was he supposed to do with it?

22  A.  He was supposed to transport it back to California.

23  Q.  And was he using a tractor trailer for these various trips

24     between California and Detroit?

25  A.  Yes.

1  Q.  And did that money make it back to California?  Did the

2     money that you gave Mr. Logan on that occasion make it

3     back to California?

4  A.  It made it, but not according to him.

5  Q.  What happened?

6  A.  At one time, like I said, I was-- I left after giving him

7     the money, I went on vacation in Florida.  It was Memorial

8     Day weekend, 2006.  When I returned home, it was a Monday

9     or Tuesday, he came to my house that morning, he rang the

10    doorbell, I came to the door, he looked as if he was-- he

11    had a sad face, and I said, "What's wrong?"  I thought he

12    had gotten into it with his wife.  He said, "Man, they got

13    the money."  I said, "Who got the money?" He said, "The

14    police."  And I said, "Well, what happened?"  He said, "I

15    was-- my nephew was driving through New Mexico, and he was

16    speeding, and he was pulled over."  He said, "They ran a

17    name-- they ran his name," and he was, I believe at the

18    time, he was on probation for a marijuana charge, they

19    searched the vehicle, found the money, took the money and

20    told him to get the fuck out of there.

21  Q.  Out of where?

22  A.  Out of New Mexico.

23  Q.  And that's what Mr. Logan related to you?

24  A.  Yes, and I thought that was odd.

25  Q.  Why?

1  A.  When he used those words, "They took the money and told me

2    to get the fuck out of there."

3  Q.  Why?

4  A.  Because before we had done anything, he had sat down in my

5    house and he says, "What you think would happen if I were

6    to get pulled over and the police take the money and they

7    tell me to get the fuck out of there?"  I said, "Well,

8    normally that wouldn't happen."  I said, "The standard

9    procedure is they would probably seize the money, give you

10    a receipt, and there would be an ongoing investigation."

11    We just left it at that.  But he used those exact words.

12  Q.  When did you have that conversation with Mr. Logan?

13  A.  That would be in the summer of 2004, before we had done

14    any courier transport-- any type of courier work.

15  Q.  Before he transported any cocaine or drug proceeds for

16    you?

17  A.  Yes.

18  Q.  And did he use those same words in describing what

19    happened to him in New Mexico?

20  A.  The same words that he told me, "They took the money, and

21    told me to get the fuck out of there."

22  Q.  And did he provide you with any paperwork--

23  A.  He had a--

24  Q.  --documenting any stop?

25  A.  Yes, he had something to the effect of something like

1    vehicle inspection report.

2  Q.   And did that say anything about any money?

3  A.   No, it was an inspection of the vehicle.

4  Q.   Did he have a receipt for any money that was taken from

5      him?

6  A.   No, he did not.

7  Q.   Did he have any seizure papers showing that any money had

8      been seized by the police?

9  A.   He had nothing to that effect.

10  Q.   Did he ever show you any other documentation for that

11      money?

12  A.   No.

13  Q.   Did you ever receive any portion of that $800,000 back?

14  A.   Yes.

15  Q.   What did you receive?

16  A.   That day when he came to the house, he had $100,000 that

17      he turned over to me and said it was part of his savings,

18      and then he agreed that we would continue-- or we were

19      going to continue with the drug operation, and he would

20      work at a reduced rate.

21  Q.   Were you suspicious that Mr. Logan had ripped you off for

22      $700,000?

23  A.   I was very suspicious.

24  Q.   Why did you continue doing business with him?

25  A.   Because I had to pay off the drug debt.

1  Q.  Who did you owe that money to?

2  A.  My suppliers.

3  Q.  And was that for marijuana that you obtained-- I mean

4      cocaine you had obtained on front from them?

5  A.  Yes.

6  Q.  And did you end up paying back the suppliers for that

7      money?

8  A.  Eventually, yes.

9  Q.  How did you go about doing that?

10  A.  I just would give them monthly installments.

11  Q.  And how did you earn or obtain the money to make up that

12      debt?

13  A.  Drug proceeds.

14  Q.  From additional drug deliveries to Detroit?

15  A.  Yes.

16  Q.  And were you still paying--  Was Mr. Logan still

17      transporting the cocaine to Detroit for you after that?

18  A.  Yes.

19  Q.  What were you paying Mr. Logan for those trips?

20  A.  Again, like I said, it would be a reduced rate, and I

21      think we agreed he would make five or six trips at reduced

22      rate, and then after that he will go back to his normal

23      rate.

24  Q.  Did that happen?

25  A.  Yes.

1 Q. How quickly did he go back to his normal rate?

2 A. Within months, a couple of months.

3 Q. Now, after the incident where the money was not returned

4 from that trip, did you continue making approximately two

5 deliveries a month to customers in Detroit?

6 A. Yes, on average again. Yes, twice a month.

7 Q. What were the amounts of those loads of cocaine?

8 A. They were averaging approximately about 50.

9 Q. So did your cocaine business with customers in Detroit

10 continue pretty much as it had before?

11 A. Yes.

12 Q. And how long did that continue?

13 A. Until January 27th, of 2007.

14 Q. Did you make any-- or did you have any loads of cocaine to

15 Detroit in the month of January, of 2007?

16 A. Yes.

17 Q. How many loads did you have in that month?

18 A. I would say two.

19 Q. And what happened on January 27th, 2007?

20 A. On that morning, I had-- I was expecting a call from

21 Logan, because he had called me the night before and said

22 he would be in the area in the morning to pick up the drug

23 proceeds.

24 Q. Are these proceeds from one or both of the loads in

25 January?

1  A.  One of the loads.

2  Q.  I'm sorry?

3  A.  One load.

4  Q.  Which load?

5  A.  The last load.

6  Q.  And how much did you have in proceeds?

7  A.  Over a million dollars.

8  Q.  From that load?

9  A.  Yes.

10  Q.  And what were you going to do with that?  What were you

11      going to do with the proceeds?

12  A.  I was going to give them to Logan to transport for me.

13  Q.  What happened?

14  A.  Like I said, he had called me the night before and said he

15      would be in the area in the morning around, I believe

16      7:00, 7:30, so I got up Sunday morning around 7:00

17      o'clock, and I waited until about 8:00 o'clock.  I didn't

18      hear from Logan.  I called him, and he said he was en

19      route, but there was bad weather, and he would be there in

20      a few hours, and he would give me a call.  I believe he

21      called me maybe around 11:00, 11:30, and said he says,

22      "I'm here."  I said, "Where are you, at the store or the

23      shop?"  We had two different meeting locations, and he

24      said, "I'm at the truck place, the shop."

25  Q.  Where was that?

1  A.  That was in Ypsilanti, Michigan.

2  Q.  What area?

3  A.  It's--  When you say what area?

4  Q.  What is it near?

5  A.  It's near the airport, Detroit Metro Airport.

6  Q.  Is it near an expressway?

7  A.  I-94.

8  Q.  And what is located at that spot?

9  A.  It's a business.  At the time, I don't know what it is

10     now, but at the time, it was a business that sold and

11     serviced tractor trailers.

12  Q.  And why did you use that location as a meeting spot?

13  A.  That was a location that Logan had scouted out, and upon

14     me going there and saw it, it was the perfect location, it

15     was well secluded, isolated from the public view, for the

16     most part.

17  Q.  And had you used that location before?

18  A.  Many times.

19  Q.  And did you go to that location on that morning?

20  A.  Yes.

21  Q.  Was the business open at that time?

22  A.  No, it was not.

23  Q.  What day of the week was this?

24  A.  This was on a Sunday, and it was after 11:00 o'clock a.m.

25     in the morning.

1    Q.   Was Mr. Logan there when you arrived there at the

2         location?

3    A.   His vehicle was there.  Normally when I go meet him to

4         drop off the drug proceeds, he is usually sitting at the

5         wheel, and I noticed when I pulled into the parking lot,

6         he wasn't sitting at the wheel, the driver's wheel, so I

7         just parked.  It was his truck and there was a Fed Ex

8         truck, so I just parked in between the two trucks, and I

9         began to call Mr. Logan on my cell phone, and it just rang

10        and rang and rang, and eventually he appeared at the

11        driver wheel of his truck, and I just hung up my phone.

12        He opened up his door and began to put his shoes on, and

13        he exited his vehicle and started approaching the driver's

14        side of my vehicle.

15   Q.   And then what happened?

16   A.   At that time, a vehicle drove into the parking lot, it was

17        a blue Dodge Charger, and it immediately drew my

18        suspicion.

19   Q.   Why?

20   A.   Because that is the type of vehicle that is used as an

21        undercover police-- narcotics undercover vehicle in the

22        Los Angeles area, so I thought maybe it was law

23        enforcement.

24   Q.   Was anyone else at that location besides Mr. Logan when

25        you arrived?

1  A.  No, not that I'm aware of.

2  Q.  Was anyone else with Mr. Logan?

3  A.  Not that I'm aware of, no.

4  Q.  So what did you do then after you saw the Dodge Charger

5      pull in?

6  A.  Well, once I saw that, Logan came to my driver's side

7      window and we began having a conversation, I said, "Did

8      you see that vehicle?"  And he acknowledged seeing the

9      vehicle, but he-- I don't know what his exact words, but

10     basically assuring me not to worry about it.  And he began

11     to have a discussion that he hadn't secured a load yet, so

12     we are not going to put the money in the back of the

13     trailer, we are going to put it on-- he had a little side

14     compartment on the passenger side of his vehicle, and we

15     were going to store the money there.

16 Q.  Was that out of the ordinary?

17 A.  Yes, it was out of the ordinary, because normally we would

18     always stash the proceeds in the tractor-- in the trailer

19     portion of the vehicle.

20 Q.  Did Mr. Logan seem concerned at all about the Dodge

21     Charger that had pulled in?

22 A.  No.  Again, like I said, he said-- he acknowledged seeing

23     it, but he basically was just reassuring me it's nothing

24     to worry about.  So eventually that vehicle, like I said,

25     it pulled in, and eventually it turned back around, and at

1   one point, it parked at an angle to the Fed Ex truck, I

2   would say maybe a 45 degree angle, and I couldn't see the

3   occupants of the vehicle, but I could see the front end of

4   the vehicle.

5  Q.   So was it parked in the same direction of the Fed Ex truck

6     or facing the Fed Ex truck?

7  A.   It was slightly parked at, like I say, a 45 degree angle.

8     The truck is parked like this, it pulled like this.

9  Q.   So nose pointing towards the Fed Ex truck at an angle?

10  A.   Yes.

11  Q.   And your vehicle was between the Fed Ex truck and

12     Mr. Logan's truck?

13  A.   That is correct.

14  Q.   What else happened at that time?

15  A.   Like I said, we were having a discussion, and then when

16     this car pulled up and it parked, again, I motioned to the

17     vehicle for him to check out the occupants, and he looked

18     over and he looked back at me, and he said-- I don't know

19     what his exact words, but again, he was just reassuring me

20     there's nothing to worry about.  I don't know who it is.

21     It looks okay to me.  It's fine with me.  Let's do what we

22     have to do basically.

23  Q.   So what did you do?

24  A.   So he stood in front of my vehicle and he motioned with

25     his head like come on, let's start transporting the

1    proceeds from your car to my vehicle.  When he nodded his

2    head to come on, the passenger from the car exited the

3    car, and I remained seated in my vehicle with the engine

4    running.  This occupant of the car, I couldn't make him

5    out, but he-- I got a slight glimpse of the occupant when

6    he walked down the side of the Fed Ex truck, because there

7    was a gap between the trailer and the cab, a small gap.

8  Q.  So when you're talking about a Fed Ex truck, are you

9      talking about a Fed Ex delivery van or something larger

10     than that?

11  A.  No, larger.  It's a semi tractor trailer.

12  Q.  All right.  And you saw the passenger from the Dodge

13      Charger walk where?

14  A.  He started walking alongside the driver's side of the Fed

15      Ex truck, and he was kicking the tires.

16  Q.  Would that be the side of the Fed Ex truck that was away

17      from you?

18  A.  Yes, it was away from me.  He was walking down the

19      driver's side.  I was right parked next to the passenger's

20      side of the Fed Ex truck.

21  Q.  So the passenger is on the opposite side of the Fed Ex

22      truck from where you're parked?

23  A.  The passenger who exited the vehicle, yes.

24  Q.  All right.  And then what happened?

25  A.  I said he started walking down alongside of the driver's

1    side of the truck, the Fed Ex truck, and I got a slight

2    glimpse of him, just a side view. He had a hooded

3    sweatshirt on, and he was kicking the tires as if he was

4    checking the tires. And something is not right here,

5    because this is a Fed Ex truck, but this person does not

6    have on a Fed Ex uniform.

7   Q. How was the person dressed?

8   A. Again, just had on dark clothing and a dark hooded

9    sweatshirt. I'm still not certain of who this person is,

10    so I'm not getting out of my vehicle to do anything.

11    Logan is still standing in front of my vehicle.

12    Eventually this person goes underneath from the driver's

13    side of the trailer to the passenger's side, and he kneels

14    behind the tire well, and he does a cocking motion-- I see

15    all of this in my rearview mirror-- and he comes from

16    underneath this trailer. Now he is in a ski mask and he

17    is creeping up from behind with a pistol in his hand, and

18    again, Logan is just standing in front of me.

19   Q. So he is creeping up behind what?

20   A. My vehicle.

21   Q. On the driver's side?

22   A. On the driver's side of my vehicle.

23   Q. How were you seeing this?

24   A. Through my rearview mirror as well as the-- what, the

25    rearview mirror inside of the car and there's a side

1      mirror on the driver's side of the car as well.

2   Q.   Did the passenger have anything at that time?

3   A.   He had a loaded gun in his hand.

4   Q.   You could see a gun?

5   A.   Absolutely.

6   Q.   And where was Mr. Logan when this was happening?

7   A.   Standing directly in front of my vehicle.

8   Q.   Was Mr. Logan in direct line of sight of this person

9      sneaking up behind you?

10   A.   He could see-- Not only could he see the person sneaking

11      up from me, he could see directly, if he looked to the

12      side, directly into the vehicle as well.

13   Q.   Which vehicle?

14   A.   That the person had exited from.

15   Q.   The charger?

16   A.   Yes.

17   Q.   Did Mr. Logan say anything to you at that time?

18   A.   No, he did not.

19   Q.   Did he warn you?

20   A.   He didn't do anything.  He just stood there.

21   Q.   What happened?

22   A.   Eventually he, as the person-- the assailant, now with a

23      gun in his hand, is approaching me from the rear,

24      eventually Logan just casually disappears out of my line

25      of vision.

1  Q.  And what did you do?

2  A.  When the gunman approached my vehicle, he demands-- he

3     says, "Get out of the car.  Get out of the car."  And I

4     hit the accelerator and he lets off one or two rounds.

5  Q.  And you hear gunshots?

6  A.  Yes.

7  Q.  Were you hit?

8  A.  I was hit, but at the time, I wasn't-- I wasn't sure

9     because, well, I smelled gunpowder, but I wasn't-- I

10     didn't-- I thought if you got shot, you would be in a lot

11     of pain, but I wasn't in any kind of pain, but I could

12     smell gunpowder.

13  Q.  And where was Mr. Logan at that time?

14  A.  At the time of the shooting, again he had disappeared out

15     of my line of vision.

16  Q.  Did you hear him say anything at all?

17  A.  I didn't hear him say a word.

18  Q.  Did you notice anything when you were trying to get out of

19     there?

20  A.  Yes.  As I exited from between the two vehicles, I looked

21     directly into the vehicle and the driver is sitting there

22     with a hood and a ski mask on as well.

23  Q.  In the Charger?

24  A.  Absolutely.

25  Q.  And--

1 A.   And then I looked back in the rearview mirror, and the

2      gunman is just standing there like he is dumbfounded, like

3      what do I do next.

4 Q.   What did you do next?

5 A.   I continued on to-- well, I got right onto my cell phone

6      to call my wife to inform her what had just happened to

7      me.

8 Q.   And you're driving at this time?

9 A.   Absolutely.

10 Q.   And where is the money?

11 A.   In the trunk of my car.

12 Q.   And did you get ahold of your wife?

13 A.   Eventually I did, yes.

14 Q.   Did you talk to anyone else before you talked to your

15      wife?

16 A.   Yes.  Like I said, I called my wife, there was no answer,

17      it went to voicemail, so I immediately hung up with her

18      and called Felicia Blake, and I told her, I said, "I need

19      you to listen carefully to what I'm about to tell you."  I

20      said, "I need you to call my wife, here's her name, here's

21      her phone number, and tell her that Emond had just tried

22      to rob and kill me and I was on my way to a hospital."

23 Q.   Now, you said Emond--  You told her Emond tried to rob and

24      kill you?

25 A.   I told her Emond Logan.  I said-- I gave her his first and

1    last name.  I said, "Call my wife, here's her name, first

2    and last name, here is her phone number, tell her that

3    Emond Logan, her brother-in-law my brother-in-law had just

4    tried to rob and kill me.  I said, "In the event I don't

5    make it to the hospital, in the event that I die, you make

6    certain to call my wife and tell her that Emond Logan

7    tried to rob and kill me."

8  Q.   Was Emond Logan the person who shot you?

9  A.   No.

10  Q.   So why did you say to her Emond Logan tried to rob and

11     kill you?

12  A.   Because he was, in my opinion, absolutely responsible for

13     it.

14  Q.   And why did you feel that way?

15  A.   Again, the meeting place, no one knew of this other than

16     myself and maybe one other person, Logan, and another

17     person perhaps, and that other person wasn't present.  So

18     no one knew where I was going that day, at that time, and

19     what type of vehicle I would be in, because why would

20     someone out of the blue want to-- they in a brand new

21     Dodge-- Dodge Charger, what the hell would they want with

22     a Ford Taurus, something they wanted and how would they

23     know that that vehicle was more valuable than their

24     vehicle.

25  Q.   Had you discussed with anyone else besides Mr. Logan when

1    you were going to be at that location?

2  A.  I told no one.  No one knew.  No one but Logan.

3  Q.  And anything else make you feel that way?

4  A.  His reactions or lack thereof.

5  Q.  Anything else?

6  A.  Again, like I said, I got back on the phone.  Eventually I

7    spoke with my wife, told her what happened.  She was in

8    the presence of his wife as well as our mother-in-law.

9  Q.  Where?

10  A.  I believe at the time they were at the mother-in-law's

11    house, that would be their mother, my mother-in-law.

12  Q.  Where is that?

13  A.  Riverside, California.

14  Q.  California?

15  A.  Yes.

16  Q.  And what did you tell your wife?

17  A.  I said-- "I been-- I think I've been shot.  Emond tried to

18    rob and kill me."  And she said, "Oh, my God, Emond tried

19    to rob and kill Papa."  Carol is her sister, and I heard

20    her in the background she said, "Oh, no, no, no."  And I

21    believe she began to call Emond on his phone, and I heard

22    her in the background, she said, "You tried to rob and

23    kill Papa," or something to that effect.  And my wife

24    said--  She hung up the phone, and she said, "Okay.  I'll

25    call you back later.  I got to get out of here."  And she

1    hung up the phone.  And eventually she called me back

2    later.

3  Q.  Who is Papa?

4  A.  That's my nickname, sir.

5  Q.  Is that how Mr. Logan referred to you?

6  A.  Yes.

7  Q.  At that time did you realize you had been shot?

8  A.  Again, I wasn't sure, because I'm thinking if you get shot

9    it's going to hurt.  I wasn't in pain, but I could smell

10    gunpowder, so I was almost certain.  I'm still kind of

11    not, you know, my faculties are not straight.  I'm not

12    certain what is going on.  I'm not sure what is really

13    going on.  I can't believe what just happened.  I'm

14    dumbfounded.  I can't believe that my brother-in-law would

15    actually try to do this.

16  Q.  So what did you do?

17  A.  I got back on the phone with Felicia Blake, and she was

18    giving me directions to the nearby hospital.

19  Q.  Did you go to a hospital?

20  A.  Yes, I did.

21  Q.  And when you got to the hospital, did you find out you had

22    been shot?

23  A.  Yes.

24  Q.  Where were you shot?

25  A.  I was shot in the chest.

1  Q.  Was it a serious injury?

2  A.  Yes, it was a serious injury.

3  Q.  And did you remain at the hospital?

4  A.  For five days.

5  Q.  And what happened to the money that was in your car?

6  A.  It was given to Blake to safe keep for me.

7  Q.  Given to her how?

8  A.  Actually, she-- it was-- it remained in the trunk of the

9      car, and she just took possession of the car.

10 Q.  Was the car at the hospital?

11 A.  I believe at one point in time it was at the hospital, and

12     it may have remained at the--  I think it remained at the

13     hospital, but I believe she eventually would just take the

14     proceeds out of the trunk of the car and transfer them to

15     her vehicle or she would-- or she would drive the vehicle,

16     put the money up and bring the vehicle back, because the

17     vehicle was recovered at the hospital, if I'm correct

18     about that.

19 Q.  And did you eventually get the money back?

20 A.  Yes.

21 Q.  How?

22 A.  I had someone else courier it back for me.

23 Q.  Now, after you got to the hospital?

24 A.  Yes.

25 Q.  Did you ever hear from Mr. Logan?

1  A.  Logan had called me while I was at the hospital, which

2     would be maybe 45 minutes after the shooting.

3  Q.  And did you talk to him?

4  A.  No, I did not answer the phone.

5  Q.  Did you ever hear from Mr. Logan after that?

6  A.  Never, ever.

7  Q.  Ever?

8  A.  Ever.

9  Q.  Did he come visit you at the hospital?

10  A.  No.

11  Q.  Did he ever contact you to see how you were doing?

12  A.  No, never.

13  Q.  Did he ever talk to you about what happened in that truck

14     lot that day?

15  A.  Never.

16  Q.  After being-- Since the time you were shot, have you ever

17     spoken to Mr. Logan again?

18  A.  Never again in my life.

19  Q.  Have you had any drug dealings of any type with Mr. Logan

20     since that time?

21  A.  No.

22  Q.  Were you questioned by the police about what had happened?

23  A.  Yes.

24  Q.  What did you tell the police?

25  A.  Initially I told them I had went to go and meet my

1    brother-in-law.  I spoke to some officer out of Dearborn

2    County, and then I said no, no, I recanted that.  I said I

3    just went to go look at some trucks, and then when the

4    other officers from another county came to question me, I

5    just told them I believed I was a victim of a car

6    jacking.

7  Q.  Now, who was your brother-in-law you were referring to?

8  A.  Emond Logan.

9  Q.  So that's who you meant by your brother-in-law?

10  A.  Yes.

11  Q.  And the first version you gave to the police was that you

12    were meeting your brother-in-law at that location?

13  A.  Yes.

14  Q.  And did you change that?

15  A.  Yes.

16  Q.  Why?

17  A.  Because I didn't want to draw suspicion to myself.

18  Q.  And did anything further come of this incident after that?

19  A.  Not that I'm aware of.

20  Q.  So even though your wife-- your wife's sister or you and

21    Mr. Logan are married to sisters, you never had any

22    further discussion or contact with Mr. Logan after this

23    incident?

24  A.  Never.

25  Q.  Mr. Jackson, how much cocaine did you tell us you were

1    held accountable for at your sentencing?

2  A.  Slightly over 1,000 kilos.

3  Q.  How much of that cocaine did Mr. Logan transport?

4  A.  All of it.

5  Q.  Over a thousand kilograms?

6  A.  Yes.

7  Q.  And what is your best estimate of how much money you paid

8    Mr. Logan altogether for transporting that cocaine?

9  A.  Over a million dollars.

10  Q.  Was that just for transportation?

11  A.  Yes.

12  Q.  Does that amount include the money that was supposedly

13    lost in New Mexico?

14  A.  No, it does not.

15  Q.  Did Mr. Logan ever discuss with you how much money he was

16    making?

17  A.  At one point in time, it was either late 2005, early 2006,

18    he said to me-- he said, "I know I've made over $700,000,

19    but hell, I'm spending it as fast as I make it.  I don't

20    have anything to show for it.  I mean not show for it, I'm

21    unable to save it.  I'm spending it as fast as I'm making

22    it."

23  Q.  And you said that was in late 2005, early 2006?

24  A.  Yes.

25  Q.  And did Mr. Logan continue transporting cocaine for you

1    for approximately another year after that?

2  A.  Yes.

3        MR. BRUHA:  May I have just a moment, your Honor?

4        (Pause in proceedings.)

5        MR. BRUHA:  I'll pass the witness.

6        THE COURT:  Mr. Graham.

7                    CROSS EXAMINATION

8    BY MR. GRAHAM:

9  Q.  Mr. Jackson, let me get a few background facts straight in

10     my own mind.

11        When did you first start selling drugs?

12  A.  When I first started selling drugs?

13  Q.  Yes.

14  A.  1980.

15  Q.  In about 1980.  And you've sold drugs, for the most part,

16     continually since then until you were arrested?

17  A.  Not continuously, no.  On and off throughout the years,

18     yes.

19  Q.  Okay.  When you started selling, you sold cocaine,

20     correct?

21  A.  No.

22  Q.  What did you sell?

23  A.  Joints of marijuana.

24  Q.  Okay.  How quickly after you started selling marijuana did

25     you move to cocaine?

1   A.  That would be about four years later.

2   Q.  Okay.  Now, you testified that part of your plea agreement

3      provided that the government would not file an Information

4      or Supplemental Information against you that would have

5      increased your mandatory minimum sentence, correct?

6   A.  Correct.

7   Q.  And you're aware of what happened in regard to that

8      provision of your plea agreement, you understand it,

9      correct?

10   A.  Yes.

11   Q.  Okay.  What was the conviction for that they were going to

12      file the Information?

13   A.  Say that again.

14   Q.  What was the conviction?

15   A.  Oh, the prior conviction?

16   Q.  Yes.

17   A.  It was possession or-- either possession or transportation

18      of four-tenths of a gram of heroin.

19   Q.  Okay.  It was a delivery of heroin charge, correct?

20   A.  No, I don't know.  Either--  It was either possession or

21      transportation of four-tenths of a gram of heroin.

22   Q.  Okay.  Why don't you tell me about the other felony

23      convictions you have.  We know about this one, right?

24   A.  Ah-huh.

25   Q.  Is that yes?  You have to say yes or no.

1   A.   Yes.

2   Q.   And we know about the heroin conviction, correct?

3   A.   Correct.

4   Q.   Okay.  What other felony convictions do you have?

5   A.   I have a battery conviction.  I don't know if that's

6        felony, that may be a misdemeanor.

7   Q.   Okay.  Anything else?

8   A.   No.

9   Q.   Okay.  Now, you graduated in what year from college?

10  A.   1992.

11  Q.   Okay.  And what legitimate jobs have you had since 1992?

12  A.   Legitimate jobs.  I've been--  I've done a lot of

13       investing, real estate, stock investing.

14  Q.   Investing drug proceeds?

15  A.   For the most part, yes.

16  Q.   Okay.  So you've taken your college degree and what you've

17       done is you've figured out how to sell drugs and then how

18       to make money from that, correct?

19  A.   I figured that out before I went to college, sir.

20  Q.   And so you are on the same plan before you were to

21       college, same plan after, correct?

22  A.   Not--  No, not initially, but yes, eventually I would get

23       back to selling drugs, if that's your question, yes.

24  Q.   And investing and making money, correct?

25  A.   Yes.

1   Q.   Okay.  Now, when you made your deal with the government,

2      part of that deal was that you were going to tell them

3      everything you knew about criminal activity, correct?

4   A.   Everything that they asked me about, yes.

5   Q.   Well, didn't they tell you that you were required to tell

6      them truthful answers-- provide truthful answers to what

7      they asked you, and you were to tell them things you knew,

8      even if they didn't ask about it if it was criminal?  Full

9      disclosure?

10   A.   Perhaps, yes.

11   Q.   Okay.  You lied to them repeatedly about your assets,

12      didn't you?

13   A.   According to the results of a polygraph examination,

14      correct.

15   Q.   Okay.  For example--  For example, you told me that you

16      made a living by selling drugs and then investing the drug

17      proceeds, correct?

18   A.   Correct.

19   Q.   Okay.  Now, you are married, right?

20   A.   Yes.

21   Q.   Okay.  Where does your wife live?

22   A.   In Corona, California.

23   Q.   In a house that you own with her?

24   A.   Yes.

25   Q.   Okay.  And what is that house worth?

1   A.   I couldn't tell you now with the market where it is now.

2       I have no way of knowing.

3   Q.   Several hundred thousand dollars, correct?

4   A.   I would say probably, yes.

5   Q.   Okay.  How many cars do you have?

6   A.   I have none.

7   Q.   Okay.  How many cars does she have?

8   A.   I believe she has one.

9   Q.   Okay.  Money?  Where do you have money put up?  Where do

10      you have money that you haven't told the government about?

11  A.   I have no money put up anywhere.

12  Q.   Okay.  So what happened was, the government confronted you

13      about your assets after you started to proffer, correct,

14      and asked you to tell them about the location of all of

15      the proceeds of your criminal activity, correct?

16  A.   Correct.

17  Q.   And you gave them answers, correct?

18  A.   Correct.

19  Q.   And they told you they didn't believe you, didn't they?

20  A.   Correct.

21  Q.   And in order to resolve that dispute about whether you

22      were telling the truth or not, you took two polygraphs,

23      didn't you?

24  A.   Yes.

25  Q.   You failed both of them, didn't you?

1   A.  Yes.

2   Q.  The first one was administered by a government polygraph

3       examiner, correct?

4           MR. BRUHA:  Objection to polygraph questioning, your

5       Honor.

6           MR. GRAHAM:  Well, they disclosed it as part of the

7       Jencks material and the Brady material here, and it's a

8       sentencing hearing.

9           THE COURT:  Go ahead.

10          BY MR. GRAHAM:

11  Q.  So to resolve this dispute, because I mean I'm watching

12      you and you are a person who appears to be a person of

13      conviction, a person who knows what he thinks and

14      expresses himself forcefully, and that is the way you told

15      the government you had no assets, correct?

16  A.  The government was interested if I had-- if I was still

17      hiding what they termed high value assets, and I

18      repeatedly denied that.

19  Q.  Okay.  And they told you they didn't believe you and

20      everybody agreed let's resolve this with a polygraph,

21      correct?

22  A.  No, that's how it was--  Initially how it took place is I

23      proffered.  He says well, of course, you know, there is

24      still some questions about your assets and the whole bit

25      about the polygraph examination, to begin with, they were

1 considered me taking the polygraph examination, if I

2 passed it, they would consider settling my case in

3 California, that was the reason for even taking the

4 examination.

5 Q. Because they didn't believe you when you told them that

6 you didn't have assets of significant value, correct?

7 A. Correct.

8 Q. That's the whole point.  So you took the polygraph.

9 During the polygraph, you were asked point blank, do you

10 have assets of, I don't know if it was a dollar value, but

11 they asked you point blank yes or no questions, correct?

12 A. They asked me a series of questions, correct.

13 Q. All yes or no, correct?

14 A. I believe so, yes.

15 Q. Okay.  Nothing difficult for you to understand, correct?

16 A. Correct.

17 Q. And you answered the questions yes or no, whatever answer

18 you thought was appropriate, correct?

19 A. Yes.

20 Q. And you failed the polygraph, right?

21 A. Yes.

22 Q. Okay.  So in order then to try to move from there and gain

23 a more advantageous position, you and your attorney

24 scheduled your own private polygraph, correct?

25 A. Correct.

1  Q.  And the same thing happened, you were asked yes or no

2     questions about your assets, correct?

3  A.  Correct.

4  Q.  And you gave the appropriate answers, correct?

5  A.  Correct.

6  Q.  And the polygraph examiner that you hired told you that

7     you failed?

8  A.  His words-- Yes, more or less, yes.

9  Q.  Okay.  So you have other assets out there that you want to

10    protect, don't you?

11  A.  No.

12  Q.  Okay.  The only asset you have then is the house, is that

13    it?

14  A.  The house and a vehicle.

15  Q.  Okay.

16  A.  Like I said, my wife-- my wife has the vehicle now, but

17    my-- yes, my asset, my main principal asset would be the

18    home.

19  Q.  How much money did you make selling drugs?

20  A.  What-- During what time period?

21  Q.  Your life.  I mean you are a person who keeps track?

22  A.  No, I never kept-- I would say several million dollars.

23  Q.  Several million dollars?

24  A.  Yes.

25  Q.  During this time period, let's say 2000-- from 2000 until

1    the time you were arrested, how much money did you make?

2  A.   Again, I would say upwards of maybe two or three million

3    dollars.

4  Q.   Okay.  And what did you do with that money?

5  A.   I've done various things with it, invest it, spent it,

6    losses.

7  Q.   You talked about quantity involving Mr. Logan, and you

8    talked about this notion of setting up a network of going

9    from California to other areas to have drugs driven or

10    couriered, you mentioned that he asked you about that

11    first.  Is that your testimony, that he raised the subject

12    with you first or is it correct that you talked to him

13    first?

14  A.   No, my testimony is he approached me with the idea.

15  Q.   Okay.  You had connections in Detroit, correct?

16  A.   When you say I had connections, I had buyers for cocaine

17    in Detroit.

18  Q.   Yes, you had drug customers in Detroit, correct?

19  A.   Yes.

20  Q.   And you were actually engaged in business with them the

21    first time you ever talked with Mr. Logan about

22    transporting drugs to Detroit, correct?

23  A.   Repeat the question again.

24  Q.   Okay.  When you first talked with Mr. Logan about

25    transporting drugs, about him transporting drugs--

1  A.  Uh-huh.

2  Q.  --from California to Detroit?

3  A.  Uh-huh.

4  Q.  --you were already involved with drug customers in

5      Detroit, correct?

6  A.  If you mean if I was actually doing business in Detroit?

7  Q.  Yes.

8  A.  No, I wasn't, not in 2004, no.

9  Q.  Well, then how long did it take you to find customers or

10     find a connection in Detroit after this first

11     conversation?

12  A.  I was aware of a person who was already here selling drugs

13     in 2004.

14  Q.  Okay.  So you contacted that person?

15  A.  Yes.

16  Q.  And you made arrangements then for drugs to be shipped

17     there?

18  A.  Yes.

19  Q.  Now, you talked today about these small, what you called

20     these small quantities at the beginning, one-- no more

21     than three times, one, two or three kilos, something like

22     that?

23  A.  Yes.

24  Q.  Then you talked about 50 kilo loads, correct?

25  A.  Yes.

1  Q.  Now, do you remember when you testified in this case

2     before the grand jury?

3  A.  Uh-huh.

4  Q.  I'm sorry, you have to answer yes or no.

5  A.  Okay.

6  Q.  Is that yes?

7  A.  Yes.

8  Q.  You did testify before the grand jury, correct?

9  A.  Yes.

10 Q.  And you were asked the same question what were the

11    quantities, correct?

12 A.  Yes.

13 Q.  And you gave an answer, "It went from 10 to 13 to 15 to 20

14    to 25 to 30, 35 to 40 to 50, like that."  Correct?

15 A.  Yes.

16 Q.  That was your testimony to the grand jury, correct?

17 A.  Yes.

18 Q.  Okay.  That was not your testimony today, was it?

19 A.  For the most part I said it started off about 10 to 15 and

20    it escalated upwards.

21 Q.  Okay.  Now, who else would drive drugs, courier drugs for

22    you from California to any other location?

23 A.  No one.

24 Q.  Okay.  So you are saying Mr. Logan was the only person

25    involved?

1  A.  Yes.

2  Q.  Now, you gave some testimony about how much money

3     Mr. Logan made, and you were asked specifically-- and when

4     I say made, made dealing with you, and then you were asked

5     specifically whether that included the New Mexico

6     incident.  I thought you testified that whatever happened

7     in New Mexico was worked out between you and Mr. Logan

8     with some quick trips afterwards, isn't that correct?

9  A.  What do you mean something worked out, what do you mean?

10  Q.  Well, he was going to work for a reduced rate you

11     testified, correct?

12  A.  Yes.

13  Q.  Okay.  And you testified that that happened, that he made

14     a number of trips at the reduced rate, correct?

15  A.  Yes.

16  Q.  And then things evened out, correct?

17  A.  No, it never evened out.

18  Q.  Oh, you never got square with him over that?

19  A.  No, that was just--  He absorbed a portion of the loss,

20     and I absorbed most of the loss.

21  Q.  When you said he would get even, when you gave the

22     testimony he would get even in five or six trips and then

23     go back to his normal rate?

24  A.  Uh-huh.

25  Q.  Are you saying that never happened?

1  A.  No, I never used the word even.  What I said is we agreed

2     that he would make several trips at a reduced rate and

3     that would make up for his part of the loss, and then he

4     would go back resuming his regular rate.

5  Q.  And did that happen?

6  A.  Yes.

7  Q.  So in terms of the money that he made or lost, that's all

8     accounted for in the transactions you told us about,

9     correct?  New Mexico is not on top of that?

10  A.  What do you mean New Mexico is not on top?

11  Q.  I'm just trying to figure out the total amount you think

12     Mr. Logan made as a result of his work for you?

13  A.  Upwards over a million dollars excluding the theft of the

14     $800,000.

15  Q.  Okay.  You've told us everything that you know about how

16     you got paid back, I'm not going to belabor that point,

17     you've told us everything that you have to say about how

18     you may have gotten paid back either with a hundred

19     thousand dollars being presented or working?

20  A.  He gave me a hundred thousand dollars and then he made

21     like several trips at a reduced rate.

22  Q.  Okay.  I just want to make sure you've told us everything

23     that you know about how either he worked at a lesser rate

24     or money was paid.  You've told us how he attempted to

25     get-- it's my term-- getting even, but getting right with

1    you, whatever?

2  A.  Yes, that's fine.

3  Q.  Okay.  Now, you testified very clearly that it's your

4    opinion, based upon the things that you said, that

5    Mr. Logan was involved in the shooting of you, correct?

6  A.  Absolutely.

7  Q.  And you are aware Mr. Logan has never been charged with

8    that crime, correct?

9  A.  Absolutely.

10  Q.  And you want to see him punished for that crime, don't

11    you?

12  A.  Eventually I want someone to be held responsible for it.

13  Q.  You want to see him held responsible and punished today,

14    right now, don't you?

15  A.  Not for the shooting incident, no.

16  Q.  You're not concerned about him being perhaps punished in a

17    more severe manner because of the shooting today?

18  A.  No.

19  Q.  You are here today just to talk about the drug trafficking

20    that occurred, is that what you're saying?

21  A.  The drug trafficking, and that was part of it as well.

22  Q.  Okay.  Now, part of your agreement with the government is

23    that the government may at its discretion file another

24    motion seeking a sentence reduction for you, correct?

25  A.  Correct.

1   Q.   And you're hoping they will do that?

2   A.   Yes.

3   Q.   You have talked specifically with your attorney about that

4        possibility, correct?

5   A.   No, I don't think we have.  I don't think we have had

6        specific conversation, I think there was an email sent to

7        him from Brian Lennon saying possibly.

8   Q.   Possibly there would be what is called a Rule 35 motion on

9        your behalf, correct?

10  A.   Correct.

11  Q.   Depending on whether or not you appear, told the truth,

12       what you did to help the government further, correct?

13  A.   I guess an ongoing investigation, yes.

14  Q.   Okay.  Now, you also have talked about that with

15       investigators in this case, correct?  The possibility of

16       another sentence reduction?

17  A.   No, I don't think I've talked to investigators.

18  Q.   You've been interviewed many times recently about this,

19       haven't you?

20  A.   No.

21  Q.   You weren't interviewed today?

22  A.   You said many times.

23  Q.   I'm asking, were you interviewed today?

24  A.   I wasn't-- Yes, I wasn't-- I don't call it an

25       interview.

1  Q.  You weren't asked questions and no one went through your

2      testimony today?

3  A.  Yes, we were discussing my testimony today.

4  Q.  Okay.  And you were asked questions about what happened

5      and prepared your testimony, correct?

6  A.  Yes.

7  Q.  I'm not saying--

8  A.  We discussed my testimony today, we never discussed any

9      type of Rule 35.

10  Q.  Okay.  When is the last time before today that you talked

11      with anybody from law enforcement?

12  A.  Regarding-- I believe an investigator from Lansing, Dan--

13      Daniel Zolnai, I believe he came and spoke with me back in

14      February.

15  Q.  Okay.

16  A.  Prior to that the last time I spoke with law enforcement

17      would be August.

18  Q.  Okay.

19  A.  Of 2010.

20  Q.  Okay.

21  A.  Wait, wait.  The marshals came and spoke with me, I

22      believe, in January of this year.

23  Q.  Okay.  Now, you talked today about what the quantity that

24      you were held accountable for, correct?

25  A.  Correct.

1  Q.  And that quantity was calculated based upon your

2     estimates, correct?

3  A.  I don't know how, you know, how the government arrived at

4     that number.

5  Q.  Well--

6  A.  I don't know if they used my testimony or if they used the

7     testimony of others to arrive at that amount is what I'm

8     saying.

9  Q.  If they would have used your testimony, it would have been

10     your estimate as to the weight and the frequency that

11     would have led to that ultimate number, correct?

12  A.  Possibly, yes.

13  Q.  Okay.  And same thing with money, correct, your estimates?

14  A.  My estimates about what money?

15  Q.  About how much money was involved, how much money was

16     transported?

17  A.  Yes, I guess that would be based on my estimates.

18  Q.  You never kept records about these things?

19  A.  No, never.

20  Q.  I mean nobody could go to a ledger sheet to figure out

21     quantities of drugs, correct?

22  A.  I certainly cannot.

23  Q.  You couldn't go to a ledger sheet to find a listing of the

24     amount of money, correct?

25  A.  I cannot, no.

1 Q. It's all based upon estimates, based upon your memory and

2    your recollection, correct?

3 A. Correct.

4 Q. All made after your agreement with the government,

5    correct?

6 A. Correct.

7     MR. GRAHAM: Thank you, your Honor.

8     THE COURT: Mr. Bruha.

9           REDIRECT EXAMINATION

10    BY MR. BRUHA:

11 Q. Mr. Logan, did you forfeit any money or property to the

12    government as part of your conviction?

13 A. Are you asking me? You said Logan.

14 Q. I'm sorry, Mr. Jackson.

15 A. Question again, sir.

16 Q. Did you forfeit any money or property to the government as

17    part of your conviction or plea agreement?

18 A. Yes.

19 Q. What did you forfeit?

20 A. I believe it's upwards of $700,000 in cash and-- cash,

21    stocks, things of that nature.

22 Q. Were you ever asked to take a polygraph examination about

23    any of your drug information?

24 A. No.

25 Q. Was it only about your assets?

1   A.  Yes.

2   Q.  And did you indicate that you were interviewed in January

3        of this year by someone from the U.S. Marshal Service?

4   A.  Yes.

5   Q.  What was that interview about?

6   A.   They came to speak with me and asked me had I heard

7        anything in terms of threats being made by Logan.

8   Q.  Did you know anything about any threats at that time?

9   A.  I told them that I wasn't aware of any threats that he had

10       made.

11   Q.  At the time they interviewed, did you tell them about a

12       cellmate in Kalamazoo County who told you anything about

13       threats by Mr. Logan?

14   A.  I think, yes.  I told them there was a cellmate, yes,

15       there was a cellmate that he was once in Logan's cell, and

16       then he came in my cell and he said that Logan had told

17       him that he was-- I believe his bond was revoked because

18       he-- reportedly he had made threats regarding the U.S.

19       Attorney maybe.

20   Q.  Would that be Mr. Lennon?

21   A.  Yes.

22       MR. BRUHA:  Nothing further, your Honor.

23                    RECROSS EXAMINATION

24       BY MR. GRAHAM:

25   Q.  That same person, that same cellmate told you that

1    Mr. Logan said his bond had been revoked for making

2    threats, but that he never intended to harm anyone,

3    correct?

4  A.   He told the guy that he was--  He was just basically he

5    was drunk and just kidding around.

6  Q.   Talking stupid?

7  A.   He didn't use that terminology.

8  Q.   Is that a fair characterization?

9  A.   You can make it, I'm not making that characterization.

10  Q.   He told the cellmate, "I was drunk, I didn't mean it,"

11    correct?

12  A.   I don't know-- he used the terminology, he was kidding or

13    he was drunk, something to that effect, yes.

14      MR. GRAHAM:  Thank you.

15      MR. BRUHA:  Nothing further.

16      THE COURT:  Mr. Jackson, you may step down, sir, with

17    the Court's thanks.

18      THE WITNESS:  Thanks.

19      (At 2:37 p.m., witness excused.)

20      THE COURT:  Mr. Bruha.

21      MR. BRUHA:  Thank you, your Honor.

22    Government calls Joseph Guzman

23      JOSEPH GUZMAN - GOVERNMENT WITNESS - SWORN

24    COURT CLERK:  Please be seated.

25    State your full name and spell your last name for the

1    record, please.

2        THE WITNESS:  Joseph Guzman.  Last name is spelled

3    G-u-z-m-a-n.

4                    DIRECT EXAMINATION

5    BY MR. BRUHA:

6  Q.   Good afternoon, Mr. Guzman.

7  A.   Good afternoon.

8  Q.   What is your occupation?

9  A.   I'm a deputy with the U.S. Marshal Service.

10  Q.   How long have you been a deputy with the Marshal Service?

11  A.   Eight years.

12  Q.   And where are you assigned?

13  A.   I'm assigned to the Grand Rapids office.

14  Q.   And do the duties of the Marshal Service include

15      investigating threats made against federal witnesses and

16      court personnel?

17  A.   They do.

18  Q.   And did you become aware of any alleged threats by the

19      defendant in this case, Emond Logan, against either a

20      federal witness or a federal prosecutor?

21  A.   I did.

22  Q.   When and how did that come to your attention?

23  A.   It first came to my attention back in July of 2010.  Our

24      office was notified by the U.S. Attorney's Office that

25      some information had surfaced from California from a

1    confidential informant in California about some threats

2    that Mr. Logan had made towards Brian Lennon.

3  Q.   And did that information include one or more tape

4    recordings that were made with Mr. Logan?

5  A.  It did.

6  Q.   And did that serve as the basis for a threat

7    investigation?

8  A.  Yes, it did.

9        MR. BRUHA:  Your Honor, at this time, I would move

10    the admission of Exhibits 1 and 2 into evidence, which

11    would be Attachments 1 and 2 to the government's

12    sentencing memorandum in this case that have been filed

13    with the Court as Document 548-1 and 548-`2, which is a

14    transcript of tape recorded conversations with Mr. Logan.

15        MR. GRAHAM:  Your Honor, I don't object, but would

16    note for the record both of the transcripts have been

17    redacted.  I'm not sure what is missing, but since this is

18    a sentencing hearing and the balance of what is included

19    is something that I think is an accurate transcription.

20        THE COURT:  All right.  So noted.

21        Exhibits 1 and 2 are received.

22        MR. BRUHA:  Thank you, your Honor.

23        Counsel is correct, that names have-- certain names

24    have been redacted from the transcript.

25        BY MR. BRUHA:

1  Q.  Mr. Guzman, how seriously does the Marshal Service take

2      threats against federal witnesses and court personnel or

3      prosecutors?

4  A.  It takes it extremely seriously.  We have, you know, a

5      division in our service that is basically exists solely to

6      investigate threats.  We have-- most of our offices or

7      districts have a full-time investigator that's all they do

8      is handle threat investigations.  Unfortunately, our

9      office doesn't have one of those yet.  But once we receive

10     information on a threat, it becomes a priority for our

11     office.

12  Q.  So did you participate in that investigation?

13  A.  I did.

14  Q.  And did you interview any witnesses in connection with

15     that threat investigation?

16  A.  I did.

17  Q.  Did you interview any witnesses who said that they had

18     also heard Mr. Logan make threats against the federal

19     witness or the prosecutor in this case?

20  A.  Yes, I did.

21  Q.  Who did you interview about that?

22  A.  Well, the first person would have been Mr. Turonald

23     Frasier.

24  Q.  And who is Mr. Frasier?

25  A.  He is a federal inmate who is currently in custody.

1  Q.   And how did he come to your attention in connection with

2      this threat investigation?

3  A.   Well, he actually had sent a letter to Brian Lennon.

4      Within that letter, he stated that Mr. Logan had made some

5      comments to him.

6  Q.   And when was that?

7  A.   Well, the letter actually was written in January of 2011,

8      but he was making reference to a conversation that

9      occurred back in August of 2010.

10  Q.   What were the circumstances of the alleged conversation

11      with Mr. Logan?

12  A.   Mr. Frasier was being transferred from our main transfer

13      station for prisoners in Oklahoma City on a plane.  He was

14      on a plane with Mr. Logan, seated next to him, and they

15      had gotten into a conversation about why Mr. Logan was in

16      custody.  And during that conversation, Mr. Logan--

17      according to Mr. Frasier-- Mr. Logan said he was in

18      custody because for making threats towards Brian Lennon,

19      and he kind of got into some details, you know, about how

20      he still wanted him dead and how he knew some personal

21      information about Brian Lennon.

22  Q.   Now, was this after Mr. Logan's bond had been revoked in

23      California for making similar threats against Mr. Lennon?

24  A.   It was.

25  Q.   And so this would have been while Mr. Logan was being

1    transported back to this district after his bond was

2    revoked?

3  A.  Yes, it was.  This would have been in August of 2010, he

4    was actually arrested in July.

5  Q.  After he had had a bond revocation in California that

6    discussed these very similar threats?

7  A.  That is correct.

8  Q.  And have you seen and reviewed the letter that Mr. Frasier

9    wrote?

10  A.  Yes.

11     MR. BRUHA:  Your Honor, at this time, I would move

12    Government's Exhibit 3 into evidence, which was filed as

13    Attachment No. 3 to the government's sentencing memorandum

14    and filed with the Court as document 548-3, which is a

15    copy of the handwritten letter from Mr. Frasier.

16     THE COURT:  Any objection?

17     MR. GRAHAM:  No.

18     THE COURT:  Received.

19    BY MR. BRUHA:

20  Q.  And did Mr. Frasier state in his letter that Mr. Logan's--

21    in Mr. Frasier's words, had placed a hit out on

22    Mr. Lennon?

23  A.  Yes.

24  Q.  And did Mr. Frasier include in his letter some personal

25    information that Mr. Logan had mentioned about Mr. Lennon?

1   A.   He did.

2   Q.   Did that include information that there is a little bar

3        that Mr. Lennon and a lot of people he worked with went to

4        near downtown Grand Rapids?

5   A.   That's correct, that was in his letter.

6   Q.   And did you subsequently interview Mr. Frasier about his

7        letter?

8   A.   I did.

9   Q.   And did Mr. Frasier confirm the statements he had made in

10       his letter about these threats?

11  A.   He did.

12  Q.   What else did Mr. Frasier tell you during that interview?

13  A.   Well, he, like I said, he confirmed a lot of the

14       statements that he had said in the letter.  He wasn't--

15       He wasn't able to tell us how Mr. Logan knew that

16       information, but he basically reiterated what he said in

17       the letter.

18  Q.   Did he also say in addition to the information about the

19       bar that Mr. Lennon's son plays basketball in Comstock

20       Park?

21  A.   He did say that.

22  Q.   Did you have any reason to doubt Mr. Frasier's information

23       in his letter and that he subsequently confirmed in his

24       interview?

25           MR. GRAHAM:  I object to that, that calls for

1    speculation.

2         THE COURT:  I'll sustain that.  Go ahead.

3    BY MR. BRUHA:

4    Q.  Did you interview any other witnesses who claimed to have

5    heard similar threats mentioned by Mr. Logan?

6    A.  Yes, I did.

7    Q.  Who else did you interview about that?

8    A.  It would have been two more inmates, Cornell Harp and

9    Anthony Johnson.

10   Q.  And where were those inmates?

11   A.  They were at Newaygo County.

12   Q.  And when did you interview those inmates?

13   A.  It would have been probably mid-January of 2011.

14   Q.  And did both of those inmates claim that they had heard

15   Mr. Logan make threatening remarks against a federal

16   witness and/or the prosecutor, Mr. Lennon?

17   A.  They did.

18   Q.  And when did they say that they-- Mr. Logan said those

19   remarks?

20   A.  Their contacts with Mr. Logan were actually before

21   Mr. Logan was released on bond, so it would have been

22   prior to March of 2010.

23   Q.  So they had heard Mr. Logan make these statements, even

24   before he was released-- initially released on bond?

25   A.  Correct.

1 Q. And what did those inmates tell you about what Mr. Logan

2    said to them?

3 A. A lot of it was similar to what Mr. Frasier had said, they

4    both mentioned the information about the bar downtown

5    Grand Rapids. Mr. Harp, although he didn't indicate that

6    Mr. Logan gave any specific information about what he was

7    going to do or how he was going to do it, but he did say

8    that Mr. Logan would make references how he had contacts

9    with Mexican cartel and he could get somebody from that

10    organization to do something, but he never got into

11    details.

12 Q. Did Mr. Harp-- Now, was Mr. Harp a cellmate of Mr. Logan

13    at the time he says Mr. Logan made these statements?

14 A. Yes.

15 Q. And that was at the Newaygo County Jail?

16 A. Correct.

17 Q. And did Mr. Harp say that Mr. Logan often made statements

18    about wanting to have both Brian Lennon killed and another

19    co-defendant on his case who was already in federal

20    prison?

21 A. He did.

22 Q. Did Mr. Harp say that Mr. Logan had mentioned any specific

23    efforts that he had or was making to carry out the

24    threats?

25 A. No, he did not.

1  Q.  And was it Mr. Harp that said Mr. Logan mentioned how he

2     had ties to the "Chappo Guzman" Mexican drug cartel and

3     that's who he would get to carry out the threat?

4  A.  That is correct.

5  Q.  And who was the other inmate you said you talked to?

6  A.  Anthony Johnson.

7  Q.  And was Mr. Johnson also an inmate at the Newaygo County

8     Jail?

9  A.  Yes, he was.

10  Q.  And had he also been in the same cell as Mr. Logan?

11  A.  Yes.

12  Q.  Before Mr. Logan was first released on bond?

13  A.  Correct.  That would have been prior to March.

14  Q.  Did Mr. Johnson say he had heard Mr. Logan talking about

15     wanting to kill the prosecutor in this case, Brian Lennon?

16  A.  He did.

17  Q.  And did Mr. Johnson say that Mr. Logan knew where Brian

18     Lennon went to a bar after work and also had a son in

19     private school?

20  A.  Yes, he did.

21  Q.  And just so I have the chronology correct, did both of

22     those inmates say these statements had been made to them

23     by Mr. Logan before Mr. Logan was initially released on

24     bond?

25  A.  That is correct.

1  Q.  And that was before the recorded conversations with the

2     confidential informant that occurred in California while

3     Mr. Logan was on bond?

4  A.  That is correct.

5  Q.  And it was after Mr. Logan was arrested for violation of

6     his bond, and had his bond revoked, that he allegedly made

7     these statements to Mr. Frasier on the transport plane?

8  A.  That is correct.

9  Q.  Was it Anthony Johnson or Andrew Johnson?

10  A.  I would have to look at my report.  Yeah, I can't recall.

11  Q.  But whatever Mr. Johnson's first name was, he was an

12     inmate at the Newaygo County Jail and was a cellmate of

13     Mr. Logan at the time these statements were allegedly

14     made?

15  A.  Correct.

16       MR. BRUHA:  I'll pass the witness, your Honor.

17       THE COURT:  Mr. Graham.

18              CROSS EXAMINATION

19     BY MR. GRAHAM:

20  Q.  Just so I'm clear.  When the statements were originally

21     made to the confidential informant, did you learn about it

22     and become involved?

23  A.  After.

24  Q.  Okay.  Shortly thereafter?

25  A.  Shortly thereafter.

1  Q.  So that would have been in the summer of 2010; is that

2     correct?

3  A.  Correct.

4  Q.  So you got involved and you actually probably heard the

5     taped conversation?

6  A.  I did.

7  Q.  Okay.  You're aware then that after--

8     I'm sorry, let me withdraw that.

9     So did you personally then begin an investigation

10    into the threats that were made as part of the

11    conversation?

12 A.  Yes.

13 Q.  Okay.  And you worked with other people in the Marshal

14    Service regarding that?

15 A.  Yes.

16 Q.  Okay.  So these threats had been made in the conversation

17    to the CI, and then you're aware, aren't you, that

18    Mr. Logan came here, his bond was revoked, he came here,

19    and a couple of months later entered a plea of guilty,

20    correct?

21 A.  Correct.

22 Q.  Okay.  Mr. Logan has not been charged with any offense

23    based upon any threat, has he?

24 A.  No.

25 Q.  Now, regarding the-- these White Cloud inmates who have

1    described threats.  Just I want to make sure that I'm

2    clear.  Frasier is the letter-- person who wrote the

3    letter, correct?

4  A.  Correct.

5  Q.  Now, you went to talk with him shortly after Mr. Lennon

6    received the letter, correct?

7  A.  Correct.

8  Q.  And that was in January of 2011, correct?

9  A.  Yes.

10  Q.  And Frasier admitted that the statement that he wrote

11    about in January of 2011 occurred back in August of 2010,

12    correct?

13  A.  Correct.

14  Q.  And he didn't say anything to you or to the government or

15    to investigators in between, did he?

16  A.  No.

17  Q.  Now, Mr. Frasier was just about ready to be sentenced when

18    he wrote that letter, wasn't he?

19  A.  Yes.

20  Q.  You were, in fact, suspicious about the fact that this man

21    wrote a letter right before he was to be sentenced, and

22    you were also suspicious about the fact that Mr. Frasier

23    was being prosecuted by Mr. Lennon.  Those things raised

24    red flags for you, didn't they?

25  A.  Sure.

1    Q.   So comments are allegedly made in August on an airplane

2       coming back, and the letter is written in January. You go

3       to investigate, and shortly after your conversation with

4       Mr. Frasier, you hear that there are a couple of other

5       people who want to talk about threats, correct?

6    A.   Yes.

7    Q.   Okay. And I guess my question is: Did you interview and

8       it was Harp and Johnson; is that correct?

9    A.   Yes.

10   Q.   H-a-r-p?

11   A.   Yes.

12   Q.   Okay. Harp and Johnson. How did you hear about what they

13       wanted to tell you?

14   A.   I believe Brian had told me that they had previously came

15       forward with information prior to when Frasier wrote that

16       letter in January that they had previously came forward

17       with information about the statements Mr. Logan had made.

18   Q.   There's no documentation to that effect, correct?

19   A.   No.

20   Q.   When threats are made that are credible threats, they are

21       well documented, aren't they? I mean that's your policy,

22       isn't it?

23   A.   Right. Absolutely.

24   Q.   It's a crucial policy, correct?

25   A.   Yes.

1  Q.  I'm not for a second trying to downplay the importance of

2      investigation and follow-up on these threats, but you had

3      no paperwork on that, you knew nothing about anything said

4      by Harp or Johnson before Frasier?

5  A.  No.

6  Q.  You talked with Frasier, and then shortly thereafter, you

7      go up and interview Harp and Johnson, correct?

8  A.  Correct.

9  Q.  And all three men talk about a bar, a specific bar near

10     downtown Grand Rapids?

11  A.  Right.

12  Q.  And all three men talk about other kind of facts that make

13     it seem as if the stories are kind of in sync, correct?

14  A.  They are similar.

15  Q.  Well, including some details that are kind of unusual in

16     that people wouldn't normally know the specifics that

17     these men knew, correct?  You wouldn't expect someone

18     normally to know the specifics like a bar that Mr. Lennon

19     hung out at or something like that?

20  A.  Right.

21  Q.  But all three of these men knew, correct?

22  A.  Correct.

23  Q.  And all three of these men had contact with each other in

24     Newaygo?

25  A.  I would have to look at Mr. Frasier's records.  I know

1    Mr. Harp and Mr. Johnson were at Newaygo around the same

2    time.  I would have to look at the records on Mr. Frasier,

3    I don't recall.

4  Q.  Well, I understand, but I think you're getting at the time

5    that statements were supposedly made.  I'm talking about

6    when you interviewed them.  When you interviewed them

7    after Frasier wrote his letter, he is in White Cloud with

8    Harp and Johnson?

9  A.  Yes.

10  Q.  And they have contact with each other at the time he

11    writes the letter?

12  A.  Sure.

13  Q.  Because I mean you were up there a couple days after the

14    letter was written?

15  A.  Yes.

16  Q.  And everybody was there?

17  A.  Yes, you're right.

18  Q.  And Harp and Johnson now are talking about threats that

19    are not made after Mr. Logan gets back.  They are talking

20    about threats that had been made no earlier than March of

21    2010, maybe even, as I read your report, maybe even in

22    2009?

23  A.  Correct.

24      MR. GRAHAM:  Thank you, your Honor.

25      THE COURT:  Mr. Bruha.

1                    REDIRECT EXAMINATION

2      BY MR. BRUHA:

3  Q.  Mr. Guzman, was Mr. Frasier transported back on the same

4      flight as Mr. Logan?

5  A.  Yes.

6          THE COURT:  Anything further, Mr. Graham?

7          MR. GRAHAM:  I'm sorry, no.

8          THE COURT:  You may step down, with the Court's

9      thanks.

10         (At 2:58 p.m., witness excused.)

11         THE COURT:  Mr. Bruha.

12         MR. BRUHA:  That concludes the government's evidence,

13     your Honor.

14         THE COURT:  Thank you.

15         Mr. Graham, do you wish to put on any proofs?

16         MR. GRAHAM:  I do.  I wish to call the defendant to

17     testify.

18         THE COURT:  Mr. Logan, please step forward, sir.

19             EMOND LOGAN - DEFENDANT - SWORN

20         COURT CLERK:  Please be seated.

21         State your full name and spell your last name for the

22     record, please.

23         THE DEFENDANT:  Emond Logan.  Last name, L-o-g-a-n.

24

25

1    DIRECT EXAMINATION

2    BY MR. GRAHAM:

3   Q.   Mr. Logan, I'm not going to ask you to go over a lot of

4        territory in your testimony.

5            I want to call your attention to a couple of matters

6        that were discussed by Mr. Jackson and ask you to tell me

7        what happened in regard to those things.

8            Now, but just by way of some preliminary matters,

9        obviously you've pled guilty in this case, correct?

10   A.   Yes.

11   Q.   Pled to the conspiracy?

12   A.   Yes.

13   Q.   And you've engaged in a couple of interviews with the

14        government since that time, correct?

15   A.   Yes.

16   Q.   Okay.  Now, you were present today and heard Mr. Jackson

17        talk about the incident when he was shot, correct?

18   A.   Yes.

19   Q.   And you have admitted that at the time that he was shot,

20        the two of you were generally involved as part of this

21        conspiracy, correct?

22   A.   Yes.

23   Q.   I mean you've never denied that--

24   A.   No.

25   Q.   --since pleading guilty and beginning the interview

1    process.

2    Okay.  I want you to tell me what happened that day

3    beginning with your-- where you were in the morning.  I

4    understand there was some weather problems, but where you

5    were in the morning, where you went.  Take me through step

6    by step what happened.

7  A.  Okay.  I had actually called him that night because it was

8    storming.  I was coming from Indiana, and I was driving

9    up, it's like a five or six hour drive up from there.  It

10    was snowing real bad, so I told him I wouldn't be there

11    until like in the morning.  I told him I would be there in

12    the morning, and he said okay, he'll meet me in the

13    morning.  So I woke up in the truck stop.  I had drove

14    halfway there, and the snow had let up, and I finished

15    driving, and I drove there.  And then I called him and let

16    him know I was there.

17  Q.  Okay.  Did you have some regular prearranged meeting

18    spots?

19  A.  Yes.

20  Q.  Okay.  And did you use one or more of those?

21  A.  Normally it was the one where we were at where this took

22    place at.

23  Q.  So-- I'm sorry, go ahead and tell me then, did you make

24    arrangements to meet him there?

25  A.  Yes, I made arrangements to meet him there.  It was a

1      Freightliner dealer in, I think Belleville, Michigan.

2  Q.  And so you spoke with him to make that arrangement,

3     correct?

4  A.  Correct.

5  Q.  What happened then?

6  A.  About a half-hour later, he showed up, and he called me on

7     the phone.  I'm laying in the bunk sleeping, and he calls

8     me on the phone and says, "Hey, I'm outside your truck."

9  Q.  Okay.

10  A.  So I wake up and put my shoes on, and I get out of the

11     truck and go talk to him, and that's when he tells me, "I

12     see some guys over there on the side of this truck.  Check

13     it out."  So I go there and I look and I see two guys with

14     masks and I shield myself.  I go around the side of my

15     truck, and I hear a shot, and I see the car take off.

16  Q.  Okay.  Now, did you have anything to do with arranging for

17     those men to be there?

18  A.  No.

19  Q.  Did you have anything to do with any plan to harm or shoot

20     Mr. Jackson?

21  A.  No.

22  Q.  Did you try to call Mr. Jackson after?

23  A.  I tried to call him.

24  Q.  After he was shot?

25  A.  Yes, plenty of times I tried to call him, but he was mad

1    at me and he didn't want to talk to me, so this is the

2    first time I seen him since 2007.

3  Q.  Okay.  Now, you have read and seen a number of things that

4    relate to statements you made that you've acknowledged

5    were inappropriate toward Mr. Lennon?

6  A.  Correct.

7  Q.  And toward Mr. Jackson?

8  A.  Correct.

9  Q.  Okay.  Now, one of the set of statements that you've seen

10    have been statements made to a confidential informant in

11    California, correct?

12  A.  Yes.

13  Q.  Now, you acknowledge that the conversation that was

14    reflected in that transcript are the words that were

15    spoken between you and the CI, correct?

16  A.  Yes.

17  Q.  Tell the Court, please, whether you ever intended to harm

18    Mr. Lennon, Mr. Jackson, or anyone else involved in the

19    case?

20  A.  No, I never had any intentions of harming anybody.

21  Q.  I guess this is the time for you to explain to the Court

22    what was going through your head, why you made those

23    statements, and why the Court should believe that you did

24    not intend to harm anyone?

25  A.  I was upset after Mr. Lennon indicted my wife and my

1    family, I thought that was out of line, and I was really

2    upset, so I said a lot of stupid stuff.

3  Q.   Okay.  Did you ever intend to follow through on it?

4  A.   No.

5  Q.   Did you, in fact, ever contact anyone to set in motion any

6    plan to harm anyone?

7  A.   No.

8  Q.   Now, you have heard about Mr. Frasier's letter that he

9    wrote in January regarding the August events.  You did--

10    You were transported by the Marshal Service from

11    California back to this district in August of 2010,

12    correct?

13  A.   Yes.

14  Q.   And do you remember whether or not you had any contact

15    with Mr. Frasier?

16  A.   I don't even know who Mr. Frasier is.

17  Q.   Okay.  Did you tell anyone on that plane anything about a

18    threat against Mr. Lennon, Mr. Jackson, or anyone else?

19  A.   No.

20  Q.   Now, you heard testimony that two people, Harp and Johnson

21    apparently said something to the effect that you had made

22    threats.  Did you ever--  Did you ever make threats in

23    front of them?

24  A.   I believe when I came back, after my wife had got

25    indicted, and I came back inside there, I was pissed off,

1    and I said, "I wish I could kill the prosecutor."  I did

2    say that.

3  Q.   Did you mean it?

4  A.   No.

5  Q.   I used the term with Mr. Jackson talking stupid, is that

6    what it was?

7  A.   Yes, correct.

8        MR. GRAHAM:  Thank you, your Honor.

9        THE COURT:  Mr. Bruha.

10        MR. BRUHA:  Your Honor, would the Court be willing to

11    grant us a short recess?

12        THE COURT:  Sure.

13        MR. BRUHA:  Thank you.

14        THE COURT:  I'll stand down for five or ten minutes.

15        Let Ms. Redmond know when you're ready.

16        MR. BRUHA:  All right.  Thank you.

17        COURT CLERK:  All rise, please.

18        Court is in recess.

19        (At 3:06 p.m., recess.)

20        (At 3:17 p.m., proceedings continued.)

21        THE COURT:  Mr. Bruha.

22        MR. BRUHA:  Thank you, your Honor.

23                CROSS EXAMINATION

24    BY MR. BRUHA:

25  Q.   Mr. Jackson, you admit that you were present when-- I'm

1      sorry.

2            Mr. Logan, you admit you were present when

3      Mr. Jackson was shot, correct?

4   A.  Correct.

5   Q.  And you were there to pick up a large amount of money from

6      Mr. Jackson?

7   A.  That is correct.

8   Q.  And you were going to transport that money back to

9      California for Mr. Jackson?

10  A.  Correct.

11  Q.  Now, did you tell anyone else when and where you were

12     going to pick up that money from Mr. Jackson?

13  A.  No, I did not.

14  Q.  And what did you see happen before Mr. Jackson was shot?

15  A.  Well, he asked me to go look and see where these guys

16     were, so I went and looked, and I seen two guys with

17     masks, so I sheltered myself around my truck, on the other

18     side of my truck.

19  Q.  Did you say anything to Mr. Jackson?

20  A.  I didn't have time to say anything.

21  Q.  Where were the two guys in masks when you saw them?

22  A.  When I saw them, they were standing directly in front of

23     me.  When I looked out, I seen them just like right in

24     front of me like this.  They were on the other side of the

25     truck, and I just looked like that, and I seen them, and I

1     went on the other side of my truck.

2  Q.  Other side of what truck?

3  A.  My rig that I was driving.  I sheltered myself on the

4     other side of the rig.

5  Q.  Where were the two guys?

6  A.  Exiting the car.

7  Q.  They were sitting in the car or exiting?

8  A.  Exiting the car.

9  Q.  Where was the car from where you were?

10  A.  In front of the Fed Ex truck.

11  Q.  Which was on the other side of Mr. Logan's vehicle,

12     correct?

13  A.  Mr. Jackson's.

14  Q.  Mr. Jackson's vehicle, I'm sorry.

15     So they were-- they were two vehicles over from your?

16  A.  Actually from my truck, he was in between the two trucks.

17     He parked in between, backed in on the side of the truck.

18  Q.  So to get back and conceal yourself behind your truck, you

19     had to go past the Fed Ex truck and Mr. Jackson's vehicle?

20  A.  No.  Mr. Jackson was backed in between.  My truck is here,

21     Mr. Jackson's car is here, the Fed Ex truck is on this

22     side.  Their vehicle is on this side of that truck.  So

23     when I went out and I looked, I seen them on the other

24     side of the Fed Ex truck, I just went around my side of my

25     truck and sheltered myself on the other side of the truck,

1    and I heard a shot, and I seen him speed off.

2  Q.  And you said nothing to Mr. Jackson?

3  A.  I didn't have time to say anything to Mr. Jackson.

4  Q.  But yet these two individuals-- one or both of these

5    individuals had time to go from the Charger past the Fed

6    Ex truck to Mr. Jackson's vehicle and shoot him?

7  A.  I imagine so.

8  Q.  And do you have any idea why those individuals were there?

9  A.  No.  And I don't understand why he stayed there if he knew

10    they were there in the first place.  He should have left.

11    Why would you sit there and just wait for somebody to

12    shoot you if you see them coming in the back of your

13    rearview mirror.

14  Q.  And you never went to the hospital to visit Mr. Jackson?

15  A.  I called him on the phone, he said that I had-- First of

16    all, he said I did it.  He didn't say nobody else did it.

17    He said I shot him.  By his own admission, that's what he

18    told his wife, that's what he told Mrs. Blake, that I shot

19    him, so why would I want to go talk to somebody that

20    thinks that I shot him.

21  Q.  To maybe say you didn't?

22  A.  What?

23  Q.  To maybe say you didn't shoot him?

24  A.  And what would that do to somebody that thinks that you

25    shot them?

1   Q.   So did Mr. Jackson tell that to you himself or is this

2        what you heard from family members?

3   A.   My wife.  When I called-- my wife called me on the phone

4        screaming and hollering, and said that I shot him, and I

5        said no, that's not what happened, I'll explain to you

6        what happened when I get home.

7   Q.   And you never talked to Mr. Jackson since then?

8   A.   I tried calling him once at his house.  He wouldn't take

9        my phone calls.  I seen him one time on the freeway, he

10       sped off from me when I tried to talk to him.

11  Q.   You had previously stolen money from Mr. Jackson, hadn't

12       you?

13  A.   Yes.

14  Q.   And that was the time when you told him that you had been

15       stopped by the police in New Mexico and they had taken all

16       of the money?

17  A.   That is correct.

18  Q.   And that wasn't true, was it?

19  A.   No.

20  Q.   You had taken Mr. Jackson's money?

21  A.   Yes, but it wasn't $800,000 either like he alleges it was.

22  Q.   How much was it?

23  A.   Probably around about $400,000-some.

24  Q.   And you took, you stole his money because you didn't think

25       you were getting paid enough; is that correct?

1  A.  That's one reason, yes.

2  Q.  And when Mr.--  When other people tried to rip Mr. Jackson

3     off at the Freightliner place, you said you would have

4     nothing to do with it?

5  A.  That is correct.  And I told my lawyers and I even told

6     the prosecutor I would be willing-- even the marshals, I

7     would be willing to take a lie detector test for that,

8     nobody has given me one.

9  Q.  So why were these two men in masks there?

10  A.  I have no idea.

11  Q.  Now, you acknowledge-- or first of all, you acknowledge

12     that after you were first arrested on the Indictment and

13     were being held at the Newaygo County Jail, you did tell

14     inmates there that you wished you could kill the

15     prosecutor?

16  A.  Not at first.  This was after my wife was indicted.  I

17     never said anything like that until my wife was indicted,

18     and I came back from court that day and I was upset.

19  Q.  And when was she indicted?

20  A.  Just before I got out, I guess.

21  Q.  And--

22  A.  Before I got out on bond.

23  Q.  And you had known for some time she was likely going to be

24     indicted, didn't you?

25  A.  Yes, but I didn't think that would happen.

1  Q.  And but it did happen?

2  A.  Yes, it did.

3  Q.  And so you are saying you felt angry right then about

4     that?

5  A.  Yes, I did.

6  Q.  And made statements that you would like to kill the

7     prosecutor?

8  A.  I didn't talk directly to anybody.  I just came in and I

9     said, "I wished I could kill the prosecutor."

10  Q.  Then after you were released on bond and were back in

11     California, you made similar statements to the

12     confidential informant out there, didn't you?

13  A.  That is correct.

14  Q.  And you do not deny what you said on those tape

15     recordings, do you?

16  A.  No.

17  Q.  And in fact, you were talking to the confidential

18     informant at that time about a marijuana grow operation,

19     weren't you?

20  A.  His marijuana grow operation, I had nothing to do with

21     that.

22  Q.  Well, do you understand that the informant has implicated

23     you in that?

24  A.  Yes.

25  Q.  And said that you were involved at least financially?

1  A.  That's not true.

2  Q.  But you did discuss, while you were on bond, discuss a

3     marijuana growing operation with the informant?

4  A.  He was telling me that he was having problems with it and

5     that a transformer blew up, and all of this stuff that he

6     was asking my advice on different things.

7  Q.  And weren't you both talking about ways you could get some

8     money?

9  A.  He was asking me, and I was actually just blowing him off,

10    just telling him all kind-- anything that he wanted to

11    hear so he would leave me alone really.

12  Q.  So he would leave you alone?

13  A.  Yes.  He was calling me and wanting to meet with me on

14    different things and asking me about-- actually he wanted

15    to know where Alvin's money was.  I had no clue where the

16    money was, so I just told him anything that, you know,

17    that he wanted to hear basically.

18  Q.  So that included talking about setting up some Mexican

19    drug dealer to rip off?

20  A.  That is correct.

21  Q.  And then when the confidential informant mentioned Papa,

22    which is Mr. Jackson, correct?

23  A.  That is correct.

24  Q.  You told the confidential informant, "I'm working on

25    trying to get somebody to pop his mother fucking ass while

1    he is inside of there."

2  A.   That is correct.

3  Q.   Meaning in prison?

4  A.   Uh-huh.

5  Q.   And this is what you were telling somebody that you were

6     just trying to blow off?

7  A.   Yes.

8  Q.   And then you said either that or the prosecutor, "You

9     know, if the prosecutor dies, it's all over with"?

10  A.   That is correct, I said that.

11  Q.   "It go away."

12        "If I make that prosecutor disappear, the case just

13     disappear"?

14  A.   Yes, I said that.

15  Q.   Were you still mad at Mr. Lennon at that time?

16  A.   Well, my wife's father had just passed away and her

17     stepfather, and she was going through a lot of stress, so

18     this infuriated me to say these things.  Like I said, I

19     never had no intent to harm anybody, just me mouthing

20     off.

21  Q.   Speaking of your wife, Mr. Jackson, (sic. Logan) how many

22     times have you been married?

23  A.   This is my third time.

24  Q.   Your third time.

25        What happened to your second wife?

1  A.  She was murdered.

2  Q.  How?

3  A.  She was shot at her job.

4  Q.  What was her job?

5  A.  She worked at a place called SSG Court Referral.

6  Q.  And what did that do?

7  A.  She did-- She worked with, I guess, people that had got

8      in trouble with law enforcement, and she assigned them to

9      community service.

10  Q.  I'm sorry?

11  A.  Community service, like to work off their fines or

12      whatever they had to do with the Court.

13  Q.  These were people that were going through the criminal

14      justice system?

15  A.  Correct.

16  Q.  And were they gang members?  Did this have anything to do

17      with gangs?

18  A.  Yes.

19  Q.  Was she a gang counselor?

20  A.  I wouldn't say that, no.

21  Q.  And was she shot on her job?

22  A.  Correct.

23  Q.  At her desk?

24  A.  I don't know the full incidents of it, but I know she was

25      shot at her job.

1 Q. What were you told about the circumstances?

2 A. Nobody ever discussed that with me.

3 Q. Were you told that two people with masks came in and shot

4    her at her desk?

5 A. No.

6 Q. You were never told anything about two people with masks?

7 A. No.

8 Q. And did you get an insurance settlement resulting from her

9    death?

10 A. Correct.

11 Q. And how much was that?

12 A. $350,000.

13 Q. How much?

14 A. $350,000.

15 Q. And can you document that?

16 A. Yes.

17 Q. Have you documented that to anyone?

18 A. Yes, it's been documented.

19 Q. Going back to what you told the confidential informant on

20    June the 29th of last year, you told the confidential

21    informant, "We will put our heads together and figure out

22    something to make money."  Correct?

23 A. Correct.

24 Q. And then you discussed possibly renting one or more

25    Corvettes and pulling the motor and transmission out and

1    selling it?

2  A.  I told him that.  That's what he could do.  I never said I

3    was going to do that.

4  Q.  And you did tell him you know some people that would

5    probably buy it?

6  A.  Yes, I told him that.

7  Q.  A dude with a body shop?

8  A.  Yes.

9  Q.  And you're having conversations about criminal activity

10    while you were on bond, correct?

11  A.  If you say--  If you say that's criminal-- whatever you

12    saying, yes, I guess so.

13  Q.  Well, what would you call it?

14  A.  Like I said, I was just talking out of my head and trying

15    to blow somebody off that keeps calling me and wanting to

16    have meetings.

17  Q.  And you just talking about some things and you said that's

18    just one idea I had to make a little money, you know.

19  A.  Yes.

20  Q.  And did you tell the confidential informant that something

21    about that, "They had called Henry and that he was getting

22    all nervous and shit"?

23  A.  Yes.

24  Q.  And you were referring to law enforcement called Henry?

25  A.  Correct.

1 Q. And who is Henry?

2 A. He was another driver that drove with me.

3 Q. What was his last name?

4 A. Massias.

5 Q. And you knew that Henry had been contacted by law

6     enforcement?

7 A. I didn't know that he was contacted by law enforcement.

8 Q. Well, didn't you tell the CI he called you. "Called me,

9     man, the prosecutor wanted to talk to me. What he want to

10    talk to me about?" And you told Henry, "I don't know, and

11    stop talking to them people"?

12 A. Yes, I said that.

13 Q. And you told the confidential informant, "I just had some

14    strong words for him," referring to Henry just telling

15    him, "Keep your mother fucking mouth shut"?

16 A. Whatever was said was said on a tape, so I don't know

17    exactly if I said that or not, but I was telling him that

18    for his own sake, not for mine.

19 Q. Telling--

20 A. I never tell him to not say anything because you are going

21    to implicate me. I was just telling him to stop talking

22    to them before he has his self in trouble.

23 Q. Well, you knew he could implicate you, didn't you?

24 A. I didn't-- I wasn't worried about that, I was already

25    indicted. What could he-- What else could he have said?

1  Q.  Did you tell the CI that you told Henry, "Tell him you

2      don't even want to talk to him.  You ain't got to talk to

3      nobody, you got rights."

4  A.  Yes, I recall saying that.

5  Q.   And did you tell the confidential informant, "I don't know

6      exactly what he's" referring to Henry's, "fucking saying,

7      but he better hope I don't go to jail.  If I get indicted,

8      I'm a put somebody on all the mother fuckers"?

9  A.  I might have said that.

10 Q.  And the CI pointed out, "You are already indicted, ain't

11      you?"

12 A.  Yes.

13 Q.  And you said, "I'm just saying the day that I go to jail."

14      And the CI says, "You mean if you lose,".

15      "Yes."

16      You said, "If I beat this shit, then I'm straight.  I

17      don't beat this shit, it's going to be a whole that's

18      going to get real ugly.  I ain't going to even give a

19      fuck, especially if I get out.  And these mo fuckers ain't

20      dead, I'm just going to go on a killing spree and go back

21      to the pen.  I don't give a shit."

22 A.  Yes, I said that.

23 Q.  Were you drunk when you said that?

24 A.  I think I was drinking.  I don't know if I was drunk, but

25      I probably had about three or four beers maybe.

1  Q.  And then the confidential informant brings up that he

2     would like to get Papa's money.  And you say, tell the

3     confidential informant, "Who wouldn't?  I already knew he

4     had money in that house.  I should have fucking been sent

5     somebody over there to get his ass.  I'm talking about

6     before he went to jail.  Should have had somebody kill his

7     ass and fucking go take that money from him."

8  A.  Yes.

9  Q.  And that's what you tried to do before at the Freightliner

10    place, wasn't it?

11  A.  No.

12  Q.  And you were advising the confidential informant to get

13    everything out of there, referring to the marijuana grow

14    site.  "There ain't shit they can fucking even do, and

15    when you start back, just do one room"?

16  A.  Yes, I've said that.

17  Q.  And then you told the confidential informant about

18    somebody who had robbed some marijuana dispensaries in the

19    LA area?

20  A.  That I heard on the news.

21  Q.  And did you tell the confidential informant, "That that's

22    what you-- we need to work on.  Just go check out one of

23    those and hit the mother fucker after he--"

24  A.  I never said we.  I was always referring to him.  If

25    that's what he wanted to do.  He was looking to make

1    money, and I was just suggesting stuff that he could do.

2  Q.  Do you want me to show you the transcript?

3  A.  There was a lot of things that's left out in that

4    transcript, too.

5  Q.  Do you deny saying that's what you and then we need to

6    work on?

7  A.  I don't recall ever saying-- putting myself in that.

8  Q.  And did you tell the confidential informant, "I'll work on

9    something.  I know some people"?

10  A.  Yes.

11  Q.  "We will figure something out"?

12  A.  Yes.

13  Q.  Now, did you have another recorded conversation with the

14    confidential informant in July of last year?

15  A.  I believe so.

16  Q.  Were you drinking then too?

17  A.  He called me all the time when I was at home.  I was at

18    home on bond, nothing to do, so I was in the backyard

19    drinking pretty much.

20  Q.  And did you talk with the confidential informant about

21    getting 20 to 50 pounds of marijuana?

22  A.  Yes.

23  Q.  And that's when you were on bond?

24  A.  Correct.

25  Q.  And did you talk about hearing where Papa's money was?

1  A.  Yes, I made up something and told him, yes.

2  Q.  And again, you and the confidential informant are talking

3     about they have Papa as a cooperating witness?

4  A.  Correct.

5  Q.  And you told the confidential informant, "I'm working on

6     somebody trying to pop his punk ass.  If I can get that,"

7     N word "out, good."  And the confidential informant asked

8     you if you know some people in Texas, and you say, "Trying

9     to get somebody to do it"?

10 A.  Correct.

11 Q.  And you knew that Mr. Jackson was in Texas, incarcerated

12     in Texas, didn't you?

13 A.  Through his wife, yes.

14 Q.  And did you say, "I been talking to Shug trying to get

15     that," N word "to do something"?

16 A.  I was just making stuff up, like I said.

17 Q.  Well, who is Shug?

18 A.  I was talking about Shug Knight, but that's not even-- I

19     don't even know him like that.

20 Q.  But you told the CI that you had been talking to someone

21     about trying to get Mr. Jackson killed?

22 A.  Correct.

23 Q.  And you said that he knows some people that could get to

24     do something?

25 A.  Like I said, I was making up a lot of stuff just off the

1      top of my head.

2   Q.  You said, "I wish I knew somebody to put that," N word,

3      "to sleep"?

4   A.  I mean I've told you that that's what I said, so.  I don't

5      know what else to say.  I'm not denying none of the stuff

6      that's on the tape, I mean I said that.

7   Q.  And this was quite awhile after your wife was indicted,

8      wasn't it?

9   A.  Well, this was after I'm home, my wife is indicted, her

10      father died, and her stepfather dying.  She was going

11      through a lot of stress.

12   Q.  And then after your-- You talked to-- you discussed with

13      the CI all the money you had, didn't you?

14   A.  I didn't have any money.  What money did I have?

15   Q.  The money you had spent, what you had spent money on?

16   A.  Maybe so, if it's on there, yes.

17   Q.  Thousands of dollars a week just on groceries?

18   A.  Yes.  Just boasting and overplaying what I made.  I didn't

19      spend no thousand dollars on groceries.

20   Q.  Well, did you tell him you paid off a Porsche Cayenne?

21   A.  Yes, but I did that with money that I had before.  I

22      bought that car in 2003.

23   Q.  You had a Maserati?

24   A.  Yes.

25   Q.  You leased two Mercedes?

1 A.  Yes.

2 Q.  And the Escalade was paid for?

3 A.  The Escalade, I bought that in 2001.

4 Q.  And you told the CI, "I fucked up a lot of money"?

5 A.  Correct.

6 Q.  And he pointed out you were just driving a truck?

7 A.  Yes.

8 Q.  And you said, "I was hustling"?

9 A.  Yes.

10 Q.  "I always had to hustle"?

11 A.  Not meaning any drugs.

12 Q.  And then after your bond was revoked, your bond was

13    revoked for making these threatening statements, wasn't

14    it?

15 A.  Correct.

16 Q.  And even after your bond was revoked and you were being

17    transported back to Michigan again, you were still talking

18    about wanting to harm the prosecutor, weren't you?

19 A.  No, I wasn't.

20 Q.  But you had told other inmates before about wanting to

21    harm the prosecutor?

22 A.  One time before when, like I said, when I came back when

23    they indicted my wife, I was upset about that.

24 Q.  And you had told the confidential informant about wanting

25    to harm the prosecutor and Mr. Jackson?

1  A.  Yes.

2  Q.  And you must have been really upset when your bond got

3     revoked?

4  A.  No, actually I was more relieved really.

5  Q.  Still didn't want to take out the prosecutor?

6  A.  No.

7  Q.  Or Mr. Jackson?

8  A.  No.

9  Q.  What does hustling mean to you, Mr. Logan?

10  A.  I worked in the rubbish business, so I was getting like

11     cardboard, cans, and stuff like that, that's what I was

12     doing.  I worked for a rubbish company for 20 years, and

13     there was all kind of perks that you can get out of the

14     rubbish.

15  Q.  Well, didn't you tell the CI in the second conversation,

16     "If you making $5,000 a month on the rubbish industry,

17     another $10,000 a month hustling"?

18  A.  That's not true.

19  Q.  Do you deny saying that?

20  A.  No, I might have said that, but that's not true.

21     MR. BRUHA:  Nothing further, your Honor.

22     THE COURT:  Mr. Graham.

23              REDIRECT EXAMINATION

24  BY MR. GRAHAM:

25  Q.  Everything that was said is on the transcript, you have

1    not denied that, correct?

2  A.  No.

3  Q.  Okay.  My question to you is simple:  Did you ever do

4      anything to set in motion any plan or action to harm a

5      witness or Mr. Lennon?

6  A.  No.

7  Q.  Thank you.

8      MR. GRAHAM:  Thank you, your Honor.

9      THE COURT:  Mr. Bruha.

10                    RECROSS EXAMINATION

11    BY MR. BRUHA:

12  Q.  But you said you did?

13  A.  What?

14  Q.  But you said you did?

15  A.  I don't understand the question.

16  Q.  But you said--  You told the CI you had taken steps to try

17      to get Mr. Jackson or the prosecutor killed?

18  A.  Yes.

19      THE COURT:  Mr. Graham.

20      MR. GRAHAM:  Nothing.

21      THE COURT:  You may step down, sir, with the Court's

22    thanks.

23      (At 3:40, defendant excused from the witness stand.)

24      THE COURT:  Mr. Graham, any further proofs?

25      MR. GRAHAM:  No, your Honor.

1     THE COURT:  Let's deal with the objections to the

2     guideline scoring.  First one is on quantity, let's talk

3     about that.

4         Whichever lawyer wishes to go first.

5     MR. GRAHAM:  In regard to quantity, anything over 150

6     kilos, I think, puts us at Level 38.  What we have is

7     evidence of estimates that were made.  Mr. Logan simply

8     doesn't agree with those estimates.  The truth is whatever

9     it is, but there is no hard evidence here, and we made

10     that objection pure and simply because, as Mr. Logan

11     thought back about the quantity, he didn't think it lined

12     up with what Mr. Jackson said.  What we know about

13     Mr. Jackson is he made estimates that he described for you

14     here, and we know he told the grand jury something

15     different, or at least partially different or

16     inconsistent.  And so Mr. Logan simply did not remember

17     the same quantity or amount of money.  It's not a scoring

18     objection, it's simply an, I think an objection against

19     the general 3553(a) factors.  So we do admit more than 150

20     kilos, but the evidence is, we don't accept Mr. Jackson's

21     estimates as being accurate.

22     THE COURT:  All right.  Thank you.

23     Mr. Bruha.

24     MR. BRUHA:  Your Honor, the government acknowledges

25     it has the burden of proof by a preponderance of evidence

1    on drug quantity.  Mr. Jackson's testimony by itself

2    supports a finding of way above, way more than a thousand

3    kilograms of cocaine, based upon the number of loads that

4    were transported by Mr. Logan.  The amount of those loads,

5    I think I added it up.  If you just assume one load a

6    month during the months that Mr. Logan was transporting

7    drugs for Mr. Jackson, that exceeds a thousand kilograms

8    of cocaine.  Mr. Jackson was held accountable for a very

9    conservative amount of over a thousand kilograms of

10   cocaine.  He has testified that all of that cocaine that

11   he was held accountable for was transported by Mr. Logan.

12   There is other information in the presentence report to

13   corroborate the over a thousand kilogram figure.  And I

14   would note that when Mr. Logan had the opportunity to

15   present evidence to the contrary on drug quantity, he did

16   not.  And I submit that the evidence establishes

17   certainly-- certainly well-- certainly by a preponderance

18   of evidence that Mr. Logan distributed and transported in

19   excess of a thousand kilograms of cocaine.

20       THE COURT:  Well, the testimony is fairly clear from

21   Mr. Jackson who, in the Court's judgment, testified quite

22   forthrightly on the issue of-- on the issue of quantity.

23   In the Court's judgment, the government has established by

24   at least a preponderance of the evidence that there was

25   more than 1,000 kilograms of cocaine involved in this

1  conspiracy for which the defendant should be held

2  accountable.

3    Obviously anything over 150 kilograms causes the base

4  offense level to be 38, but the Court does find that the

5  amounts involved here were at least 1,000 kilograms of

6  cocaine.

7    And Mr. Graham, I guess the next one is obstruction.

8    MR. GRAHAM:  Yes, your Honor.

9    The words that were spoken to the confidential

10  informant are undisputed.  The Court not only had a chance

11  to read those when the government made its filing, but it

12  had a chance to listen to the most damning portions of the

13  transcript during the cross examination.  Our position is

14  just really very very simple, because I'm not going to

15  justify for one second any of the words that were spoken

16  to the CI.  They can't be justified.  But the question is

17  whether or not the evidence as a whole establishes

18  obstruction of justice.  I would like to comment on the

19  allegations coming from other sources.

20    The, for me, it's beyond credibility that a finding

21  could be made that these other three inmates were honest

22  when we know a statement is allegedly made in August, is

23  not reported until January, and suddenly three people who

24  have access to each other know these details that just

25  happen to be similar.  There is a-- Mr. Frasier waits five

1    months until the eve of his sentencing, and then writes a

2    letter and to me, I think that that portion of the

3    evidence should be disregarded.

4        In regard to what the CI said, I can only go to the

5    point that I think was clear from the questions, he never

6    intended any of it.  And more importantly, never did one

7    thing to set anything in motion to harm a witness or

8    Mr. Lennon.  Again, I'm not justifying the words, they

9    can't be.  But the question to me is whether or not he

10    intended, and whether or not he did anything in terms of

11    establishing the proof necessary to prove obstruction.

12        Thank you.

13        THE COURT:  Mr. Bruha.

14        MR. BRUHA:  We only have to rely solely on the

15    information of the other jail inmates, your Honor, some of

16    which Mr. Jackson has-- I'm sorry, Mr. Logan has

17    acknowledged because we have similar statements in his own

18    words.  He acknowledges that he made a statement-- a

19    threatening statement about the prosecutor after-- while

20    he was still incarcerated at Newaygo County before he was

21    released on bond.  He continued to make statements about

22    the prosecutor and a federal witness.  Mr. Jackson, while

23    he was released on bond or during the time he was released

24    on bond, in California, he says-- he tells the

25    confidential informant he has taken overt acts in

1    furtherance of those feelings, that he has talked to

2    someone about trying to find someone to harm Mr. Jackson

3    in prison.  And he is still expressing animus toward the

4    prosecutor and expresses the belief that if he takes the

5    prosecutor out, the case will go away.

6        Then we have Mr. Frasier's letter, after Mr. Logan's

7    bond is revoked, expressing similar feelings and providing

8    personal details about Mr. Lennon indicating that someone

9    or suggesting that someone has been following Mr. Lennon

10   to gather that information.  The test is whether Mr. Logan

11   obstructed or attempted to obstruct justice, and in

12   addition to the threatening behavior, he also on tape,

13   told the confidential informant that he had basically told

14   a potential government witness-- a witness that he knew,

15   based upon the statements he made on tape, that had been

16   contacted by law enforcement, not to say anything to law

17   enforcement.  And that alone, the government submits,

18   would constitute obstruction of justice or attempted

19   obstruction of justice.  So taking the evidence as a

20   whole, the government submits that there is a sufficient

21   basis for a finding of obstruction in this case.

22       THE COURT:  Mr. Graham, anything else on this issue?

23       MR. GRAHAM:  No.

24       THE COURT:  All right.  The defendant's explanation

25   for these repeated statements that it was bluster, that he

1    was-- that the statements were made as a product of his

2    angst at the fact that relatives of his, including his

3    wife, were indicted by Mr. Lennon is not credible in the

4    Court's judgment for a number of reasons.

5       First, they're repeated under several different

6    circumstances.  If the defendant's explanation may have a

7    little bit more credibility if he had said it once, never

8    to be repeated again, but in this instance, we have three

9    separate instances where the defendant is making

10    references to the fact that he wishes he could kill the

11    prosecutor, wants to kill the prosecutor, first just

12    before his wife was indicted, just before he bonded out,

13    he made statements-- similar statements to the-- made the

14    first statement at that point, tells the CI through

15    similar statements about killing the prosecutor or and/or

16    Mr. Jackson.  He tells individuals that he had taken steps

17    to accomplish that, and then while I recognize Mr. Logan

18    denies the statement to Mr. Frasier, and I recognize the

19    circumstances that Mr. Frasier was writing his letter

20    immediately before he was going to be sentenced, the

21    statements on the plane are strangely similar to the

22    statements made in other context.  I don't find the

23    defendant's explanation credible at all.

24       And in addition to that, he is advising a witness,

25    who has been contacted by the government, Mr. Massias, not

1    to cooperate.  Now, his explanation is that don't tell the

2    government anything because you don't want to implicate

3    yourself.  Once again, Mr. Massias was in a position to

4    hurt Mr. Jack-- Mr. Logan.  I understand that Mr. Logan

5    was already indicted at that particular point in time, but

6    by his own admission, Mr. Massias was an individual who

7    could give the government information about his

8    activities.  That, in the Court's judgment, is an

9    independent ground for the application of obstruction.

10    And I, having heard the evidence regarding the

11    circumstances of Mr. Jackson's shooting, which I don't

12    understand Mr. Jackson's explanation of why he-- if he was

13    an innocent party to this event, why he at least didn't

14    open his mouth and yell to Mr. Jackson, that only takes a

15    split second, to warn Mr. Jackson that someone was armed

16    with a weapon, with ski masks on are headed towards his

17    car, that takes a split second.  And under the

18    circumstances to say he didn't have time to say anything

19    to Mr. Jackson is just totally lacking in credibility in

20    the Court's judgment, and shows to the Court that

21    Mr. Jackson has got the wherewithal, if you will, to harm

22    other people, if it's in his interest to do so.

23    The evidence of obstruction here is quite clear.  The

24    objection is overruled.  The guideline calls for two

25    levels for obstruction.  And under the circumstances,

1   given the fact that the evidence on obstruction is so

2   strong, based on what I've heard today, and through the

3   papers that I have read, I think clearly denying

4   acceptance is also appropriate.  So acceptance is denied.

5       This is not one of those unusual cases where

6   acceptance should be given when obstruction is assessed,

7   because in the Court's judgment, the testimony as I've

8   said regarding obstruction is particularly strong.

9       Again, I could understand a blustery statement when

10  an individual is mad at a prosecuting official, but not

11  three separate times on three separate occasions.  I take

12  Mr. Graham's point about the two other individuals at the

13  jail.  That appears to me to be the result of

14  conversations between Mr. Frasier and Mr. Harp and

15  Mr. Johnson, and which Mr. Johnson and Mr. Harp may have

16  been jumping on the bandwagon, so I'm not giving what

17  Mr. Harp and Mr. Johnson said any credibility.  But the

18  testimony otherwise is compelling, in the Court's

19  judgment.

20      I believe that exhausts the guideline objections.

21      MR. GRAHAM:  Yes, your Honor.

22      THE COURT:  Okay.  With that, the Court having

23  overruled all of the objections of the defendant, the

24  Court finds that the advisory guideline range in this case

25  is 360 months to life.

1     Mr. Bruha, allocution on behalf of the government,

2   sir.

3     MR. BRUHA:  Is the Court going to make any finding as

4   to the objection on amount of money that the defendant

5   was-- received from this illegal activity?  I think he was

6   disputing that in the presentence report.

7     MR. GRAHAM:  Your Honor, I assumed that your ruling

8   on the quantity kind of went hand in hand with that.

9     THE COURT:  Takes care of that.

10    MR. BRUHA:  Thank you.

11    MR. GRAHAM:  You know, your Honor, if I can make one

12  other point, there is a variance motion that was made, and

13  I just wanted to make sure.

14    THE COURT:  You're next on that.

15    MR. GRAHAM:  Not that, I just didn't know if you

16  wanted hear that before or after, so I'll wait and do it

17  all at once.

18    THE COURT:  I'll give the government the first

19  chance.

20    Mr. Graham, you can make your motion or remind me of

21  the grounds for the motion, because obviously I've read

22  it.

23    Mr. Bruha, go ahead, sir.

24    MR. BRUHA:  Thank you, your Honor.

25    Your Honor, this is big time drug trafficking.  This

1   is major drug trafficking.  Over a thousand-- the

2   defendant has been held accountable for over a thousand

3   kilograms of cocaine, which is approximately six times the

4   amount necessary to trigger the highest offense level

5   under the sentencing guidelines.

6       The Court has heard some of the evidence about the

7   nature and circumstances of the offense, and it has heard

8   more about the history and characteristics of the

9   defendant.  Based upon the testimony of Alvin Jackson,

10   some of which Mr. Logan acknowledges, there is evidence

11   that Mr. Logan stole money, a large amount of money from

12   Mr. Jackson during the course of this conspiracy.  And

13   based upon Mr. Jackson's testimony, and as the Court

14   pointed out, the very weak response by Mr. Logan, there's

15   certainly strong reason to believe that Mr. Jackson was--

16   Mr. Logan rather, was involved in the attempt to again rip

17   off money from Mr. Jackson at the freightliner location

18   where Mr. Jackson was seriously shot and wounded.

19   Mr. Logan ripped off Mr. Jackson once before, it's not

20   hard to believe that he would try to do it again.  And in

21   fact, as we heard on the-- or as we see in the transcripts

22   of the conversations with the confidential informant,

23   Mr. Logan is still trying to get Mr. Jackson's money even

24   after he is indicted in this case.

25       After his Indictment, we have the evidence of his

1    attempt at obstruction of justice by talking about wanting

2    to kill a federal witness or the prosecutor in this case.

3    The government certainly takes such threats very

4    seriously, and such repeated threats are indicative of the

5    kind of individual that Mr. Logan poses.

6        He is talking, while he is on bond, about additional

7    criminal activity.  He is talking about trying to--

8    telling a witness not to cooperate.  He is talking about

9    marijuana grow operations, ripping off a drug dealer,

10    selling stolen Corvette engines, robbing a marijuana

11    dispensary.  I think that kind of conversation, after an

12    individual has been indicted, and is on bond, says a lot

13    about Mr. Logan's state of mind.  I understand that--

14        Does the Court want me to address the variance now or

15    wait until the defense arguments?

16        THE COURT:  Let's hear from Mr. Graham, and then you

17    can respond.

18        MR. BRUHA:  Thank you.

19        THE COURT:  Thank you.

20        MR. BRUHA:  On the basis of the nature and

21    circumstances of the offense, your Honor, and the history

22    and characteristics of this defendant, the government

23    submits that this defendant fully deserves a guideline

24    sentence in this case.

25        THE COURT:  Thank you.

1     Mr. Graham

2     MR. GRAHAM:  Your Honor, I apologize for suggesting

3     that I wasn't going to get a chance, it's always awkward

4     for me when I get a presentence report and it says that

5     there is no basis for a variance or departure, and so then

6     I object to that, and so I never know if that's really an

7     objection or whether it's a separate motion.  That was my

8     only point.  Because, of course, at the end of every

9     report there is commentary on that.

10     Anyway, this is what jumps out at me at the  case.

11     I've said it in the papers, and I'm not going to belabor

12     the point, we have been here awhile this afternoon.

13     I understand that the government has arguments based

14     upon what Mr. Logan did after he was released on bond.

15     And I understand that the Court has to consider those

16     things, and has made some very specific findings about

17     some of those things.  But in regard to the crime itself,

18     the government knowing what the crime was, and knowing

19     what his conduct was, made a plea offer that had a ten

20     year cap.  So apparently the underlying offense was such

21     that the government was satisfied that a ten year cap

22     would adequately address it.  And now, and again, I'm not

23     condoning anything that has happened since.  I'm not

24     condoning anything that-- any of the statements that were

25     made that the Court has found to have been made, but I

1   would note one thing, when that offer was made, whatever

2   happened with Mr. Jackson in this shooting was known to

3   the government.  And it just seems to me to go from

4   something that is acceptable at ten years to 360 to life,

5   just doesn't make sense to me in terms of what is fair for

6   the conduct.

7      The only other thing I would note is, and again, I'm

8   not saying the circumstances are identical, but the only

9   other courier punished in this case received a sentence of

10   36 months.  He was held accountable not for a thousand

11   kilos, but for 660 kilos.  The Court sentenced him and

12   Mr. Emerson and is aware of, I think, the circumstances,

13   so 660 kilos meant 36 months, and so for those two

14   reasons, and then everything else that I have presented in

15   writing that I know the Court has considered, I suggest

16   that a variance is appropriate.

17      And then just so that we are clear about how we were

18   hoping to address the Court when we reached the time for

19   Mr. Logan's allocution, Mr. Terrell is going to address

20   the Court, if that's okay.

21      THE COURT:  Instead of the defendant?

22      MR. GRAHAM:  No, both of them.  Instead of counsel, I

23   guess, when we do allocution, I normally consider there to

24   be counsel's arguments and then the defendant's statement.

25      THE COURT:  Oh, I see what you are saying, okay.

1    That's fine.

2      MR. GRAHAM:  Thank you.

3      THE COURT:  That's fine.

4      Mr. Bruha, do you have any other comments on the

5    issue of the variance?

6      MR. BRUHA:  Yes, your Honor.  I certainly don't see

7    or understand how a plea agreement that is rejected by a

8    defendant somehow serves as a basis for a downward

9    variance.  The plea agreement was entered into before the

10   government had any knowledge of the threats by Mr. Logan,

11   it was before he disputed relevant conduct in this case.

12   Mr. Logan seems to want to have his cake and eat it too,

13   in that he now wants the benefit of a plea agreement--

14   plea bargain that he rejected and that was never accepted

15   by any court.  And the government certainly does not think

16   that that constitutes a basis for any type of downward

17   variance now that the Court has a fuller picture of the

18   defendant's criminal conduct, and his obstruction of

19   justice.  And the Court is aware of the circumstances of

20   the other courier, Mr. Emerson, who cooperated-- unlike

21   Mr. Logan, cooperated immediately, and extensively, and

22   who had very serious health issues.  So I don't think

23   Mr. Logan can compare himself to Mr. Emerson either.

24      And for those reasons, your Honor, the government

25   would ask that the motion for downward variance be denied.

1      THE COURT:  Thank you.

2      Mr. Terrell.

3      MR. TERRELL:  Thank you, your Honor.

4      THE COURT:  Allocution on behalf of the defendant.

5      MR. TERRELL:  Thank you very much, your Honor.

6      Your Honor, I heard the government talk about the

7      history and characteristics of Mr. Logan, and this whole

8      case involves at least characteristics that the government

9      is trying to portray is what has happened in a four year

10     period, approximately 2003 to 2007.  That's why I found it

11     odd when the government talked about Mr. Logan's second

12     wife, when she was murdered, that took place before any

13     drug involvement, but there was some type of inference

14     that Mr. Logan was somehow involved in that.  I don't

15     understand why that was brought up.

16     I'm Mr. Logan's attorney, but I've known Mr. Logan

17     for 40 years.  I know his whole family for 40 years,

18     because we live in the same area, Carson.  And I heard,

19     when Mr. Logan talked about hustling, because he had a job

20     as a rubbish collector for about 15 to 20 years, and I

21     used to see him when I used to jog.  The point that I'm

22     trying to make is that there is a Emond Logan that was not

23     portrayed or demonstrated by the government at all.  A man

24     who, outside of this period in dealing with Mr. Jackson,

25     who by his own admission is a career drug dealer for some

1    over 30 years, Mr. Logan was not.  Mr. Logan has a mother,

2    and a father, brothers and sisters, cousins, and family

3    members, a family person for the super majority of his

4    life.

5       Mr. Logan made mistakes, which this Court has heard.

6    But there is an Emond Logan that the government does not

7    want you to know about.  That Emond Logan was a good

8    citizen who happened to get caught up with a group of bad

9    people, and he made mistakes.  But this man who is now

10   basically fighting for his life, because let's be up front

11   and honest, 360 months to life is a life sentence for

12   Mr. Logan, a man in his fifties.

13      I think this Court received several letters from

14   family members, people who know Mr. Logan.  A person who

15   somehow the government did not see, they're looking and

16   trying to create Mr. Logan as a monster.  Emond Logan is

17   not a monster.  Again, I share with Mr. Graham, cannot

18   condone those comments, but Mr. Logan is not some massive

19   drug kingpin who orders hits on people left and right,

20   left and right.  Mr. Logan is a man who played little

21   league baseball, has his kids in college, raised a family,

22   had a legitimate business for the majority of his life.

23   And what we are trying to do is make sure this Court saves

24   a part of his life outside of being incarcerated.  And I

25   think the letters and the comments, my personal knowledge,

1  not just as an attorney, because as an attorney I have to

2  be an advocate, but as a person who knows him for quite

3  awhile, I would hope the Court would take that into

4  consideration.

5      Thank you, your Honor.

6      THE COURT:  Thank you, counsel.

7      Mr. Logan, is there anything you wish to say, sir, on

8  your own behalf?  You may proceed as you wish.

9      THE DEFENDANT:  I would just like to apologize for my

10  role that I played.  I mean you heard what the prosecution

11  is saying about me, but I didn't have anything to do with

12  trying to kill my brother-in-law or set him up or do

13  anything like that.  Even when Alvin was saying that I

14  came to him, that's not true, he came to me and asked me

15  to do that for him.

16      Never was no intent to try to harm Mr. Lennon or

17  anybody.  Just like I said, I was talking out of my head,

18  and I apologize for that.

19      I got involved with what my brother-in-law and doing

20  things that were wrong, and I shouldn't have done that.

21  But like I said, I apologize to the families that I

22  probably hurt by doing that.  I know pretty much how that

23  feels, because I lost my first wife to crack cocaine, what

24  separated us was drugs.  It hurts too when they try to say

25  that I had something to do with my wife's murder.  I never

1    harmed nobody or never tried to kill anyone.

2        I don't know what else to say, your Honor.  But just

3    hopefully that the Court will have mercy on me and give me

4    the variance that I think I deserve.  I mean I don't see

5    what 30 years is going to do to a man who is 50 years

6    old.  I mean if I get ten years, I'm still going to be

7    almost 60 years old before I get out.

8        Like I said, I apologize for the things that I said.

9    I'm ready for the Court to impose sentence on me.

10       THE COURT:  Thank you, sir.

11       It is the Court's duty to impose a sentence

12   sufficient, but not greater than necessary to comply with

13   the purposes of sentencing set forth in 18 U.S. Code

14   3553(a).

15       The Court recognizes the guidelines are advisory to

16   the Court, but I have taken the guidelines into account as

17   an initial benchmark or starting point when sentencing in

18   this case.

19       I recognize I must make an individualized assessment

20   based on the facts presented.  The guideline range is one

21   of the array of factors warranting consideration.

22       I also fully recognize my discretion in determining

23   an appropriate sentence as recognized by the United States

24   Supreme Court in its decisions in Booker, Kimbrough, Rita,

25   Gall, Spears, and the recent Sixth Circuit case of

1    Herrera-Zuniga.

2       I have considered all of the defendant's arguments in

3    support of his request for a lower sentence.

4       The 3553 factors are the nature and circumstances of

5    the offense, and the history and characteristics of the

6    defendant.  The sentence must reflect the seriousness of

7    the offense; promote respect for law; provide just

8    punishment for the offense; afford adequate deterrence to

9    criminal conduct; protect the public from further crimes

10    of the defendant; provide the defendant with needed

11    medical, educational, and/or correctional treatment; the

12    need to avoid unwarranted sentencing disparity among

13    similarly situated defendants; any guideline policy

14    statements that pertain; and the kinds of sentences

15    available to the Court.

16       The Court has had the benefit of the government's

17    sentencing memorandum as well as the defendant's motion

18    for a variance, the government's memorandum in support

19    thereof, as well as several letters received by the Court

20    on Mr. Logan's behalf.

21       It's clear to the Court that Mr. Logan has the love

22    and support of his family.  He reports to the presentence

23    officer that he had a good childhood.  And to

24    Mr. Terrell's point, which he made eloquently, that for a

25    significant period of time, Mr. Logan was engaged in a

1  legitimate business to support himself and his family.

2  Something, however, went terribly wrong in the middle of

3  the last decade in which Mr. Logan was deeply involved in

4  one of the largest drug conspiracy cases that this Court

5  has seen in my three and a half years on the federal

6  bench.  As the government appropriately points out, the

7  amount of drugs involved here was more than six times the

8  threshold amount for a Level 38 as the base offense level

9  in this case.

10      The charge to which the defendant offered a plea

11  carries a mandatory ten year sentence and a maximum of

12  life.  Clearly that shows congressional and executive

13  branch understanding that the offense to which the

14  defendant has been convicted, is one of the most serious

15  crimes that you can be convicted of under the federal

16  penal code.

17      The Court views the-- this offense, the breath and

18  depth of this conspiracy, in terms of the amount of drugs

19  that were placed on the streets of the State of Michigan,

20  is stunning to me, and I'm just-- as part of my evaluation

21  of this case in terms of what just punishment is for this

22  offense, I've got to be thinking at least in part upon the

23  people who had the opportunity to ingest all of these

24  drugs, whether they be powder cocaine in the fashion that

25  it was delivered from California or whether it was

1    delivered on the streets in some other form.  Obviously

2    this is a powder cocaine case, and I understand that, but

3    the devastation of the amounts of drugs that were part of

4    this conspiracy on the communities in-- mostly, I gather,

5    on the eastern side of the state, this is the sort of

6    activity that has sapped the vitality out of the biggest

7    city in our state, the City of Detroit.  This poison is

8    put out on the streets by individuals like Mr. Logan and

9    Mr. Jackson, and unfortunately, there is a market for it

10   on the streets, and it just devastates communities.  So

11   devastates communities, devastates individuals, and

12   families like Mr. Logan's, with aunts, and uncles, and

13   brothers, and sisters, and youngsters who get hooked on

14   this poison because of the efforts of Mr. Logan and

15   Mr. Jackson and his co-conspirators for what purpose, to

16   make money, to make so much money that they don't even

17   know which end is up, as far as the money flow that is

18   coming in.  A sentence must reflect that devastation to

19   the communities, because it will provide just punishment

20   for the activity.

21       Now, I recognize as based on Mr. Terrell's argument,

22   and based on the letters that I received that, there was

23   at some point in time, Mr. Logan was perhaps on the right

24   track, although I would note that he's got a robbery

25   conviction when he was 26 years old, not a situation where

1    he is committing a robbery under the impulse of being a

2    late teen, but at the age of 26, he is involved in a

3    robbery.  There is a disturbing pattern of violence here

4    which the Court sees in Mr. Logan's record and the

5    incidents that have-- that the Court has heard about here

6    today.

7        He admits stealing a large sum of money from

8    Mr. Jackson before.  In the Court's judgment, based on

9    what I heard in evaluating the credibility of the

10    witnesses who have testified, this was deja vu all over

11    again, in the Court's judgment.  This was a rip off of

12    Mr. Jackson's money at the very least, and I don't accept

13    the defendant's assertions that he was not involved in

14    this-- in this shooting.  It's inconceivable to me how he

15    survived.  And if indeed it was just a robbery, why would

16    Mr. Logan come out scott free without a scratch

17    apparently, when we have two individuals masked, one of--

18    at least one of which has a gun, why is it that Mr. Logan

19    walks away clean?  Why is it that Mr. Logan doesn't even

20    take the millisecond it takes to warn Mr. Jackson about

21    the fact that he is about to get shot?  I couple that with

22    the robbery conviction back when he was age 26, and I see

23    a pattern of the use of violence to accomplish what

24    Mr. Logan wants to accomplish.

25        In the Court's judgment, he is a very severe threat

1    to the public, and my sentence must protect the public

2    from further crimes of this defendant.  He is a high risk

3    for recidivism.

4        Where Mr. Logan went wrong is beyond me.  But he just

5    got involved in this drug culture of money and drugs and

6    just lost, if he had his way, being pro social, he lost

7    it.  And threatening a prosecutor now, and I recognize the

8    defendant's assertion this is all bluster and he didn't

9    intend to do it, but I think-- the Court concludes it's a

10    fair inference, based on this shooting of Mr. Jackson,

11    that Mr. Logan is not telling the truth in regard to

12    whether, if he could, he would accomplish a hit on either

13    Mr. Jackson or Mr. Lennon.  That, in the Court's judgment,

14    of course, I applied two levels for obstruction, but that

15    in the Court's judgment is an aggravating factor within

16    the guideline range which calls for a sentence higher than

17    the minimum guideline range in this particular case.

18        I also must be mindful of general deterrence of

19    others who might contemplate similar drug dealing

20    activity, and I have done so in fashioning a sentence in

21    this particular case.

22        I must impose a sentence sufficient, but not greater

23    than necessary, to comply with the purposes of

24    sentencing.

25        I recognize that Mr. Logan is 50 years old.  And I

1    recognize that this is a sentence of substantial length,

2    may result in Mr. Logan being incarcerated for the rest of

3    his life.  But regretfully, his criminal conduct justifies

4    it, in the Court's judgment.

5        So having considered all of the factors-- 3553

6    factors that the Court is required to consider, I

7    recognize that the guideline range is advisory to the

8    Court.  It's the judgment of the Court that the defendant

9    be committed to the custody of the Bureau of Prisons to be

10   imprisoned for a term of 420 months.

11       Upon release from imprisonment, the defendant shall

12   be placed on supervised release for a term of five years.

13       Within 72 hours of release from custody of the Bureau

14   of Prisons, the defendant shall report in person to the

15   probation office in the district to which he is released.

16       While on supervised release, the defendant shall

17   comply with the mandatory and standard conditions of

18   supervision, including DNA collection, drug testing.  He

19   is not to possess any firearms, destructive devices, or

20   dangerous weapons.

21       Additionally, the defendant shall comply with the

22   following special conditions of supervision:

23       Provide his probation officer with access to any

24   requested financial information.

25       He shall not apply for nor enter into any loan or

1    other credit transaction without the prior approval of his

2    probation officer.

3        The special assessment is ordered of $100 is due and

4    payable immediately.

5        The Court finds the defendant does not have the

6    ability to pay a fine, accordingly, the fine is waived in

7    this case.

8        One more thing on the reasons for my sentence, just

9    to address two other items that Mr. Graham raised, that

10   is, the sentence for Mr. Jackson.  Mr. Jackson got a

11   substantial assistance motion from the government for his

12   cooperation.  That alone distinguishes Mr. Logan's case

13   from Mr. Jackson's case.  In addition to that, Mr. Jackson

14   also got acceptance of responsibility.  As to Mr. Emerson,

15   Mr. Emerson's case is so different than Mr. Logan's that I

16   don't think it needs further reflection.  I gave

17   Mr. Emerson a low sentence, as has been pointed out,

18   Mr. Emerson had health issues, and as the government has

19   pointed out, he immediately cooperated with the

20   government.

21       The last point is the fact that at one point in time,

22   Mr. Logan had a plea agreement that capped his sentence at

23   ten years, number one, that assumes that a Judge on this

24   bench would have accepted that.  That really is not-- is

25   not knowable, obviously.  But I would also note that the

1    defendant apparently rejected that plea agreement

2    protesting his innocence, and I would suspect that the

3    offer was made largely because Mr. Logan, if he had chosen

4    to cooperate with the government, would have been of

5    substantial assistance to the government.  Again, I don't

6    know that, but the whys and wherefores of the plea

7    agreement, in the Court's judgment, are very irrelevant to

8    this sentence simply because it's very similar to a

9    situation where a defendant rejects a plea agreement and

10    chooses to go to trial.  Those are choices the defendant

11    makes.  They have an absolute right to go to trial if they

12    wish.  In this case, the defendant, after reflection,

13    apparently decided that he wished to offer a plea of

14    guilty, for reasons that are not known to the Court, but

15    the fact that he had a more favorable plea agreement at

16    another time is not a factor at all in the Court's

17    judgment, and should not be considered, and has not been

18    considered by the Court.

19        I would also note that the threats to the-- threats

20    to the prosecutor continued.  The shooting regarding Mr.

21    Jackson was known, but the threats to Mr. Jackson and the

22    threats to Mr. Lennon were not known, and that clearly

23    distinguishes Mr. Logan's position now as opposed to if he

24    had chosen to take the plea agreement.

25        Mr. Graham, any recommendations to the Bureau of

1    Prisons that you would like?

2        MR. GRAHAM:  Just that he be housed as close to his

3    family in California as possible.

4        THE COURT:  All right.  So recommended.

5        Mr. Graham, are you satisfied that I've addressed all

6    of your arguments on the record?

7        MR. GRAHAM:  Yes, your Honor.

8        THE COURT:  Any legal objections to the sentence

9    imposed?

10        MR. GRAHAM:  None, other than made.

11        THE COURT:  Thank you.

12        Mr. Bruha, are there counts to be dismissed?

13        MR. BRUHA:  Yes, your Honor.  Pursuant to the terms

14    of the plea agreement, the government moves to dismiss

15    Count Three of the Second Superceding Indictment, and any

16    other Indictments as to this defendant.

17        THE COURT:  Those counts are dismissed pursuant to

18    the plea agreement.

19        Mr. Bruha, any legal objections to the sentence

20    imposed?

21        MR. BRUHA:  No, your Honor.

22        THE COURT:  Mr. Logan, I advise you, sir, you can

23    appeal your conviction if you believe that your guilty

24    plea was somehow unlawful or involuntary, or if there is

25    some other fundamental defect in the proceeding not waived

1    by your guilty plea.

2       You also have a statutory right to appeal your

3    sentence under certain circumstances, particularly if you

4    think the sentence is contrary to law.  However, a

5    defendant may waive those rights as part of a plea

6    agreement, and you have entered into a plea agreement

7    which waives some or all of your rights to appeal the

8    sentence itself.  Such waivers are generally enforceable,

9    but if you believe your waiver is unenforceable, you can

10   present that argument to the appellate court.

11      You have the right to apply for leave to appeal in

12   forma pauperis, if you are poor.  If you wish to do so,

13   with a few exceptions, you need to file the documents for

14   which your attorney is acknowledging receipt on your

15   behalf within 14 days of the entry of the judgment in this

16   case.  If you file the documents, the Clerk of the Court

17   will prepare and file a notice of appeal upon your

18   request.

19      Anything further before I remand the defendant?

20      MR. BRUHA:  No, your Honor.

21      MR. GRAHAM:  No, your Honor.

22      THE COURT:  Defendant is remanded to the custody of

23   the marshal for execution of sentence.

24      COURT CLERK:  All rise, please.

25      Court is adjourned.

1    (At 4:29 p.m., proceedings were concluded.)

2

3

4

5

6                    REPORTER'S CERTIFICATE

7

8

9        I, Kathleen S. Thomas, Official Court Reporter for

10    the United States District Court for the Western District

11    of Michigan, appointed pursuant to the provisions of Title

12    28, United States Code, Section 753, do hereby certify

13    that the foregoing is a true and correct transcript of

14    proceedings had in the within-entitled and numbered cause

15    on the date hereinbefore set forth; and I do further

16    certify that the foregoing transcript has been prepared by

17    me or under my direction.

18

19

20            /s/

21         _____
           Kathleen S. Thomas, CSR-1300, RPR
           U.S. District Court Reporter
22          410 West Michigan
           Kalamazoo, Michigan   49007
23

24

25